**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)**

| | | |
|---|---|---|
| GREATER BALTIMORE CENTER FOR PREGNANCY CONCERNS, INC., | * * * * | |
| Plaintiff, | * * | No. 1:10-cv-00760 MJG |
| v. | * * | |
| MAYOR AND CITY COUNCIL OF BALTIMORE, *et al.* | * * * | |
| Defendants. | * * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**CARE NET, HEARTBEAT INTERNATIONAL, NATIONAL INSTITUTE OF FAMILY
AND LIFE ADVOCATES, AND VITAE FOUNDATION'S
MEMORANDUM IN SUPPORT OF THEIR MOTION TO QUASH SUBPOENAS FOR
DEPOSITIONS AND DOCUMENT PRODUCTION**

<u>Introduction</u>

The Defendants (hereinafter "the City," or Defendants) have decided to use this Court's rules to launch a national fishing expedition into the files of ideological opponents on the abortion issue. They did so by launching seven expansive subpoenas—three for depositions and four for document production—upon four national non-profit pro-life organizations neither located in Maryland nor regulated by the Ordinance. Such harassing and burdensome requests far exceed the discovery the City requested in its Rule 56(f) affidavit on July 16, 2010, on which the Fourth Circuit explicitly relied in remanding the case and specifying that discovery could be sought from Plaintiff.

The City is the entity on trial here. The government passed a compelled speech law so egregious that is presumptively unconstitutional, meaning it must satisfy the "most demanding

1

test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The only grounds for City discovery set forth either in the Fourth Circuit's opinion or in the City's Rule 56(f) affidavit (on which that opinion extensively relies) is to seek discovery from the City's own sources to justify its constitutional burdens, or the Plaintiff or possibly other centers located in Baltimore to determine whether they are commercial speakers. All such information is available from Plaintiff or other sources, not from the Organizations.

The City's subpoenas exacerbate its First Amendment hostility by infringing on the freedom of expressive association of the Organizations. Their  documents and testimony are being demanded not because they are regulated by the Ordinance (they are not) but because the Organizations reside on the opposite side of the abortion debate. But the Organizations exist for entirely expressive purposes, and demanding that they be subject to subpoenas—and massive ones at that—merely because they engage in that associative activity is itself a First Amendment injury. A City that so egregiously regulates speech that it inflicts upon itself the need to sustain "compelling" evidence cannot use its handicap as a sword to attack the freedom of association of speakers nationally. To subject people who speak about an issue to non-party subpoenas simply because the City wants to coerce speech is a perversion of the First Amendment.

The government has the opportunity to support its alleged interests by seeking discovery from the City's own experts and sources, Plaintiff itself, and possibly other entities in Baltimore to ascertain the commercial character or lack thereof of entities regulated by the Ordinance. The City asked this Court for no more in 2010, and the Fourth Circuit sustained no more in its remand. If the government cannot meet its constitutional burden based on all of these available sources, it has failed the scrutiny level applicable to this case. It has no license to probe the nation and demand discovery from its ideological opponents. The subpoenas should be quashed.

**Factual and Procedural Background**

Plaintiffs' complaint challenges Baltimore's ordinance concerning limited-service pregnancy centers, Baltimore City Ordinance 09-252, codified at Baltimore City Health Code §§ 3-501 to 3-506 and Baltimore City Code Art. I, §§ 40-14, 41-14 ("the Ordinance"), on First Amendment grounds. The Ordinance defines limited service pregnancy centers as "any person" in the City "whose primary purpose is to provide pregnancy related services; and [w]ho: (I) For a fee or as a free service, provides information about pregnancy-related services; but (II) Does not provide or refer for: (A) Abortions; or (B) Nondirective and comprehensive birth-control services." *Id.* at § 3-501. The Ordinance's only requirement is that regulated centers provide "clients and potential clients" with a "disclaimer," posted "in the center's waiting room or other area where individuals await service," which disclaimer states that the center does not provider or make referral for abortion or birth control. § 3–502(A).

This Court ruled that the Ordinance is a presumptively unconstitutional regulation of free speech, and therefore the City must satisfy the compelling interest. *O'Brien v. Mayor and City Council of Baltimore*, 768 F. Supp. 2d 804, 814 (D. Md. 2011). It also ruled that "Defendants may not [] use discovery in an attempt to generate justifications for the Ordinance following its enactment." *Id.* at 810 (citing *United States v. Virginia*, 518 U.S. 515, 533 (1996)).

The Fourth Circuit reversed and remanded on narrow grounds. *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 286–87 (4th Cir. 2013) ("*GBCPC, Inc.*"). The Court did not dictate the scrutiny level, but allowed for certain discovery from the Plaintiff and the City's own experts. The Fourth Circuit relied extensively on the Rule 56(f) affidavit of the Special Assistant City Solicitor filed on July 16, 2010. *Id.* at 275–76. That affidavit (Document # 18-6) requests the opportunity to obtain three

3

kinds of discovery, all only from entities within Baltimore, namely: (1) the City's own expert testimony (*id.* ¶¶ 3 & 4); (2) "discovery concerning the advertising that the Pregnancy Center [Plaintiff] and other limited-service pregnancy centers employ" (*id.* ¶ 5); and lastly, (3) "factual support for the City's argument that the services offered by Plaintiffs are a form of commerce" (*id.* ¶ 6). Based on this affidavit, the Fourth Circuit remanded to allow for these kinds of discovery. Specifically, it allowed discovery into the Plaintiff "Center's economic motivation (or lack thereof) and the scope and content of its advertisements" so as to determine whether the commercial speech scrutiny level is appropriate; it allowed discovery into whether a "limited-service pregnancy center's speech" is intertwined with commercial speech, for the same purpose; and it allowed discovery the City could generate itself, such as by experts, "substantiating the efficacy of the Ordinance in promoting public health, as well as evidence disproving the effectiveness of purported less restrictive alternatives." *GBCPC, Inc.*, 721 F.3d at 286–88.

The non-party Organizations are non-profit pro-life groups located in Virginia, Ohio and Missouri. They are not subject to the Ordinance. Care Net, Heartbeat International, Inc. and the National Institute of Family and Life Advocates (NIFLA), are loosely organized networks of pregnancy centers around the United States. Care Net Declaration ¶ 6; Heartbeat Declaration ¶ 6; NIFLA Declaration ¶ 6 (Exhibits 1–3, attached). Affiliates of those organizations are not franchisees and are not subject to any legal control from the Organizations, but "membership" simply entails an exchange of information, ideas and referrals, and a shared mission of speaking on the same issue.  *Id.* Vitae Foundation is an organization that sponsors pro-life advertisements around the country. Vitae Declaration ¶ 5 (Exh. 4, attached). None of the organizations have any locations or employees in Baltimore. Vitae Decl. ¶ 3; NIFLA Decl. ¶ 3; Heartbeat Decl. ¶ 3; Care Net Decl. ¶ 3. None of them have "a waiting room or other area where individuals await service"

in Baltimore, such that the Ordinance's requirement to post disclaimers could apply to them. *Id*. Therefore the Ordinance in no way regulates the Organizations or their speech, and the Organizations are not "limited services pregnancy centers" under it. Yet all of the Organizations are associated for the purpose of promulgating their noncommercial pro-life viewpoint in the United States.

Despite the Organizations' unregulated status under the Ordinance and their lack of any waiting room or location in Maryland (much less Baltimore), and despite the City's Rule 56(f) affidavit never listing discovery from the Organizations as evidence needed prior to summary judgment in this case, on May 29, 2014 the City served seven far-reaching and unbridled subpoenas upon the Organizations that unreasonably demand a plethora of irrelevant and privileged materials, in violation of the Federal Rules of Civil Procedure. Four of these subpoenas seek a variety of documents from the Organizations, including, among others:

- A variety of documents concerning communications with Plaintiff Greater Boston Center for Pregnancy Concerns, including: (1) communications concerning advertising, marketing, referrals, or solicitation of patronage; (2) communications concerning search engine optimization; (3) communications concerning GBCPC's helpline;

- All documents and communications concerning the Ordinance

- Operation manuals

- Forms provided to members or affiliates of the Organizations to complete

- A variety of documents concerning Option Line

- Annual reports of the Organizations

- IRS Form 990 filed by the Organizations from 2011–present

- All documents concerning the topic of whether any advertisement concerning a limited-service pregnancy center is vague, confusing, misleading, or deceptive, including documents concerning whether any individual has been confused, misled, or deceived about the services offered by any limited-service pregnancy center

5

- All documents concerning efforts by the Organizations or their affiliates to target abortion-minded or abortion-vulnerable women for outreach, advertising, marketing, or solicitation activities

As to Vitae Foundation in particular, the City additionally seeks, among others:

- All documents concerning the development of advertisements used in Vitae's 2011 Baltimore Campaign, including market research, focus group findings, and other documents discussing the strategy behind the campaign, the intended targets of the campaign, and the intended outcome

- All documents concerning the development of the advertisements used in Vitae's 2011 Baltimore Campaign, including but not limited to market research, focus group findings, and other documents discussing the strategy behind the campaign, the intended targets of the campaign, and the intended outcome of the campaign

- All documents and communications concerning the Ordinance as well as New York City Local Law 17, including all documents discussing the expected impact of these laws on marketing and advertisements developed and used by Vitae

As to NIFLA in particular, the City additionally seeks, among other things:

- All documents provided to members concerning the process of converting a limited-service pregnancy center to a licensed medical facilities

- All documents concerning training for members and their staff and volunteers

The remaining three subpoenas seek to require Care Net, NIFLA, and Vitae to testify at depositions concerning, among else:

- The three Organizations' history, mission, and organizational structures

- The three Organizations' publications, materials, and other resourced provided to limited-service pregnancy centers

- Efforts by the three Organizations to assist limited-service pregnancy centers or affiliated organizations with advertising, marketing, and/or solicitation of patronage; as to Care Net this includes search engine optimization

- Information regarding Option Line hotline and website from Care Net

- The three Organizations' sources of revenue

- NIFLA's efforts to assist its members with the process of converting a limited-service pregnancy center to a licensed medical facility

- NIFLA's Directors Track course for clinical directors, executive directors, board members, and CEOs

- Vitae Foundation's research-based messaging concerning limited-service pregnancy centers

All subpoenas are attached as Exhibits 5–11.

Pursuant to Fed. R. Civ. P. 45(d), the Organizations object to these subpoenas as unduly burdensome and expensive. The challenged subpoenas demand materials and testimony that are not reasonably calculated to lead to the discovery of admissible evidence. The discovery requested is protected by the First Amendment privilege. The Organizations further object to their subpoenas as requiring disclosure of trade secrets, and/or confidential research, development, or other proprietary information. *See* Fed. R. Civ. P. 45(d)(3)(B). The City can obtain all it needs from its own sources, Plaintiff, or parties actually regulated by the Ordinance. The City's requests exceed the scope of their Rule 56(f) affidavit and the Fourth Circuit's remand. Accordingly, the Organizations respectfully request that this court quash the subpoenas.

## **ARGUMENT**

The City's subpoenas violate the Federal Rules of Civil Procedure. Under Rule 45, a court is required to quash a subpoena that subjects a person to undue burden or would require disclosure of privileged information. Fed. R. Civ. P. 45(d)(3)(A). Courts are permitted to quash subpoenas which seek to disclose trade secrets or other confidential research, development, or commercial information. *See id.* at (d)(3)(B). District courts have broad discretion in resolving discovery disputes. *Mylan Labs., Inc. v. Akzo*, 2. F.3d 56, 64 (4th Cir. 1993).

In evaluating a motion to quash, courts should consider (1) the relevance of the discovery sought, (2) the requesting party's need, and (3) the potential hardship to the party subject to the

subpoena. *Wood v. Town of Warsaw*, No. 2:10-CV-00219-D, 2011 WL 67848797, at *1 (Dec. 22, 2011); *Health & Control, Inc. v. Hester Indus.,* 785 F.2d 1017, 1024 (Fed. Cir. 1986). Discovery should be limited if it is obtainable from another source that is more convenient, less burdensome, or less expensive, or if the burden of the proposed discovery outweighs the likely benefit. *Wood*, 2011 WL 6748797, at *1 (citing Fed. R. Civ. Pro, 26(b)(2)). Importantly, a court should give extra consideration to the objections of non-party witnesses, such as the Organizations, in weighing burdensomeness against relevance. *Indemn. Ins. Co. of N. Am. V. Am. Eurocopter LLC*, 227 F.R.D. 421, 426 (M.D.N.C. 2005).

"'Whether a subpoena subjects a witness to an undue burden . . . usually raises a question of the reasonableness of the subpoena,' an analysis that requires 'weighing a subpoena's benefits and burdens' and 'consider[ing] whether the information is necessary and whether it is available from any other source.' This inquiry is 'highly case specific' and involves 'an exercise of judicial discretion.'" *Maxtena, Inc. v. Marks,* 289 F.R.D. 427, 439 (D. Md. 2012) (citing 9A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2463.1 (3d ed. 2008)).

I.    **Heartbeat was not served a subpoena for deposition or a witness check.**

Unlike the other three Organizations, Heartbeat International was not served with a deposition subpoena or a witness check. See Heartbeat Decl. This violates the service requirements of Rule 45(b), and the fees requirement of Rule 45(b)(1). Counsel for the Organizations was informed by Council for the City that the City takes the position that it served a deposition subpoena and check on Heartbeat. This is contradicted by the attached Affidavits of Service on Heartbeat executed by Ms. Marrah and Ms. Sapp, along with the Heartbeat Declaration of Mr. Godsey, who indicated that the deposition subpoena and check were not in the packet that was served—it only contained the subpoena for documents. *See id.*; Heartbeat

Affs. of Service. To the extent the City will rely on an affidavit by its process server (shown to Counsel for the Organizations), notably that affidavit lacks any signature by Ms. Marrah confirming that she received each of the alleged contents of the packet he claims he delivered. Apparently the process server forgot to include the deposition subpoena and check, but executed affidavits of service for all the documents anyway. These two items were not served.

To the extent that the Court considers the deposition subpoena as having been served on Heartbeat, Heartbeat asks that it be quashed for reasons parallel to the Organizations' arguments contained in the present motion. And if that subpoena is actually served, Heartbeat also requests the opportunity to respond with a timely and specific motion to quash that subpoena.

## II.   The subpoenas violate Rule 56(f) by seeking discovery beyond what was specified in the City's affidavit which the Fourth Circuit sustained.

Fed. R. Civ. P. 56(f) does not permit the City to seek discovery beyond "specified reasons" contained in their affidavit indicating what discovery is needed. But the City's Rule 56(f) affidavit from July 16, 2010 never asked for evidence from national pro-life organizations not regulated by its Ordinance. The Fourth Circuit reviewed that discovery request directly, relied on this affidavit extensively, and remanded based on an analysis tracking only the City's requested items.

The City's affidavit, document # 18-6, asked only for the City's own expert testimony (*id.* ¶¶ 3 & 4), discovery about ads of "the Pregnancy Center" (Plaintiff) and "other limited-service pregnancy centers" (those regulated by the Ordinance) (*id.* ¶ 5), and discovery about the commercial quality of "the services offered by Plaintiffs" (*id.* ¶ 6). In light of this request, the Fourth Circuit's ruling remanded specifically for discovery of the same kind: compelling interest and least restrictive means evidence from the City itself, discovery from Plaintiff or other entities

regulated by the Ordinance, and discovery indicating Plaintiff might be commercial. *GBCPC, Inc.*, 721 F.3d at 286–88.

The Organizations are not the Plaintiff. Their "affiliation" is merely in the character of expressive association, and involves no legal control or franchisee relationship. Vitae Decl.¶ 5; NIFLA Decl. ¶ 6; Heartbeat Decl. ¶ 6; Care Net Decl. ¶ 6. The Organizations are also not regulated by the Ordinance. The Ordinance's only function is to require disclosures in a center's "waiting room" or area where clients wait, but the Organizations have no locations in Maryland (much less in Baltimore). Vitae Decl.¶ 3; NIFLA Decl. ¶ 3; Heartbeat Decl. ¶ 3.Care Net Decl. ¶ 3. The Ordinance does not regulate the Organizations' speech at all. Discovery about their speech is therefore not discovery about the Ordinance, the Plaintiff, or entities the Ordinance regulates.

The City cannot sustain its discovery request on the basis of a free-ranging need to satisfy judicial scrutiny. To do so would convert the handicap of strict scrutiny, which the City inflicted upon itself by passing a law attacking speech, into a sword that can be used to harm First Amendment activity throughout the country. The nature of the City's burden (even if the commercial speech test somehow applied) is a burden belonging to the City—not to every non-party in the United States who advocates on the issue. When the government threatens a constitutional right and must defend its threat, the threat cannot itself be grounds to let the government enslave all citizens in the nation to help the government succeed. If the City does not have enough evidence to meet judicial scrutiny from itself, its experts, the Plaintiff, entities it actually regulates, and the public record, *then the City has failed the test*. It is not entitled to roam throughout the land forcing citizens to turn over private information so that it might uncover evidence it didn't have when it passed its law attacking free speech.

Therefore the discovery sought against the Organizations falls squarely outside the scope of discovery implicated in this case, specifically requested in the City's affidavit, or included in the Fourth Circuit's remand with respect to that specific discovery request and the issue of whether the Plaintiff or entities regulated by the Organizations are somehow commercial. All such evidence, if it exists, is available from the Plaintiff or entities regulated by the Ordinance, and therefore it is unnecessary and burdensome to demand it from non-parties. The Organizations are not within the proper scope of discovery in this case.

### III.    The subpoenas seek information violating the Organizations' freedom of expressive association and protected by the First Amendment privilege.

These subpoenas attack the Organizations' First Amendment rights. Demanding internal communications and information from an advocacy group and communications with those it cooperates with raises a significant potential "for chilling the free exercise of political speech and association guarded by the First Amendment." *Fed. Election Comm'n v. Machinists Non–Partisan Political League*, 655 F.2d 380, 388 (D.C. Cir. 1981).

Permitting these subpoenas would chill the free speech efforts of countless membership groups such as the NAACP, the Sierra Club, and People for the Ethical Treatment of Animals. It would impose a massive chilling effect on speech if every time an organization works with its members to advocate on issues in local parts of the country it subjects the national organization to non-party discovery requests about its goals, its strategies, its communications, and its sources of revenue. The non-party subpoenas in this case are as great a threat to the First Amendment than the Ordinance itself, but with a national instead of a city-wide impact.

Protection of First Amendment interests is *especially* important when discovery is sought from non-parties, because (as applied to the freedom of the press) "the paramount public interest in the maintenance of a vigorous, aggressive and independent press is more likely to outweigh

the duty to testify and the private interests in civil litigation where the reporter is a non-party." *Driscoll v. Morris*, 111 F.R.D. 459, 462 (D. Conn. 1986) (quoting *Continental Cablevision, Inc. v. Storer Broadcasting Co.*, 583 F. Supp. 427, 433 (E.D. Mo. 1984)). "[A] court should give extra consideration to the objections of a non-party witness . . . in weighing burdensomeness versus relevance." *Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC*, 227 F.R.D. 421, 426 (M.D.N.C. 2005).

In granting non-party organizations' motions to quash, the D.C. District Court observed that demanding discovery from advocacy organizations strikes at "the essence of First Amendment freedoms—the freedom to protest policies to which one is opposed, and the freedom to organize, raise money, and associate with other like-minded persons so as to effectively convey the message of the protest." *Wyoming v. U.S. Dept. of Agriculture*, 208 F.R.D. 449, 454 (D.D.C. 2002) (quoting *Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 2 (D.D.C. 2002)).  The First Amendment protects "not only to the organization itself, but also [] its staff, members, contributors, and others who affiliate with it." *Int'l Union v. Nat'l Right to Work Legal Defense and Ed. Found., Inc.*, 590 F.2d 1139, 1147 (D.C. Cir. 1978). "Membership lists are not the only information afforded First Amendment protection." *Wyoming*, 208 F.R.D. at 454.

"[T]he Supreme Court has recognized that in the context of discovery, the First Amendment creates a qualified privilege against disclosure of certain associational information." *In re Motor Fuel Temperature Sales Practice Litigation*, 707 F. Supp. 2d 1145, 1152 (D. Kansas 2010) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)). "In evaluating claims of associational privilege in the discovery context, the Court applies a burden-shifting analysis." *Id.* (citing *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160-61 (9th Cir. 2010); *Wyoming v. USDA*, 239 F.Supp.2d 1219, 1236 (D. Wy. 2002), appeal dismissed as moot, 414

F.3d 1207 (2005); *In re GlaxoSmithKline PLC*, 732 N.W.2d 257, 270-71 (Minn. 2007)). Determining whether the First Amendment privilege applies to a discovery demand is a two-step process. The person or entity invoking the privilege first must make the requisite prima-facie showing—by demonstrating a reasonable probability that "enforcement of the discovery requests will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences [that] objectively suggest an impact on, or 'chilling' of, [First Amendment] rights." *Perry*, 591 F.3d at 1160 (alterations omitted); *Citizens United*, 130 S. Ct. at 916 (acknowledging the "reasonable probability" standard). One notable chill of a group's expressive associational rights is a diminished "effective[ness]" in its "advocacy of both public and private points of view." *NAACP*, 357 U.S. at 460.

Following the prima-facie showing, the burden shifts to the party requesting the discovery to "demonstrate[] an interest in obtaining the disclosures it seeks [that] is sufficient to justify the deterrent effect on the free exercise of the constitutionally protected right of association." *Perry*, 591 F.3d at 1161 (quoting *NAACP*, 357 U.S. at 463) (alterations omitted). This involves a balancing inquiry. *Id.*; *Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 4 (D.D.C. 2002). The party seeking the discovery, to succeed in this balancing analysis, "must show that the information sought is *highly relevant* to the claims or defenses in the litigation—a more demanding standard of relevance than that under [Rule 26]"—that "the information [is] otherwise unavailable," and that "[t]he request [is] carefully tailored to avoid unnecessary interference with protected activities." *Perry*, 591 F.3d at 1161 (emphasis added); *see also Int'l Action Ctr.*, 207 F.R.D. at 4. In close cases where First Amendment rights are implicated, "the tie goes to the speaker," *FEC v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 474 (2007), because

"[i]nfringement of First Amendment interests must be kept to a minimum," *Int'l Action Ctr.*, 207 F.R.D. at 4.

The Organizations are not regulated by the Ordinance and are not plaintiffs in this case. Being an "affiliate" of the Organizations is a purely associative, non-legally controlling relationship in which ideas and referrals are exchanged. Vitae Decl. ¶ 5; NIFLA Decl. ¶ 6; Heartbeat Decl. ¶ 6; Care Net Decl. ¶ 6.[1] Nevertheless the City seeks "*all* documents" concerning efforts by the Organizations, their affiliates, and members to target abortion-minded or abortion-vulnerable women for outreach, advertising, marketing, or solicitation activities, and testimony ranging into all their free speech and associational activities in furtherance of their expressive missions. Such requests strike at the core of the organizational mission of the Organizations. It essentially requires production of all documents related to the main purpose of the Organizations to promote a pro-life message by freely associating with like minded pro-life people and organizations around the country. Compliance with such a request would not only be impossible, but it would cripple and punish the Organizations and their speech, and ironically it would do so *because* the City attacked speech and got sued.

The City's request for documents and testimony would require disclosure of highly sensitive associational data, which in turn implicates the First Amendment right to freedom of association. The City requests both documents and testimony regarding corporate structure, history, operations, missions, communications, and even sources of funding of the Organizations. No group of citizens can associate behind a common expressive cause if, for that reason alone,

---

[1] Once again, if "affiliation" with the Organizations (or cooperative efforts such as with Vitae) involved any legal or franchisee relationship with Plaintiff, as opposed to a mere freely expressive associational relationship, the City would already have access to such evidence from the Plaintiff itself. But despite discovery from Plaintiff, the City lacks any evidence that the Organizations' and Plaintiff's relationship is anything other than a purely expressive relationship, such as occurs when one is a "member" of any other national advocacy organization.

the government can demand they disclose their communications, their sources of revenue and donors, their organizational structure and the way in which they pursue their advocacy goals as they vie against competing viewpoints in the public square. Requiring the Organizations to produce personal, nonpublic, or proprietary communications which express personal, political, and moral views would chill such communications in the future. Vitae Decl. ¶ 6; NIFLA Decl. ¶ 7; Heartbeat Decl. ¶ 8; Care Net Decl. ¶ 8. "Compelled disclosures concerning protected First Amendment political associations have a profound chilling effect on the exercise of political rights." *Perry*, 591 F.3d at 1156 (citing *Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539, 557 (1963)). To justify such demands based on the fact that the City attacked speech in the first place through its Ordinance and now must satisfy judicial scrutiny would be a rationale that cuts off the First Amendment's nose to spite its face.

Among other things, the City demands the Organizations produce documents and testimony about "sources of revenue" and fees. This is a blatant attack on the associative rights of the Organizations' donors and the Organizations themselves. Those who fund the Organizations may wish to remain anonymous, and requiring Organization to disclose the sources of their funds has great potential to chill the association of those individuals and organizations with the Organizations.

The City directly attacks the Organizations' public advocacy efforts by subjecting them to discovery *because they advocate*. The subpoenas attempt to dig into the Organizations communications concerning the Ordinance and similar ordinances around the country—a blatant punishment of the Organizations for exercising their right to speak about important public matters such as these ill-fated laws. Counsel for the City suggested to counsel for the Organizations that the fact that some representatives of Care Net or Heartbeat may have testified

against the Ordinance in Baltimore City proceedings justifies subpoena requests about that testimony. The opposite is true. "The potential chilling effect on political participation and debate is [] substantial" on "the myriad social, economic, religious and political organizations that publicly support or oppose ballot measures." *Perry*, 591 F.3d at 1158; *see also Pleasant v. Lovell*, 876 F.2d 787, 795 (10th Cir. 1989) (the First Amendment protects "advocacy concerning the lawful modification or elimination of the federal tax system"). If citizens know they may be dragged into depositions and be forced to produce documents simply because they testify for or against a proposed law, the chill on core free speech and participation in civic life would be immeasurable. "[A]dvocacy for modification of [] laws" is protected by the First Amendment against discovery requests. *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 2007 WL 852521, at *3 (D. Kan. 2007) (denying motion to compel non-party discovery).

The City's requests would further require the Organizations to disclose the heart of their communications and methods of freely associating with like-minded individuals. Information about membership and associations with expressive organizations are central to the exercise of the First Amendment. *See NAACP*, 357 U.S. at 461–64 (protecting membership information from compelled disclosure); *DeGregory v. Attorney Gen.*, 383 U.S. 825, 828–30 (1966) (preventing compelled disclosure, even from a party, about his relationship with the Communist Party). And as discussed above, this concern is heightened with non-parties. But the City demands the Organizations disclose not only communications with the Plaintiff (which are unnecessary since they are available from the Plaintiff), but also documents and testimony ranging a panoply of communications and exchanges of information with their members that strike at the heart of their expressive relationships, including:

- materials, manuals and forms provided to affiliates concerning training, advertising, marketing, referrals, or converting a facility to do medical services, among other things;

- efforts by the Organizations to communicate with affiliates about their outreach to women considering abortion;

- policies and procedures regarding new members;

- "solicitation of patronage" and search engine optimization

These demands span the gamut of nearly all the communications between the Organizations and the persons and groups with which they associate. The subpoenas impose a scorched earth policy upon the membership relationships within a non-party expressive organization.

The City's demand for information related to Heartbeat's "Option Line" project is likewise improper. Option Line is a service by which if women call a centralized number, she may be referred to a member center near her. Being on Option Line's referral list, like being an affiliate, establishes no legal relationship with entities such as Plaintiff. Heartbeat Decl. ¶ 7; Care Net Decl. ¶ 7. It is a purely expressive sharing of information between Heartbeat and its members, and therefore is fully protected by the First Amendment. Heartbeat and Option Line themselves engage in no advertising in Baltimore. And as with Vitae's ads, Option Line is not regulated by the Ordinance, because Heartbeat has no waiting room in Baltimore. To the extent that women who call it are referred to the Plaintiff, the Plaintiff has information about those calls, or else the City seeks information irrelevant to the Ordinance because it pertains to entities and activities the Ordinance leaves unregulated. Heartbeat's expressive association through Option Line cannot subject them to non-party discovery consistent with the First Amendment, especially in a case such as this where the only issue is whether the City sustain its attack on free speech.

17

The City's broad requests for documents and testimony would also require the Organizations to disclose the strategies and methods by which they compete in the associational marketplace of ideas against (among other organizations) the Center for Reproductive Rights itself (Counsel for the City) and NARAL (the source of this Ordinance).  To subject a non-party to subpoenas about how, why, and where it communicates and pursues its expressive mission would severely undercut the ability of any entity to pursue their associational rights. The requests also seek trade secrets and confidential and proprietary information pertaining to the Organizations' methods of working with local pro-life persons and engaging in their speech. This disclosure would intensely interfere with the Organizations' ability to associate with others in order to engage in strategy with affiliates and members of the Organizations, and would severely damage the Organizations' ability to carry out their missions. Vitae Decl. ¶ 6; NIFLA Decl. ¶ 7; Heartbeat Decl. ¶ 8; Care Net Decl. ¶ 8.

Consequently, there is far more than an "objectively reasonable probability that compelled disclosure will chill associational rights." *In re Motor Fuel*, 707 F. Supp. 2d at 1153. The burden therefore shifts to Defendants to "demonstrate a compelling need for the requested information." *Id*. The factors considered in determining whether a compelling need is established are: (1) the relevance of the information sought; (2) Defendants' need for the information; (3) whether the information is available from other sources; (4) the nature of the information sought; and (5) whether Defendants have placed the information in issue. *Id*. As explained above, these already high burdens imposed by the First Amendment are especially acute when non-party organizations are subpoenaed.

As discussed herein, the information the City requests is irrelevant and unnecessary. It does not pertain to the scope of the Ordinance or the interests it allegedly serves since the

Organizations are not regulated by the Ordinance. Relevant information is readily available from Plaintiff. And neither the City's Rule 56(f) affidavit nor the Fourth Circuit's vindication of the same included the discovery sought from the Organizations. The City cannot meet its burden of establishing a compelling need to violate these non-parties' First Amendment interests. The draconian chilling effect of unfettered non-party subpoenas upon the free speech of non-profit organizations cannot be outweighed by any interest the City could conjure.

**IV.    The City requests information available from other sources that unnecessarily and improperly burdens the non-party organizations.**

Many items the City requests are from the Plaintiff, regulated entities, or the City itself.

To the extent that the Organizations might possess any communications with or information received from Greater Baltimore Center for Pregnancy Concerns, that discovery is (by definition) available to the City already through discovery from the Plaintiff. It is improper to burden the Organizations with responding to non-party discovery for such items, since the City has no need to obtain them from non-parties. To the extent the City asked the Plaintiff for information about the Organizations (and not about the Plaintiff), or which the Plaintiff said it did not have, the City is not entitled to such evidence because it is unrelated to the Ordinance and outside the scope of the City's Rule 56(f) request.

The City's request for information about advertisements that Vitae Foundation ran in Baltimore City busses in 2011 is especially ironic. Counsel for the City indicated to counsel for the Organizations that discovery concerning these ads is justified because somehow they were were deceptive. But the City concedes that all these ads ran on the City's own busses. Thus the City concedes that it *participated* in what it calls a deceptive campaign, but somehow it can justify its Ordinance by obtaining discovery showing that the campaign was deceptive. This is self-contradictory. If the City had an interest, compelling or otherwise, in preventing deception,

it could not under any scrutiny level justify its own promulgation of that exact deception. Counsel for the City suggests that somehow it could be a "less restrictive means" of preventing deception for the City to *engage in the deception itself* (so as to respect the speech in the ad) but later impose a prophylactic speech requirement on a category of speakers because of that deception and whether or not they engaged in that speech. This is impossible to reconcile with *Riley v. National Federation of the Blind*, 487 U.S. 781, 800 (1988), which held exactly the opposite: that the government must pursue measures to stop fraud rather than impose prophylactic speech requirements. Moreover, it contradicts the City's theory of the case (and the precedent on which the Fourth Circuit relied) that the government has an interest against deceptive speech as such which overrides the interests of people seeking to do things like run actually false ads. Under that theory the City had no excuse for countenancing the ads. Of course anyone who looks at the ads (which the City has in its possession) can see they are not deceptive, which is why the City had to run them when requested.

This request is also unnecessary to the point of harassment. By definition the City already has these ads, since the City itself ran them. The ad copy is entirely available without demanding it from the Organizations. What the City really wants is discovery about the intent and discussions behind those ads, and about pro-life associations' strategy in promoting their message nationwide. Asking for this evidence is inimical to Vitae's right to freedom of expression free from government probing, which is squarely implicated by Vitae's running ads about abortion. It is also utterly irrelevant to the issue of whether the ads are "deceptive." Ads are not subliminal—the only extent to which they affect public health, if any, is limited by the four corners of what the ads say. The City already has that information, because it has the ads. The ads also did not list Vitae's contact information, they listed the contact information of the

Plaintiff. Therefore information about who responded to the ads is wholly in the Plaintiff's possession. The City is not entitled to rummage around in the Organizations' inner thoughts—a blatant violation of their First Amendment associative freedoms.

Most importantly, *the Ordinance does not regulate advertising*. Even if Vitae ran these ads again today in Baltimore, they would still not be regulated by the Ordinance. The Ordinance regulates the walls of physical entities in Baltimore, of which Vitae has none. It is not possible for the City's discovery requests from Vitae concerning these ads to produce relevant evidence, because nothing in that request relates to what the Ordinance actually regulates. Nor is such discovery within the scope of the City's Rule 56(f) request for evidence about the Plaintiffs and centers actually regulated by the Ordinance.

The City also unreasonably requests generic information from NIFLA related to the conversion of pro-life centers from being non-medical to being medical facilities. The Ordinance does not regulate this issue in general, or with respect to the Organizations—it only requires signs on waiting rooms located in Baltimore about whether a center offers abortions. It is harassment for the City to use an Ordinance unrelated to a non-profit non-party organization to rummage around the files pertaining to that organization's ideologically motivated activities.

## V.    The subpoenas are overbroad and seek information not reasonably calculated to lead to the discovery of admissible evidence

The sole issue in this case is the constitutionality of Baltimore City Ordinance 09-252. Plaintiffs have brought a facial and/or as-applied challenge arguing that the law is unconstitutional. The Ordinance does not regulate the Organizations and does not even regulate activities within Baltimore such as Vitae's ad campaign. The City requested only a specified scope of information prior to summary judgment, and the Fourth Circuit remanded based on that limited request, namely to determine whether Plaintiff or entities regulated by the Ordinance are

commercial, and to allow the City to attempt to conjure up compelling interest and least restrictive means evidence *from its own sources* such as experts. The Organizations do not have any information that would constitute relevant or admissible evidence within this scope, and any such information is already available to the City from Plaintiff.

The constitutionality of the Ordinance—which in no way regulates the Organizations, since they have no waiting rooms or locations in Baltimore—is not relevant or related to the City's request for documents and testimony about the Organizations' purposes, missions, history, organizational structures, goals, marketing strategies, day-to-day operations, communications and information shared with members, proprietary information, finances, proprietary information and annual reports and IRS filings, all of which the City has demanded. Since the Organizations are not regulated by the Ordinance, information about the Organizations cannot bear on issues justifying any legitimate purpose the Ordinance supposedly serves. The Fourth Circuit specified that the relevant inquiries on remand are the commercial quality or lack thereof of Plaintiffs and other pregnancy centers in Baltimore, and the City's own record and experts to somehow justify the Ordinance's trampling on free speech.

The City has essentially requested that the Organizations produce and each and every document or thing that they have prepared, distributed, or received in the past five years. The City requests practically all information regarding the operations and practices of the Organizations. Such a request is outrageously burdensome and overbroad and cannot possibly be reasonably calculated to lead to admissible evidence, especially since the Ordinance does not regulate the Organizations, and evidence about who it regulates is all available from Plaintiffs or entities actually in Baltimore. Due to the sheer volume of the documents and testimony requested, these requests further subject the Organizations to an undue burden and an extreme

expense. Vitae Decl. ¶ 4; NIFLA Decl. ¶ 5; Heartbeat Decl. ¶ 5; Care Net Decl. ¶ 5. The areas of inquiry as well as the document requests are abusive and constitute an impermissible undue burden and expense on non-party Organizations under Rule 45.

The City's areas of inquiry and its document requests are massively overbroad in scope. All of the requests would impose heavy burdens and costs on all the Organizations, while serving no need or legitimate purpose for the City in this case. It is burdensome to produce "*all* documents" concerning the topic of whether any advertisement concerning a limited-service pregnancy center is vague, confusing, misleading, or deceptive, including documents concerning whether any individual has been confused, misled, or deceived about the services offered by *any* limited-service pregnancy center. The City does not even attempt to limit such request to the issues involved in this case, instead issuing a far-reaching request that implicates limited-service pregnancy centers throughout the entire United States, and certainly not limited to Baltimore.

Similarly, it would be incredibly burdensome and functionally impossible to produce "*all* documents and communications" concerning a New York City law and Vitae's campaign regarding such law, as well as all documents discussing the expected impact of the New York City law on marketing and advertisements used by Vitae. It is difficult to imagine how the request of information regarding a law in a different jurisdiction could possibly be reasonably calculated to lead to admissible evidence regarding the constitutionality of the Ordinance.

## VI.   The subpoenas seek information that comprises protected trade secrets and/or confidential research, development, and/or commercial matter.

"In order to resist discovery on the ground of trade secrecy, the objector must establish that the information sought is a trade secret and that its disclosure would be harmful. The burden then shifts to the opposing party to demonstrate that disclosure is relevant and necessary. The court must then balance the need for disclosure against the injury." *Echostar Communications*

*Corp. v. The News Corp.*, 180 F.R.D. 391 (D.C.Colo.1998). Various requests contained in the subpoenas pertain to information that comprises protected trade secrets and/or confidential research, development, and/or commercially valuable matter. *See* Fed. R. Civ. P. 45(d)(3)(B). To enumerate just a few of the various examples, the City seeks the following protected proprietary information:

- Search engine optimization

- Operation manuals

- Development of advertisements

- Documents provided to members of the Organizations concerning advertising, marketing, referrals to or solicitation of patronage by or for a limited-service pregnancy centers

- Documents concerning efforts to target abortion-minded women for outreach, advertising, marketing, or solicitation activities

- Policies and procedures of the Organizations

- Training materials

- As to Vitae Foundation's 2011 Baltimore Campaign, all documents concerning the development of advertisements, including but not limited to market research, focus group findings

- As to NIFLA, information pertaining to their method of assisting pro-life centers to convert to offering medical services

Compliance with such requests would require the Organizations to produce highly sensitive and valuable information that would be immensely harmful. Vitae Decl. ¶ 7; NIFLA Decl. ¶ 8; Heartbeat Decl. ¶ 9; Care Net Decl. ¶ 9. To require production of such information would require the Organizations to produce information about their strategies, advertising, research, and other commercially sensitive information in furtherance of their organizational mission, of which the Organizations have spent many years developing. *Id.* Even though the

Organizations are non-profit, the assistance and information they offer to local pro-life centers is protected and proprietary. These subpoenas would permit the City and others, including the Organizations' ideological opponents and competitors in public advocacy, to improperly benefit from such confidential proprietary information.

The Organizations have demonstrated a prima facie showing that the documents and testimony requests in the subpoenas is protected proprietary information, and the burden accordingly shifts to the City to demonstrate that disclosure of such requested materials and testimony is relevant and necessary. This it cannot do. For example, disclosure of the Organizations' "search engine optimization" strategies, sensitive proprietary information which the Organizations have undoubtedly spent a great deal of time producing, is neither relevant or necessary to determining the constitutionality of the Ordinance, since the Ordinance regulates none of those things. Likewise, operations, training manuals, and other training or employment information are not pertinent. The Ordinance regulates one thing: the walls of pregnancy centers physically located in Baltimore. Thus the City expressed a need only for discovery from Plaintiff and centers in Baltimore. The City's subpoenas should be quashed.

## CONCLUSION

For the foregoing reasons, the Organizations respectfully request that the Court issue an order quashing the City's subpoenas for deposition and document production.

Respectfully submitted this the 12th day of June, 2014,

Respectfully submitted,

_s/ John R. Garza_ _____
John R. Garza (D. Md. Bar # 01921)
GARZA, REGAN & ASSOCIATES
17 West Jefferson St.
Rockville, MD 20850
(301) 340-8200

(301) 294-6159 fax
jgarza@garzanet.com

Steven H. Aden*
Matthew S. Bowman*
ALLIANCE DEFENDING FREEDOM
801 G St., N.W., Suite 509
Washington, DC  20001
(202) 393-8690
(202) 347-3622 fax
saden@alliancedefendingfreedom.org
mbowman@alliancedefendingfreedom.org

Elissa M. Graves*
ALLIANCE DEFENDING FREEDOM
15100 North 90th St.
Scottsdale, AZ 85260
(480) 444–0020
(480) 444-0028
egraves@alliancedefendingfreedom.org

*Appearing for the purpose of quashing subpoenas pursuant to Local Rule 101(1)(c).*

*Attorneys for Non-Party Organizations: Care Net, Heartbeat International, Inc., National Institute of Family and Life Advocates, and Vitae Foundation.*