**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)**

GREATER BALTIMORE CENTER     *
FOR PREGNANCY CONCERNS,     *
INC.,     *
    *
           Plaintiff,     *        **No. 1:10-cv-00760 MJG**
    *
      v.     *
    *
MAYOR AND CITY COUNCIL OF     *
BALTIMORE, *et al.*,     *
    *
          Defendants.     *
    *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT
OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

UNDISPUTED FACTS ................................................................................................ 2

  I.   Pregnancy Centers Are Part of a Multi-Million Dollar Industry That Utilizes
      Sophisticated Commercial Advertising Techniques to Attract Clients. .............................. 2

  II.  In Baltimore and Throughout the Country, Pregnancy Centers Engage in
      Deceptive Advertising. ....................................................................................... 6

  III. Consumer Confusion About the Scope of Services Offered by Pregnancy Centers
      Poses a Threat to Public Health. ......................................................................... 8

  IV. The City Enacted the Ordinance to Remedy Consumer Confusion About the Scope of
      Services Offered by Pregnancy Centers. ............................................................ 9

  V.   This Case is Currently on Remand From the Fourth Circuit Following the *En Banc*
      Court's Reversal of This Court's Decision Granting Summary Judgment to Plaintiff. ...... 11

ARGUMENT ........................................................................................................ 15

  I.   Summary Judgment Standard. ............................................................................ 15

  II.  The City is Entitled to Summary Judgment on Plaintiff's Free Speech Claim. ................ 15

     A.  The Ordinance is a Permissible Regulation of Commercial Speech. ........................... 16

          1.  Although Not All Pregnancy Center Speech is Commercial,
             the Specific Speech Regulated by the Ordinance is Commercial. .................. 16

          2.  The Ordinance Does Not Regulate Noncommercial Speech by
             Pregnancy Centers. .......................................................................... 22

          3.  The Ordinance is Reasonably Related to the City's Interest in Preventing
             the Deception of Consumers. ............................................................. 24

     B.  Alternatively, the Ordinance is a Permissible Regulation of Professional Speech ....... 28

i

1.  Under the "Sliding Scale" Announced in *Stuart v. Camnitz*, if the Ordinance Regulates Noncommercial Speech, Then it is Subject to Intermediate Scrutiny. .................................................................................. 28

2.  The Ordinance Directly Advances a Substantial Governmental Interest and is Drawn to Achieve That Interest. ........................................................ 30

C.  Plaintiff's Arguments Concerning Strict Scrutiny Are Unavailing. .......................... 31

1.  The Ordinance is Viewpoint Neutral. ............................................................ 31

2.  Although the Ordinance Need Not Satisfy Strict Scrutiny, it Nevertheless Constitutes the Least Restrictive Means of Serving the City's Compelling Interests in Preventing Consumer Confusion and Promoting Public Health. .................................................................................................. 33

a.  The Ordinance Serves the City's Compelling Interests in Protecting Consumers from Deceptive Business Practices and Promoting Public Health. ................................................................ 33

b.  The Ordinance is the Least Restrictive Means of Serving the City's Compelling Interests. .............................................................. 36

III.  The City is Entitled to Summary Judgment on Each of Plaintiff's Remaining Claims. .... 41

A.  Plaintiff's Free Exercise Claim Fails as a Matter of Law .......................................... 41

B.  Plaintiff's Free Assembly Claim Fails as a Matter of Law ........................................ 43

CONCLUSION ............................................................................................................. 43

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Am. Life League, Inc. v. Reno*,
    47 F.3d 642 (1995)............................................................................................33, 34, 36, 41

*Argello v. City of Lincoln*,
    143 F.3d 1152 (8th Cir. 1998) ...............................................................................23

*Bd. of Trustees of the State Univ. of N.Y. v. Fox*,
    492 U.S. 469 (1989)...............................................................................................22

*Bolger v. Youngs Drug Prods. Corp.*,
    463 U.S. 60 (1983).......................................................................................... passim

*Burson v. Freeman*,
    504 U.S. 191 (1992)...................................................................................32, 33, 41

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
    520 U.S. 564 (1997)...............................................................................................18

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980).....................................................................................18, 23, 24, 29

*Centro Tepeyac v. Montgomery Cty.*,
    5 F. Supp. 3d 745 (D. Md. 2014) .................................................................24 n.10

*Chiropractors United for Research & Educ., LLC v. Conway*,
    No. 3:15-CV-00556-GNS, 2015 WL 5822721 (W.D. Ky. Oct. 1, 2015),
    *appeal docketed*, No. 15-6103 (6th Cir. Oct. 7, 2015)...............................15–16 n.5

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010)...............................................................................................36

*Contest Promotions, LLC v. City & Cty. of S.F.*,
    No. 15-CV-00093-SI, 2015 WL 4571564 (N.D. Cal. July 28, 2015),
    *appeal docketed*, No. 15-16682 (9th Cir. Aug. 25, 2015) .................................16 n.5

*Couch v. Jabe*,
    679 F. 3d 197 (4th Cir. 2012) ...............................................................................15

*Dana's R.R. Supply v. Attorney Gen., Fla.*,
    No. 14-14426, 2015 WL 6725138 (11th Cir. Nov. 4, 2015) ......................15 n.5, 29

*Emp't Div., Dep't of Human Res. of Or. v. Smith*,
    494 U.S. 872 (1990)...............................................................................................42

*Evergreen Ass'n, Inc. v. City of New York,*
  740 F.3d 233 (2d Cir. 2014)........................................29, 37, 37 n.13, 38

*Fargo Women's Health Org., Inc. v. Larson,*
  381 N.W.2d 176 (N.D. 1986) ........................................17, 20

*First Resort, Inc. v. Herrera,*
  80 F. Supp. 3d 1043, 1053–54 (2015),
  *appeal docketed*, No. 15-15434 (9th Cir. Dec. 17, 2015).......................19

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.,*
  721 F.3d 264 (4th Cir. 2013) (en banc) ........................................ passim

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.,*
  683 F.3d 539 (4th Cir. 2012), *vacated by* 721 F.3d 264 (4th Cir. 2013) (en banc) ................13

*Ill. ex rel. Madigan v. Telemarketing Assoc., Inc.,*
  538 U.S. 600 (2003)........................................33

*John Doe No. 1 v. Reed,*
  561 U.S. 186 (2010)........................................36

*Libertarian Party of Va. v. Judd,*
  718 F.3d 308 (4th Cir. 2013) ........................................39

*McCullen v. Coakley,*
  134 S. Ct. 2518 (2014)........................................31, 32

*Milavetz, Gallop & Milavetz, P.A. v. United States,*
  559 U.S. 229 (2010)........................................24, 25, 26

*Nat'l Fed'n of the Blind v. Fed. Trade Comm'n,*
  420 F.3d 331 (4th Cir. 2005) ........................................ 33, 38-39

*O'Brien v. Mayor of Balt.,*
  768 F. Supp. 2d 804 (D. Md. 2011), *aff'd in part, vacated in part sub. nom. by*
  *Greater Balt. Ctr. for Pregnancy Concerns v. Mayor & City Council of Balt.,*
  721 F.3d 264 (4th Cir. 2013) (en banc) ........................................12, 13

*Pickup v. Brown,*
  740 F.3d 1208 (9th Cir. 2013) ........................................28

*Plett v. United States,*
  185 F.3d 216 (4th Cir. 1999) ........................................15

*Reed v. Town of Gilbert,*
  135 S. Ct. 2218 (2015)........................................15 n.5, 16, 29, 32

iv

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
   487 U.S. 781 (1988)............................................................................ passim

*S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*,
   483 U.S. 522 (1987)............................................................................17, 20

*San Jose Christian Coll. v. City of Morgan Hill*,
   360 F.3d 1024 (9th Cir. 2004) .......................................................................43

*Stuart v. Camnitz*,
   774 F.3d 238 (4th Cir. 2014), *cert. denied sub nom. by*
   *Walker-McGill v. Stuart*, 135 S. Ct. 2838 (2015) .................................16, 28, 29, 30

*Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*,
   57 F.3d 1317 (4th Cir. 1995) .......................................................................15

*Timilsina v. W. Valley City*,
   No. 2:14-CV-00046-DN, 2015 WL 4635453 (D. Utah Aug. 3, 2015)............................16 n.5

*Tucson Woman's Clinic v. Eden*,
   379 F.3d 531 (9th Cir. 2004) .......................................................................41

*United States v. Playboy Entm't Grp., Inc.*,
   529 U.S. 803 (2000).................................................................................39

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*,
   156 F.3d 535 (4th Cir. 1998) .......................................................................18

*Wollschlaeger v. Governor of Fla.*,
   797 F.3d 859 (11th Cir. 2015) ......................................................................29

*Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio*,
   471 U.S. 626 (1985)............................................................15, 24, 25, 26, 36

## STATUTES

BALT. CITY CODE ART. I, § 40-14...............................................................1, 10

BALT. CITY CODE ART. I, § 41-14...............................................................1, 10

BALT. CITY HEALTH CODE § 3-501............................................................1, 10 n.3, 31

BALT. CITY HEALTH CODE § 3-502................................................................ passim

BALT. CITY HEALTH CODE § 3-503....................................................................10

BALT. CITY HEALTH CODE § 3-506....................................................................10

MD. CODE ANN., HEALTH GEN. § 20-214 ...............................................................11, 41

Administrative Code § 20-816(f).................................................................................37

**OTHER AUTHORITIES**

Balt. City Health Dep't, Final Regulation: Limited-Service Pregnancy Center
    Disclaimers in Baltimore City (Sept. 27, 2010)...........................10, 11, 27 n.11, 38

FED. R. CIV. P. 56(f) ...............................................................................................11

*Find a Pregnancy Center*, CARE NET, http://www.care-net.org/find-a-pregnancy-center ...........21

OPTIONLINE, http://www.optionline.org .................................................................7 n.2

*Worldwide Directory of Pregnancy Help*, HEARTBEAT INT'L,
    https://www.heartbeatinternational.org/worldwide-directory.................................................21

Responding to evidence that limited-service pregnancy centers ("Pregnancy Centers") in Baltimore and throughout the country are engaging in deceptive advertising practices that mislead consumers and endanger the public health, the City of Baltimore enacted Baltimore City Ordinance 09-252 ("Ordinance") (codified at BALT. CITY HEALTH CODE §§ 3-501 to 3-506) (ECF No. 101, Attach. #9) and BALT. CITY CODE ART. I, §§ 40-14, 41-14), *available at* http://baltimorecode.org, in December 2009.  The Ordinance protects consumers by requiring that each Pregnancy Center post a notice in its waiting room or other areas where prospective clients wait for services disclosing that it does not provide abortion services or certain types of birth-control services.

Plaintiff, a Pregnancy Center operating in Baltimore, objects to posting the required notice because it contains the word "abortion."  Yet all of Plaintiff's advertising contains the word "abortion," *see infra* at 7, as does the "Commitment of Care" (annexed hereto as Exhibit 1), GBCPC 000110 that Plaintiff displays "in full view of clients, generally in the reception area," *see* Deposition of Carol Ann Clews ("Clews Dep.") (relevant excerpts annexed hereto as Exhibit 2), 12:5–12.  To this Court, Plaintiff portrays itself as a religious ministry.  But to the public, Plaintiff portrays itself as a business.  Its advertising does not reference Plaintiff's religious affiliation or principles; instead, it promises consumers "free pregnancy tests" and other medical services.  *See infra* at 7.  Further, Plaintiff belongs to the Chamber of Commerce and has a policy of referring to its patrons as "clients."  *See infra* at 5, 20.

Plaintiff's Executive Director admitted that Plaintiff's advertisements are "purposely vague" and lead some women to think that the center provides abortions.  *See infra* at 8, 26.  She complained that the Ordinance hinders Plaintiff's ability to communicate with women who are confused about the services Plaintiff provides, acknowledging that: "If a woman was coming in

1

to get abortion information, or was under the impression for some reason that we do abortions, that sign would certainly interrupt . . . that conversation." Clews Dep. at 24:8–13. The City agrees, and that is precisely the reason it enacted the Ordinance.

Plaintiff and other Pregnancy Centers have no constitutional right to deceive consumers about the services they provide. The modest disclosure requirement imposed by the Ordinance discourages Pregnancy Centers from employing deceptive advertising tactics and ensures that consumers who arrive at a Pregnancy Center seeking birth-control or abortion services are promptly informed that they are in the wrong place. Because the Ordinance withstands review under any level of constitutional scrutiny, this Court should enter summary judgment for the City on all of Plaintiff's claims.

## UNDISPUTED FACTS

**I.  Pregnancy Centers Are Part of a Multi-Million Dollar Industry That Utilizes Sophisticated Commercial Advertising Techniques to Attract Clients.**

Pregnancy Centers are part of a multi-million dollar "industry." Testimony of Jeanneane Maxon, Care Net General Counsel, to Baltimore City Council (Oct. 26, 2009) ("Care Net Testimony") (annexed hereto as Exhibit 3), I-spc37. Most Pregnancy Centers in the United States, including Plaintiff, belong to two umbrella organizations: Care Net and Heartbeat International. *See* Clews Dep. at 29:6–16; 32:14–33:15; *see also* 2006 report prepared for U.S. Representative Henry A. Waxman ("Waxman Report") (ECF No. 18, Attach. #2), 5. Care Net's total revenue was over $4.3 million in 2013, the most recent year for which it provided information during discovery. Care Net 990 Form (annexed hereto as Exhibit 4), N000301. Heartbeat International's total revenue was more than $3.1 million in 2011, the most recent year for which it provided information during discovery. Heartbeat Int'l, 2011 Annual Report

(annexed hereto as Exhibit 5), N000714.  A report cited in the legislative record notes that "[a]nnual combined [pregnancy] center income nationwide is at least $200 million," and that "[w]hile approximately half of the centers nationwide operate with total revenue at or below $125,000 per year, the largest centers have budgets as high as $4 million."  Pregnancy Resource Center Service Report (annexed hereto as Exhibit 6), 31; *see* Testimony of Peggy Hartshorn, Heartbeat International President, to Baltimore City Council (Oct. 27, 2009) (annexed hereto as Exhibit 7), I-spc50; *see also* Waxman Report at 3 ("Since 2001, pregnancy resource centers have received over $30 million in federal funding.").

Affiliates of Care Net and Heartbeat International pay an annual membership fee and, in exchange, receive certain benefits.  As Plaintiff's Executive Director put it, "[W]e pay our dues and we reap the benefits of the organization every year."  Clews Dep. at 30:6–7; *accord* Deposition of Jor-El Godsey ("Godsey Dep.") (relevant excerpts annexed hereto as Exhibit 8); Why Affiliate with Heartbeat International? (annexed hereto as Exhibit 9); Benefits of Being a Heartbeat International Affiliate (annexed hereto as Exhibit 10); Affiliation Costs (annexed hereto as Exhibit 11); Letter from Cynthia Hopkins, May, 15, 2015 (annexed hereto as Exhibit 12), N000984.  The benefits of Care Net membership include a license to use its logo, which is registered with U.S. Department of Commerce's Patent and Trademark Office.  Care Net, Reg. No. 3,820,674 (annexed hereto as Exhibit 13), N000986; Care Net Identity & Logo Usage (annexed hereto as Exhibit 14), N001051–54.  Members are also included in the referral database for Pregnancy Decision Line, "the only national call center and Internet website designed to reach people considering abortion with immediate pregnancy decision coaching, information, and referrals."  Care Net Report, Dec. 4, 2014 (annexed hereto as Exhibit 15).  Similarly, Heartbeat International members are included in the referral database for Option Line, which

"advertises the services of pregnancy help organizations and connects women in need with their nearest Heartbeat International affiliate."  Benefits of Being a Heartbeat International Affiliate. Like the Care Net logo, the Option Line logo is registered as a trademark with the U.S. Department of Commerce.  Letter from Jor-El Godsey, July 6, 2015 (annexed hereto as Exhibit 16), N001070.

Both Care Net and Heartbeat International use sophisticated commercial advertising techniques to advertise the Pregnancy Decision Line and Option Line, and by extension, the Pregnancy Centers, including Plaintiff, that are listed in their databases and receive direct referrals from them.[1]  *See* Heartbeat Int'l, 2011 Annual Report, N000706 (describing the Option Line as "a conduit for national and regional marketing campaigns designed to reach abortion-vulnerable and abortion-minded women").  These techniques include search engine optimization ("SEO"), which is a process that maximizes the number of visitors to a particular website by ensuring that the site appears high on the list of results returned by a search engine.  *See* E-mail from Brad Mandel, President Ad Am. (Jan. 27, 2013, 09:43 PM) (annexed hereto as Exhibit 17), GBCPC 000079–80 ("To reach more at-risk women you need a successful client marketing strategy.  Ad America is an approved vendor for Care Net and Heartbeat.  With proven SEO methods, we can help you get more results with your Google Places listing and website, and bring a more positive user-experience to a girl in crisis to get more calls."); *see generally* Waxman Report at 5–6.  In a 2014 report directed to potential funders, Care Net noted that

---

[1] Indeed, Care Net employs an entire "Marketing/Communication Department," which includes a "Senior Graphic Designer" whose job is to "develop[] and supervise[] production of printed, electronic, and multimedia materials for advertising, publications, conference, Internet applications and websites, and other graphic needs for Care Net."  Care Net, Career Opportunities (annexed hereto as Exhibit 18).

"[a]lmost 85,000 visitors to the [Pregnancy Decision Line] website have been a result of targeted keyword advertising supported by donations."  Care Net Report, Dec. 4, 2014.

Care Net and Heartbeat International also provide members like Plaintiff with general advice and assistance about advertising and marketing their services.  For instance, the President and CEO of Care Net sent Plaintiff's Executive Director an e-mail entitled "Client Marketing after Obamacare."  E-mail from Roland Warren, Care Net President & CEO, to Carol Clews, Exec. Dir. of Greater Balt. Ctr. for Pregnancy Concerns (Nov. 4, 2013, 02:22 PM) (annexed hereto as Exhibit 19), GBCPC 000081–82.  The e-mail contained a link to a recorded seminar designed to address the following topics: "We all know that the Affordable Care Act (aka Obamacare) changes how consumers interact with health insurance companies and providers.  But how will it affect your client marketing?  And how should your center adjust to attract more clients in this new environment?"  *Id.*  Similarly, Heartbeat International offers its members "a web hosting and design service specifically for pregnancy help organizations operated as a program of Heartbeat International."  Frequently Asked Questions about Heartbeat International (annexed hereto as Exhibit 20).

Plaintiff also engages in paid advertising independently of Care Net and Heartbeat International.  It has a standing committee on advertising and marketing.  Clews Dep. at 37:16–38:9.  In recent years, Plaintiff has run ads in the *Pennysaver*, on local radio, and on public buses.  Clews Dep. at 36:12–18; 39:5–19; 58:3–60:1; E-mail from Carol Clews, Exec. Dir. of Greater Balt. Ctr. for Pregnancy Concerns (Jan. 16, 2013, 01:14 PM) (annexed hereto as Exhibit 21), GBCPC 000111–13; Essex Ad (annexed hereto as Exhibit 22), GBCPC 000114; Advertisement (annexed hereto as Exhibit 23), GBCPC 000116.  In addition, Plaintiff is a paying member of the Chamber of Commerce and the Catholic Business Network.  Clews Dep. at 26:6–27:13.

Further, Plaintiff, like many Pregnancy Centers, markets itself as a medical service provider.  It is a member of the National Institute of Family Life Advocates ("NIFLA"), another national association of Pregnancy Centers, which helped Plaintiff undergo a "medical conversion."  National Institute of Family and Life Advocates, Membership Benefits & Services (annexed hereto as Exhibit 24); *see* Deposition of Thomas Glessner ("Glessner Dep.) (relevant excerpts annexed hereto as Exhibit 25), 15:15–16:5 ("The plaintiff is what we consider a medical clinic . . . ."); Clews Dep. at 34:10–18.  Plaintiff tells the public that it has a "medical director," who "[o]versees the medical aspect of the Center."  Clews Dep. at 107:3–5; *see* Glessner Dep. at 82:17–21 ("They have a licensed physician licensed in Maryland to provide medical services who supervises the medical services, they are a medical clinic.").  Plaintiff's Executive Director admitted, however, that the Medical Director is "[v]ery rarely" at the center and does not ever meet directly with center clients.  Clews Dep. at 107:6–11.

## II.  In Baltimore and Throughout the Country, Pregnancy Centers Engage in Deceptive Advertising.

The City enacted the Ordinance in response to evidence presented to the City Council documenting a pattern of deceptive practices by Pregnancy Centers both in Baltimore and nationwide.  The 2006 Waxman Report found that Pregnancy Centers often engage in deceptive advertising and other forms of solicitation to attract women seeking abortion and comprehensive birth-control services to their facilities.  Waxman Report at 1–2.  The Waxman Report's findings were confirmed by a 2008 report ("Maryland Report") that documented similar deceptive practices used by Pregnancy Centers in the State of Maryland, including in Baltimore City.  Maryland Report (ECF No. 18, Attach. #3), 1–10.  After soliciting women seeking abortion and/or comprehensive birth-control services, the centers then use delay tactics to stall women from accessing such services.  6–7.  *Id.* at The City Council also heard testimony from numerous

6

individuals complaining about deceptive practices used by Pregnancy Centers and collected specific examples of deceptive advertising by such centers.  *See, e.g.*, Testimony of Tori McReynolds (ECF No. 18, Attach. #4); Testimony of Jodi Kelber-Kaye (ECF No. 18, Attach. #5).

The legislative record included an on-line advertisement for Option Line, which stated that affiliated pregnancy centers provide the following services: "Abortion and Morning After Pill information, including procedures and risks;" "Medical services, including STD tests, early ultrasounds and pregnancy confirmation;" and "Confidential pregnancy options."[2]  Special Initiatives, Option Line (annexed hereto as Exhibit 26), I-spc190.  The advertisement does not indicate that the "medical services" and "confidential pregnancy options" offered by the centers exclude abortion and comprehensive birth-control services.  *Id.*  Nor does this advertisement—or any other advertisement for Plaintiff Pregnancy Center—indicate that the services provided are religious in nature, or that Plaintiff is a religious ministry.

Discovery has yielded additional evidence of deceptive advertising.  For example, in 2010, Plaintiff participated in a campaign that ran ads on public buses touting "FREE Abortion Alternatives."  Advertisement at GBCPC 000116.  The ads promised "FREE Confidential Options Counseling," "FREE Pregnancy Tests," and "FREE Services," but did not indicate that the featured centers would not provide abortion services or referrals.  *Id.*  Moreover, the ads fail to provide any notice to consumers that Plaintiff "is a Christian pro-life ministry committed to

---

[2] Two Pregnancy Centers in Baltimore, including Plaintiff Pregnancy Center, are affiliates of Care Net.  Care Net Testimony at I-spc37.  Five Pregnancy Centers in Baltimore are affiliates of Heartbeat International.  Testimony of Peggy Hartshorn.  The Option Line internet search tool featured in the advertisement at Exhibit 26 directs consumers to these affiliates.  *See* OPTIONLINE, http://www.optionline.org (last visited Dec. 16, 2015).  If you enter the location "Baltimore, MD" into the search tool, Plaintiff Pregnancy Center is the first result you will obtain.  *Id.*  It is identified as "Center for Pregnancy Concerns (17771)."  *Id.*

exercising its faith through sharing religious truths with women." Pl.'s Summ. J. Br. at 3 (ECF No. 101). After the ads began to run, the Director of Plaintiff's telephone hotline reported an increase in "abortion minded callers" who "were under the impression from the bus advertisements that we assisted in paying for abortions." E-mail from Alice Steck to Carol Clews, Exec. Dir. of Greater Balt. Ctr. for Pregnancy Concerns (Jan. 5, 2011, 10:06 AM) (annexed hereto as Exhibit 27), GBCPC 000117. These women "did not seem to understand 'abortion alternatives' and wanted to schedule an abortion." *Id.* Plaintiffs' Executive Director told the staff member that "those ads are purposely vague, of course." E-mail from Carol Clews, Exec. Dir. of Greater Balt. Ctr. for Pregnancy Concerns, to Grace Morrison, Dev. Coordinator for Balt., Vitae Found. (Dec. 22, 2010, 09:57 AM) (annexed hereto as Exhibit 28), GBCPC 000119.

As a result of such "purposely vague" advertising, some women are misled into thinking that Pregnancy Centers are medical clinics that provide a full range of medical services and do not understand, on arrival at a Pregnancy Center, what kind of facility they are in. *See, e.g.*, Testimony of Tori McReynolds.

### III. Consumer Confusion About the Scope of Services Offered by Pregnancy Centers Poses a Threat to Public Health.

Consumer confusion concerning the scope of services offered by Pregnancy Centers poses a threat to public health by delaying women who seek abortion or birth-control from accessing those services. *See* Declaration of Robert W. Blum ("Blum Decl.") (annexed hereto as Exhibit 29), ¶¶ 7–9. Although abortion is a safe medical procedure, the risks of abortion, as well as the costs, increase as a woman advances through her pregnancy. *Id.* ¶ 8. As a result, the longer a woman is delayed in having an abortion, the riskier and costlier the procedure becomes. *Id.* Similarly, delays in access to the birth-control method of a woman's choice can leave the woman and her partner vulnerable to unintended pregnancy and sexually transmitted disease. *Id.*

8

Delays caused by deceptive advertising are often compounded by delay tactics employed by Pregnancy Centers after consumers arrive there.  *See, e.g.*, Testimony of Jodi Kelber-Kaye. The Maryland Report found that women are encouraged to wait to make the abortion decision because "[a]bortion is legal through all nine months of pregnancy," even though abortion procedures are not available in Maryland through all nine months of pregnancy.  Maryland Report at 6.  Women are also pressured to delay decisions about birth-control and abortion until they undergo additional tests at the Pregnancy Center, such as pregnancy tests and sonograms, which may not be scheduled until weeks after a women's initial visit.  *Id.* at 7.  Plaintiff's Executive Director testified that Plaintiff will not provide a pregnancy test until after a client has undergone counseling at the center.  Clews Dep. at 89:15–90:9; *see* The Client Who Only Wants a Test (annexed hereto as Exhibit 30), GBCPC 000439.  Further, Plaintiff will not perform an ultrasound on a client less than seven weeks pregnant "[b]ecause you cannot absolutely discern a child's beating heart" that early in pregnancy.  Clews Dep. at 102:9–18.  A client less than seven weeks pregnant is asked to return for a sonogram after she reaches seven weeks.  *Id*. at 103:13–19.

## IV.   The City Enacted the Ordinance to Remedy Consumer Confusion About the Scope of Services Offered by Pregnancy Centers.

The City enacted the Ordinance to discourage Pregnancy Centers from running "purposely vague" advertisements that confuse consumers, as well as to ensure that any woman seeking abortion or birth-control services who is drawn to a Pregnancy Center on false pretenses is immediately informed that the Pregnancy Center does not offer the services that she wants.

The Ordinance provides that "[a] limited-service pregnancy center must provide its clients and potential clients with a disclaimer substantially to the effect that the center does not

provide or make referral for abortion or birth-control services."[3]  BALT. CITY HEALTH CODE § 3-502(A).  The Ordinance requires a Pregnancy Center to give this disclaimer through one or more signs that are: "(1) written in English and Spanish; (2) easily readable; and (3) conspicuously posted in the center's waiting room or other area where individuals await service."  BALT. CITY HEALTH CODE § 3-502(B).  The Ordinance authorizes the Health Commissioner to issue a violation notice to a Pregnancy Center that is violating the Ordinance, directing the center to correct the violation.  BALT. CITY HEALTH CODE § 3-503.  Failure to comply with a violation notice is punishable by the issuance of an environmental citation or a civil citation.  BALT. CITY HEALTH CODE § 3-506; BALT. CITY CODE ART. I, §§ 40-14, 41-14.

After the City enacted the Ordinance, the Health Department enacted a regulation concerning its enforcement of the Ordinance.  Balt. City Health Dep't, Final Regulation: Limited-Service Pregnancy Center Disclaimers in Baltimore City (Sept. 27, 2010) ("Regulation") (annexed hereto as Exhibit 31).[4]  As amended, the Regulation clarifies the permissible content of a sign required by the Ordinance by providing that, "[i]f the center provides or refers for some birth-control services, it may indicate on the disclaimer sign what birth-control services it does provide and/or refer for."  Regulation, § (B)(ii).  The Regulation

---

[3] "Limited-service pregnancy center" is defined as "any person: (1) whose primary purpose is to provide pregnancy-related services; and (2) who: (I) for a fee or as a free service, provides information about pregnancy-related services; but (II) does not provide or refer for: (A) abortions; or (B) nondirective and comprehensive birth-control services."  BALT. CITY HEALTH CODE § 3-501.

[4] As explained by Avery Aisenstark, Director of the Baltimore City Department of Legislative Reference, the final regulation is on file in the Department of Legislative Reference, where it is accessible to the public.  *See* Declaration of Avery Aisenstark ("Aisenstark Decl.") (annexed hereto as Exhibit 32), ¶ 8.

further provides that "[a] center may indicate on the disclaimer sign that the sign is required by Baltimore City ordinance."  Regulation, § (B)(iii).

**V.      This Case is Currently on Remand From the Fourth Circuit Following the *En Banc* Court's Reversal of This Court's Decision Granting Summary Judgment to Plaintiff.**

On March 29, 2010, prior to any enforcement of the Ordinance, the Archbishop of Baltimore ("Archbishop"); St. Brigid's Roman Catholic Congregation, Inc. ("St. Brigid's"); and the Greater Baltimore Center for Pregnancy Concerns, Inc. ("Plaintiff Pregnancy Center" or "Plaintiff"), filed this lawsuit against the Mayor and City Council of Baltimore; Stephanie Rawlings-Blake, in her official capacity as Mayor of Baltimore; Olivia Farrow, in her official capacity as Acting Baltimore City Health Commissioner; and the Baltimore City Health Department ("Health Department") (collectively, the "City") to challenge the Ordinance both on its face and as-applied to Plaintiff Pregnancy Center.  Complaint (ECF No. 1).  Plaintiffs claimed that the Ordinance violates their rights to free speech, free assembly, free exercise of religion, and equal protection of the laws as guaranteed by the U.S. Constitution.  *Id.* at 13–16.  Plaintiffs further claimed that the Ordinance violates Section 20-214 of the Maryland Health Code.  *Id.* at 17.  They sought a declaratory judgment that the Ordinance is unconstitutional on its face and/or as-applied to Plaintiff Pregnancy Center and a permanent injunction against enforcement of the Ordinance.  *Id.* at 17–18.

On June 4, 2010, before the deadline for the City to respond to the Complaint had expired, Plaintiffs moved for partial summary judgment.  Pls.' Mot. Partial Summ. J. (ECF No. 9).  They sought judgment as a matter of law on their claims that the Ordinance violated their rights to free speech and equal protection of the laws.  *Id.*  The City responded pursuant to FED. R. CIV. P. 56(f), requesting that this Court dismiss Plaintiffs' motion without prejudice to afford

the City an opportunity to conduct discovery and develop expert testimony.  Reply Supp. Defs.'

Mot. Dismiss & Resp. in Opp'n to Pls.' Mot. Partial Summ. J. (ECF No. 18).

On June 8, 2010, the City filed a motion to dismiss on the grounds that the Complaint

fails to state a claim; the Archbishop and St. Brigid's lack standing; and the Health Department

lacks the capacity to be sued.  Defs.' Mot. Dismiss (ECF No. 11).  At oral argument, the

Plaintiffs agreed to dismiss the claims asserted against the Health Department.  *O'Brien v. Mayor*

*of Balt.*, 768 F. Supp. 2d 804, 808 n.5 (D. Md. 2011), *aff'd in part, vacated in part sub. nom. by*

*Greater Balt. Ctr. for Pregnancy Concerns v. Mayor & City Council of Balt.*, 721 F.3d 264 (4th

Cir. 2013) (en banc).  Otherwise, they opposed the City's motion to dismiss.  Pls.' Opp'n to

Defs.' Mot. Dismiss (ECF No. 17).

This Court disposed of the Plaintiffs' motion for partial summary judgment and the

City's motion to dismiss in a single Decision & Order ("Decision & Order").  *O'Brien*, 768 F.

Supp. 2d 804.  This Court converted the City's motion to dismiss into a motion for summary

judgment and held that, with respect to the Plaintiffs' claims concerning free speech and equal

protection of the laws, the parties' respective motions would be treated as cross-motions for

summary judgment.  *Id.* at 810.  This Court concluded that entry of summary judgment was not

premature, notwithstanding the City's lack of opportunity to conduct discovery, because, in

defending the Ordinance, the City was limited to the evidence in the legislative record and could

not submit any additional evidence.  *Id.*

On the merits, this Court held that the Archbishop and St. Brigid's lacked standing to

challenge the Ordinance.  *Id.* at 812.  As a result, it granted summary judgment to the City on the

claims asserted by those two Plaintiffs.  *Id.* at 812, 818.  It further held that the Ordinance

violated Plaintiff Pregnancy Center's right to free speech and granted summary judgment to

12

Plaintiff Pregnancy Center on its free speech claim. *Id.* at 817. This Court held that the remaining claims asserted by Plaintiff Pregnancy Center were moot in light of the disposition of the free speech claim and dismissed those claims without prejudice. *Id.* On January 31, 2011, this Court entered a permanent injunction against enforcement of the Ordinance. ECF No. 35.

The City appealed, and a divided panel of the Fourth Circuit affirmed the judgment entered by this Court. *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 683 F.3d 539 (4th Cir. 2012), *vacated by* 721 F.3d 264 (4th Cir. 2013) (en banc). Subsequently, on rehearing en banc, the full Fourth Circuit vacated this Court's decision and remanded the case for discovery. 721 F.3d 264, 291 (4th Cir. 2013) (en banc). The en banc court held that this Court had abused its discretion in denying the City's request for discovery, failed to view the legislative record in the light most favorable to the City, and erred in granting summary judgment on the existing record. *Id.* at 281–83, 288. The Fourth Circuit discussed two categories of discovery that would be especially important for the City to obtain on remand: (1) discovery that would help the City establish that consumers are sometimes confused or misled by advertising about the kinds of services that are available at limited-service pregnancy centers, *see id.* at 273–76, 282–83; and (2) discovery that would help the City establish that the disclaimer required by the Ordinance is commercial speech, *see id.* at 275–76, 284–88.

As part of the discovery process that followed, the City served document and deposition subpoenas on Care Net, Heartbeat International, NIFLA, and Vitae Foundation. Those organizations moved to quash the subpoenas, making a blanket assertion of privilege as to all information and documents sought by the City. *See* Mot. to Quash Subpoenas for Deps. & Docs. (ECF No. 60). The Court rejected this assertion of privilege; instead, Magistrate Judge Gesner modified the scope of the subpoenas by imposing "geographic limitations" that limited the

13

requests to information pertaining to limited-service pregnancy centers in Baltimore.  *See* Mem. & Order, Dec. 23, 2014 (ECF No. 77).  Magistrate Judge Gesner then ordered the nonparties to comply with the subpoenas as modified.  *See id.*

Subsequently, the nonparty organizations refused to produce certain documents and answer certain deposition questions that were squarely within the scope of the modified subpoenas.  For example, they refused to provide documents and answers concerning advertising and marketing tools, such as Pregnancy Decision Line and Option Line, that help Plaintiff attract clients; clients they referred to Plaintiff; and communications with Plaintiff about these topics. By letters dated April 17, 2015 (ECF No. 85) and April 27, 2015 (ECF No. 87), respectively, the City and the nonparties requested a conference with Magistrate Judge Gesner to clarify the order entered on December 23, 2014.  Magistrate Judge Gesner held a telephone conference on May 8, 2015, and requested additional submissions from the parties.  On June 16, 2015, Magistrate Judge Gesner entered a Memorandum and Order directing the nonparties to produce documents that they had previously agreed to produce within 21 days, but holding that the nonparties were not required to produce the documents that were the subject of the ongoing dispute.  *See* Mem. & Order, June 16, 2015 (ECF No. 94).  The Memorandum and Order was silent concerning the nonparties' failure to answer deposition questions.  *See id.*  The City appealed the Magistrate Judge's decision to this Court on June 30, 2015 (ECF No. 95), and this Court affirmed it on August 14, 2015 (ECF No. 99).  The City maintains that this Court's ruling was erroneous.

## ARGUMENT

### I.   Summary Judgment Standard.

Summary judgment is appropriate when there is no genuine dispute of material fact and thus, "the moving party is entitled to judgment as a matter of law." *Couch v. Jabe*, 679 F. 3d 197, 200 (4th Cir. 2012) (citing FED. R. CIV. P. 56(a)).  "[T]he mere existence of some disputed facts does not require that a case go to trial." *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995).  Further, "the question of whether a given set of facts entitles a party to judgment is a question of law." *Plett v. United States*, 185 F.3d 216, 223 (4th Cir. 1999).  Here, the undisputed facts demonstrate that the City is entitled to summary judgment on all of Plaintiff's claims.

### II.   The City is Entitled to Summary Judgment on Plaintiff's Free Speech Claim.

The standard to which the Ordinance is subject depends, in large part, on whether it regulates commercial speech or noncommercial speech.  *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983).  Laws that regulate commercial speech by compelling disclosures are permissible if their "disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."[5]  *Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of*

---

[5] Contrary to Plaintiff's argument, the Supreme Court's recent decision in *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), does not require application of strict scrutiny to the Ordinance. *Reed* clarified that "facially content-based" laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." 135 S. Ct. at 2226, 2228.  As explained *infra* at 29, 32, however, *Reed* did not disturb the "many subcategories and exceptions to the rule," including commercial speech, where the Court applies less stringent review. *Id.* at 2235 (Breyer, J., concurring).  Indeed, the courts that have addressed commercial speech regulations post-*Reed* have consistently found that *Reed*'s general rule that content-based restrictions trigger strict scrutiny is inapplicable to commercial speech. *See, e.g.*, *Dana's R.R. Supply v. Attorney Gen., Fla.*, No. 14-14426, 2015 WL 6725138, at *6 (11th Cir. Nov. 4, 2015); *Chiropractors United for Research & Educ., LLC v. Conway*, No.

*Ohio*, 471 U.S. 626, 651 (1985).  Laws that regulate noncommercial speech by compelling disclosures are generally subject to strict scrutiny.  *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015); *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 798 (1988).  If, however, the noncommercial speech is rendered in connection with the provision of professional services, then the court must use a sliding scale to determine the proper level of scrutiny.  *See Stuart v. Camnitz*, 774 F.3d 238, 248 (4th Cir. 2014), *cert. denied sub nom. by Walker-McGill v. Stuart*, 135 S. Ct. 2838 (2015).

The Ordinance regulates commercial speech because it targets speech that solicits consumers to patronize Pregnancy Centers for the purpose of obtaining commercially valuable goods and services.  *See infra* at 16–27.  Therefore, it should be subject to rational basis scrutiny. Ultimately, though, the Ordinance withstands scrutiny under any standard.  *See infra* at 27–41.

### A.  *The Ordinance is a Permissible Regulation of Commercial Speech.*

#### 1.   <u>Although Not All Pregnancy Center Speech is Commercial, the Specific Speech Regulated by the Ordinance is Commercial.</u>

The "core notion of commercial speech" is "speech which does no more than propose a commercial transaction."  *Bolger*, 463 U.S. at 66 (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)) (internal quotation marks omitted); *accord Greater Balt. Ctr.*, 721 F.3d at 284.  Speech outside of this "core notion" may also be classified as commercial based on its context.  *Bolger*, 463 U.S. at 66–67; *Greater Balt. Ctr.*, 721 F.3d at 284.  For example, in *Bolger*, the Supreme Court held that, although an informational

---

3:15-CV-00556-GNS, 2015 WL 5822721, at *5 (W.D. Ky. Oct. 1, 2015), *appeal docketed*, No. 15-6103 (6th Cir. Oct. 7, 2015); *Timilsina v. W. Valley City*, No. 2:14-CV-00046-DN-EJF, 2015 WL 4635453, at *7 (D. Utah Aug. 3, 2015); *Contest Promotions, LLC v. City & Cty. of S.F.*, No. 15-cv-00093-SI, 2015 WL 4571564, at *4 (N.D. Cal. July 28, 2015), *appeal docketed*, No. 15-16682 (9th Cir. Aug. 25, 2015).

pamphlet concerning the benefits of condoms in preventing the spread of sexually transmitted diseases fell outside the core notion of commercial speech, a contextual analysis demonstrated that the pamphlet was quintessentially commercial.  463 U.S. at 66–67.  The Court relied on the fact that the pamphlet was a form of advertising, the pamphlet referred to a specific product, and the pamphlet's author had an economic motivation for disseminating the pamphlet to the public. *Id.*  Similarly, the Supreme Court held that advertisements promoting an athletic event called the "Gay Olympic Games," which was sponsored by a nonprofit corporation dedicated to seeking equal rights for gays and lesbians, constituted commercial speech because the term "Olympic" has value in the commercial marketplace.  *See S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 541 (1987).  And in a case that is exactly on point, the North Dakota Supreme Court held that a Pregnancy Center's advertisements constituted commercial speech because they were placed in a "commercial context."  *See Fargo Women's Health Org., Inc. v. Larson*, 381 N.W.2d 176, 181 (N.D. 1986), cited with approval in *Greater Balt. Ctr.*, 721 F.3d at 286.  In particular, the Court stated that the Pregnancy Center's "advertisements are placed in a commercial context and are directed at the providing of services rather than toward an exchange of ideas."  *Fargo Women's Health Org., Inc.*, 381 N.W.2d at 181.  It concluded that, "[i]n effect, the [Pregnancy Center's] advertisements constitute promotional advertising of services through which patronage of the clinic is solicited, and in that respect constitute classic examples of commercial speech."  *Id.*

Notably, in this case, the Fourth Circuit emphasized that "context matters" when analyzing "the potential commercial nature of speech."  *Greater Balt. Ctr.*, 721 F.3d at 286. That context "includes the viewpoint of the listener" as well as that of the speaker because the interests of consumers are served by "further[ing] the societal interest in the fullest possible

dissemination of information."  *Id*. (quoting and citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561–62 (1980)).  As explained below, the speech regulated by the Ordinance falls within the core notion of commercial speech because it is speech that does no more than propose a commercial transaction.  In addition, the context in which the speech occurs indicates that it should be treated as commercial.

When a Pregnancy Center proposes that a woman patronize its establishment for the purpose of obtaining commercially valuable goods and services—such as "Abortion and Morning After Pill information, including procedures and risks," "Medical services, including STD tests, early ultrasounds and pregnancy confirmation," and "Confidential pregnancy options," Special Initiatives, Option Line at I-spc190—it is proposing a commercial transaction. This is true even with respect to the subset of Pregnancy Centers that operate as nonprofit corporations and/or have religious motivations.  *See Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 573 (1997) (holding, in a challenge brought under the dormant Commerce Clause, that a nonprofit summer camp with a religious mission engaged in commercial transactions: "Even though petitioner's camp does not make a profit, it is unquestionably engaged in commerce, not only as a purchaser, but also as a provider of goods and services." (citations omitted)); *Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 156 F.3d 535, 541 (4th Cir. 1998) (holding that a nonprofit environmental organization engaged in a commercial transaction when it accepted a donation of commercially valuable land: "[T]he dispositive inquiry is whether the *transaction* is commercial, not whether the *entity* engaging in the transaction is commercial."); *see also* Deposition of Anirban Basu ("Basu Dep.") (relevant excerpts annexed hereto as Exhibit 33), 108:1–111:5 (explaining that an organization's status as a not-for-profit for tax exemption purposes is not indicative of whether it engages in commercial

18

activities).[6]   Indeed, a district court in California recently upheld an ordinance prohibiting misleading advertising by Pregnancy Centers as a permissible regulation of commercial speech. *First Resort, Inc. v. Herrera*, 80 F. Supp. 3d 1043, 1053–54 (2015), (granting summary judgment to the City), *appeal docketed*, No. 15-15434 (9th Cir. Dec. 17, 2015).

The Ordinance regulates Pregnancy Centers' proposals to provide commercially valuable goods and services to the public.   The record in this case demonstrates that Pregnancy Centers, including Plaintiff, offer a variety of goods and services to consumers, including counseling, pregnancy testing, sonograms, maternity and infant items, and educational programs.   Special Initiatives, Option Line at I-spc190.   They promote these goods and services through traditional advertising, internet advertising, in-person solicitation, signage, and other methods.   Plaintiff, for example, has promoted its services to the public through advertisements in the *Pennysaver*, radio ads, and in 2010, a $30,000 campaign that placed ads inside municipal buses.   Campbell Associates, Invoice (annexed hereto as Exhibit 34), N00911; *see supra* at 5, 7–8, 40 n.15.   Even though the Ordinance does not require the mandatory disclosure to appear directly on Pregnancy Center advertisements and other forms of solicitation, it regulates these forms of speech by mitigating the confusion and deception that arises from them.[7]   Accordingly, the speech

---

[6] Indeed, in his expert declaration, Mr. Basu explains that a nonprofit, mission-driven organization is capable of engaging in commercial transactions regardless of whether the organization is primarily motivated by religious or moral beliefs rather than a desire to earn a profit.  Declaration of Anirban Basu ("Basu Decl.") (annexed hereto as Exhibit 35), ¶ 5.  No one would doubt that the purchase or sale of property is a commercial transaction, even when the Catholic Church is the buyer or seller.

[7] Rather than requiring that Pregnancy Centers post the mandatory disclosure on their premises, the City could have required that they include the mandatory disclosure in all of their advertising and other forms of solicitation.  But the method that the City chose has three distinct advantages over this alternative: it is less burdensome for Pregnancy Centers; it is easier to enforce; and it

regulated by the Ordinance is speech that does no more than propose a commercial transaction. It therefore falls within the core notion of commercial speech. *See Bolger*, 463 U.S. at 66.

In addition, contextual analysis of Pregnancy Center advertisements and other forms of solicitation provides further support for the conclusion that these forms of speech are commercial. Like the pamphlet at issue in *Bolger*, Pregnancy Center solicitations refer to specific products and services. *Id.* at 66-67. Like the term "Olympic" in *San Francisco Arts & Athletics, Inc.*, the goods and services promoted by Pregnancy Centers have value in the commercial marketplace.[8] *See* 483 U.S. at 541. And like the Pregnancy Center solicitations at issue in *Fargo Women's Health Organization, Inc.*, the Pregnancy Center solicitations at issue here are directed at the provision of goods services rather than toward an exchange of ideas, and they promote those goods and services for the purpose of soliciting Pregnancy Center patronage. *See* 381 N.W.2d at 181.

In addition, Plaintiff presents itself to the public as a business enterprise. Its advertisements do not mention a religious or advocacy mission, but rather, tout "medical services" and "prenatal vitamins." Special Initiatives, Option Line at I-spc190; Essex Ad at GBCPC 000114. It is a dues-paying member of the Chamber of Commerce, Clews Dep. at 26:6–27:4, and refers to its patrons as "clients," *id.* at 13:18–21. Further, it has affiliated with two national umbrella organizations—Care Net and Heartbeat International—that provide it with highly sophisticated advertising and marketing assistance, including use of registered trademarks

ensures that every woman who actually enters a Pregnancy Center seeking abortion or comprehensive birth-control services is informed that she is in the wrong place.

[8] Indeed, a report cited in the legislative record estimated that the total value of the services provided by Pregnancy Centers in 2010 was $100,888,000 based on data provided by affiliates of Care Net, Heartbeat International, and NIFLA. Pregnancy Resource Center Service Report, at 1; *see* Heartbeat Int'l, Affiliate News (annexed hereto as Exhibit 36), N001062–69.

and search engine optimization, *see supra* at 4, as well as a third national organization, NIFLA, that provides it with guidance about how to present itself to the public as a "medical practice," just like "other medical clinics."   Glessner Dep. at 56:19–57:21; 71:8–72:21; Clinic Tips (annexed hereto as Exhibit 37), N000882–83.   Care Net and Heartbeat International maintain databases of pregnancy centers throughout the United States and, through their marketing and advertising endeavors, provide direct referrals to affiliated Pregnancy Centers, including Plaintiff. *Find a Pregnancy Center*, CARE NET, http://www.care-net.org/find-a-pregnancy-center (last visited Dec. 17, 2015); *Worldwide Directory of Pregnancy Help*, HEARTBEAT INT'L, https://www.heartbeatinternational.org/ worldwide-directory (last visited Dec. 17, 2015).   Care Net operates the Pregnancy Decision Line and Heartbeat operates the Option Line, both of which reach potential clients via websites that purport to offer information about pregnancy, abortion, and contraception (including specifically, the "morning after pill"), and toll-free call centers that are staffed 24/7.   Consumers are referred to affiliate Pregnancy Centers in their area through both the websites and the toll-free hotlines for the Pregnancy Decision Line and the Option Line. Indeed, on the Care Net and the Heartbeat International websites, a search for affiliated centers in the Baltimore area yields the Plaintiff Pregnancy Center as one of the top results.   *Find a Pregnancy Center*, CARE NET (search zip code "21224"); *Worldwide Directory of Pregnancy Help*, HEARTBEAT INT'L (search Country "United States" and City "Baltimore").

Every time Pregnancy Centers promote their goods and services in the commercial marketplace—whether through the Pregnancy Decision Line and the Option Line, radio ads, bus ads, oral solicitations by Pregnancy Center staff for women calling a toll-free hotline, or other methods—they are engaging in commercial speech.

**2.**   **The Ordinance Does Not Regulate Noncommercial Speech by Pregnancy Centers.**

Of course, not all Pregnancy Center speech is commercial speech.  For example, a conversation between a Pregnancy Center staff member and a consumer about abortion's risks and alternatives, just like a conversation between a doctor and a patient about abortion's risks and alternatives, is plainly noncommercial.  But the Ordinance does not regulate any aspects of Pregnancy Centers' noncommercial speech.  In particular, the Ordinance does not regulate the manner in which Pregnancy Centers discuss abortion or birth-control services with consumers. *See* BALT. CITY HEALTH CODE § 3-502.  Furthermore, it does not prevent Pregnancy Centers from telling consumers that they believe abortion and certain methods of birth-control are immoral or unhealthy.  *See id.*  It requires only that Pregnancy Centers disclose via a posted sign that they do not provide abortion or comprehensive birth-control services and that they do not refer consumers to providers of those services.  *See id.*  Accordingly, the speech regulated by the Ordinance is purely commercial speech.

The Supreme Court has explained that, where the commercial elements of speech are discreet from the noncommercial elements, the two must be treated separately.  *See Bd. of Trustees of the State Univ. of N.Y.* v. *Fox*, 492 U.S. 469, 474–75 (1989) (finding speech that functioned both to teach home economics and sell housewares to be commercial).  In conformity with the Supreme Court's guidance on this issue, the written disclosure required by the Ordinance regulates Pregnancy Centers' commercial speech, but has no impact on any other, noncommercial speech that might occur at a Pregnancy Center.[9]

---

[9] Unlike the challenged speech in *Riley*, 487 U.S. 781, the disclosure required by the Ordinance is not intertwined with any speech of a noncommercial nature.  *See id*. at 796 (explaining that

For example, the Ordinance does not regulate the manner in which Pregnancy Centers discuss abortion or birth-control services with consumers.  *See* BALT. CITY HEALTH CODE § 3-502.  Nor does it prevent Pregnancy Centers from attempting to persuade women not to have abortions or to use birth-control, or telling them that abortion and certain methods of birth-control are immoral or unhealthy.  *See id.*  Instead, the Ordinance's written disclosure requirement clearly distinguishes between the commercial aspects of the Centers' identity (namely, the scope of the pregnancy-related services they provide), and the noncommercial aspects, such as religious speech and messages (which are not impacted by the Ordinance).  *Cf. Argello v. City of Lincoln*, 143 F.3d 1152, 1153 (8th Cir. 1998) ("There is a distinct difference between the offer to tell a fortune ('I'll tell your fortune for twenty dollars.'), which is commercial speech, and the actual telling of the fortune ('I see in your future . . . .'), which is not.").

Furthermore, the fact that Pregnancy Centers engage in noncommercial speech does not, as Plaintiff argues, immunize them from reasonable regulations targeted at the commercial aspects of their speech.  The dispositive consideration in determining whether speech is commercial is not the subject matter that the speech addresses, but whether the speech proposes a commercial transaction.  *See Bolger*, 463 U.S. at 67–68; *Cent. Hudson*, 447 U.S. at 562 n.5.  As the Supreme Court explained in *Bolger*, the fact that an advertisement "links a product to a current public debate" does not transform it into noncommercial speech entitled to heightened First Amendment protection.  463 U.S. at 67–68 (internal quotation marks omitted); *accord Cent. Hudson*, 447 U.S. at 562 n.5 (distinguishing between "direct comments on public issues,"

---

when "the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase").

which constitute noncommercial speech, and "advertising that links a product to a current public debate," which are commercial).

In view of the Supreme Court's clear guidance on this issue, this Court should reject Plaintiff's attempt to classify the disclosure required by the Ordinance as a regulation of noncommercial speech on a matter of public concern.  Like the pamphlet advertisements at issue in *Bolger*, a Pregnancy Center's advertisement of commercially valuable goods and services to consumers is commercial speech, notwithstanding that the speech touches on abortion and birth-control, which are important topics of public debate.  *Cf. Bolger*, 463 U.S. at 67–68.  The required disclosure regulates only commercial speech, and does not prevent or otherwise regulate Pregnancy Centers' noncommercial, religious expressions.  Such speech is completely distinct from Pregnancy Center solicitations and advertisements and therefore it is not "inextricably intertwined" with commercial speech.[10]

### 3.     The Ordinance is Reasonably Related to the City's Interest in Preventing the Deception of Consumers.

Mandatory disclosures regulating commercial speech are permissible so long as they are reasonably related to the State's interest in preventing deception of consumers.  *Zauderer*, 471 U.S. at 651; *accord Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 247–48 (2010).  The Ordinance satisfies this requirement.

---

[10] In holding that a Montgomery County regulation requiring Pregnancy Centers to post signs informing clients of certain information—namely, that the Pregnancy Center does not have a licensed medical processional on staff and that the health department recommends pregnant women consult a health care provider—failed to further a compelling government interest, the District Court of Maryland failed to appropriately consider whether the regulation at issue targeted misleading advertising as commercial speech, and therefore failed to apply the appropriate standard of review under *Greater Balt. Ctr.*, 721 F.3d 264.  *Centro Tepeyac v. Montgomery Cty.*, 5 F. Supp. 3d 745 (D. Md. 2014).  Here, however, the City's evidence demonstrates that the Ordinance targets deceptive advertising by Pregnancy Centers, and further, that such deceptive advertising poses a threat to the public health.

As explained by the Supreme Court in *Zauderer*, "[b]ecause disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech, warnings or disclosures might be appropriately required in order to dissipate the possibility of consumer confusion or deception."  471 U.S. at 651 (alterations omitted) (internal quotation marks omitted).  The Court upheld the required disclosure at issue, which required attorneys who advertised contingency-fee services to disclose in their advertisements that a losing client might still be responsible for certain litigation fees and costs.  *Id.* at 630–31.  The Court ultimately concluded that "an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."  *Id.* at 651.

Applying the same deferential standard in *Milavetz*, the Court held that the mandatory disclosure—requiring plaintiff to "identify itself as a debt relief agency and include certain information about its bankruptcy-assistance and related services"—was "'reasonably related to the [Government's] interest in preventing deception of consumers.'"  *Id.* at 252–53 (alteration in original) (quoting *Zauderer*, 471 U.S. at 651)).  With respect to the evidence regarding whether plaintiff's advertisements were misleading, the Court applied a deferential standard, explaining: "Evidence in the congressional record demonstrating a pattern of advertisements that hold out the promise of debt relief without alerting consumers to its potential cost is adequate to establish that the likelihood of deception in this case 'is hardly a speculative one.'"  *Id.* at 251 (citation omitted) (quoting *Zauderer*, 471 U.S. at 652).  The *Milavetz* Court unanimously upheld the required disclosure, which mandated only "an accurate statement" of the advertiser's identity and "the character of the assistance provided."  *Id.* at 250.  Such a disclosure, the Court found, was "intended to combat the problem of inherently misleading commercial advertisements."  *Id.*

Here, it is plain that the Ordinance satisfies the deferential standard of review for

disclosure requirements related to misleading commercial speech.  The mandated disclosure, like those in *Zauderer* and *Milavetz*, is reasonably related to the government's interest in protecting consumers from deception and confusion.

Far from being speculative, the potential misleading nature of Pregnancy Center advertisements is part of the evidence that was produced during discovery in this case.  In response to an advertising campaign run on city buses, the Plaintiff Pregnancy Center received inquiries from a number of women who were, in reality, seeking assistance in obtaining abortion services.  *See* E-mail from Alice Steck to Carol Clews, Exec. Dir. of Greater Balt. Ctr. for Pregnancy Concerns (Jan. 5, 2011, 10:06 AM), GBCPC 000117.  Indeed, Plaintiff's Executive Director made clear that these ads were "purposely vague" about what services are available at the Center, in order to deliberately target women who are "very seriously considering having an abortion."  *See* E-mail from Carol Clews, Exec. Dir. of Greater Balt. Ctr. for Pregnancy Concerns, to Grace Morrison, Dev. Coordinator for Balt., Vitae Found. (Dec. 22, 2010, 09:57 AM), GBCPC 000119; Clews Dep. at 64:12–65:5 ("Q: So, would it be fair to say that part of the reason why the ads are purposely vague is to reach women who are abortion minded, so they will call over to the Pregnancy Center? A: I would say that is fair.").

In addition to remedying the deceptive nature of the advertisements and promotions by Pregnancy Centers regarding the services they offer and/or provide referrals for, the City's Ordinance also serves the government's interest in protecting the public health.  In particular, women who are young, poor, and/or less educated are more vulnerable to being deceived by Pregnancy Centers that do not adequately inform consumers about the scope of services they provide.  Blum Decl. ¶ 9.  Such women are already less likely to have "general knowledge and access to accurate reproductive health information than other consumers." *Id.*  Moreover, as

26

explained by the City's medical expert, Dr. Robert Blum—who is the William H. Gates, Senior

Professor and Chair, Department of Population, Family, and Reproductive Health at the Johns

Hopkins Bloomberg School of Public Health—women who are making decisions around family

planning or pregnancy-related care need timely access to the services they seek, because these

services are frequently time-sensitive.  *Id.* at ¶ 8.   When women are delayed in accessing

comprehensive information, they may be subject to increased health risks and obstacles,

including the risk of unintended pregnancy, sexually transmitted infection, and delayed abortion

care.  *Id.* ¶¶ 7–8.   Thus, the Ordinance provides such women with key information about the

availability of health care services at Pregnancy Centers.  This in turn promotes their ability to

make fully informed, autonomous decisions about family planning and/or pregnancy-related

care, and to access the services they seek in a timely manner.  *Id.* ¶¶ 6–7.

In sum, the Ordinance's requirement that Pregnancy Centers post a descriptive sign in

their waiting rooms or other areas where prospective clients wait for services is reasonably

related to the City's important interest in preventing deception of potential customers that enter

the Centers seeking services, and promoting the public health.  Accordingly, this Court should

grant summary judgment in favor of Defendants.[11]

---

[11] Plaintiff claims that they provide information about "abstinence and natural family planning" and thus the Ordinance requires them to lie by saying they do not provide or make referrals for birth-control services. Pl.'s Summ. J. Br. at 8. Yet Plaintiff's Commitment of Care clearly states that it does not "offer, recommend or refer for . . . abortifacients (birth control)." *See* Commitment of Care at GBPCPC 000110; Clews Dep. at 14:3–12.  Similarly, as Plaintiff's Executive Director admitted, the Pregnancy Center's policies and procedures manual has a section entitled "Why We Don't Refer for Contraceptives" that says nothing about abstinence but clearly states that Plaintiff "doesn't refer clients for contraceptives for a number of reasons." Clews Dep. at 53:11–54:11.  In any event, the Regulation expressly allows a Pregnancy Center's disclaimer to state what birth control it does provide, and if it provides some methods but not comprehensive methods. *See* Regulation.

**B. Alternatively, the Ordinance is a Permissible Regulation of Professional Speech.**

As described *supra* at 16–27, this Court should subject the Ordinance to rational basis review only. However, if this Court determines that the Ordinance regulates noncommercial speech, intermediate scrutiny, not strict scrutiny, is the proper level of review for the Ordinance as a regulation of professional speech under the Fourth Circuit's controlling decision in *Stuart v. Camnitz*. 774 F.3d at 248. Nevertheless, regardless of the level of scrutiny this Court chooses to employ, the outcome will be the same: the Ordinance will survive constitutional review.

1. **Under the "Sliding Scale" Announced in *Stuart v. Camnitz*, if the Ordinance Regulates Noncommercial Speech, Then it is Subject to Intermediate Scrutiny.**

In *Stuart v. Camnitz*, the Fourth Circuit adopted a "sliding scale" approach to the level of scrutiny that professional speech is subject to in a free speech challenge: "[w]hen the First Amendment rights of a professional are at stake, the stringency of review thus slides 'along a continuum' from 'public dialogue' on one end to 'regulation of professional *conduct*' on the other.'" 774 F.3d at 248 (quoting *Pickup v. Brown*, 740 F.3d 1208, 1227, 1229 (9th Cir. 2013)); *Pickup*, 740 F.3d at 1227–29 ("At one end of the continuum, where a professional is engaged in a public dialogue, First Amendment protection is at its greatest," but "[a]t the midpoint of the continuum, within the confines of a professional relationship, First Amendment protection of a professional's speech is somewhat diminished," and "[a]t the other end of the continuum . . . is the regulation of professional *conduct*, where the state's power is great, even though such regulation may have an incidental effect on speech."). Applying this "sliding scale" approach, the Fourth Circuit held that North Carolina's Display of Real-Time View Requirement, mandating that a physician (or a qualified technician) display and describe ultrasound images to a woman seeking an abortion in a manner dictated by the state, was professional speech and fell

28

"somewhere in the middle on that sliding scale." *Stuart*, 774 F.3d at 248.

Contrary to Plaintiff's assertions, as discussed *supra* at 15–16 n.5, "the general rule [announced in *Reed*] that content-based restrictions trigger strict scrutiny is not absolute." *Dana's R.R. Supply*, 2015 WL 6725138, at *6; *see also see Reed*, 135 S. Ct. at 2235 (Breyer, J., concurring) (describing the "many subcategories and exceptions" to the rule announced in *Reed*). Rather, "[c]ontent-based restrictions on certain categories of speech such as commercial and professional speech, though still protected under the First Amendment, are given more leeway because of the robustness of the speech and the greater need for regulatory flexibility in those areas." *Dana's R.R. Supply*, 2015 WL 6725138, at *6 (citing *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011) (commercial speech); *Wollschlaeger v. Governor of Fla.*, 797 F.3d 859 (11th Cir. 2015) (professional speech)). Indeed, it is well-settled that "[f]or these categories of speech, the inquiry is the more flexible, yet still searching, standard of intermediate scrutiny." *Id.* (citing *Cent. Hudson*, 447 U.S. at 564 (describing the test for commercial speech); *Wollschlaeger*, 797 F.3d at 893–97 (applying the same test to professional speech)). Thus, *Reed* does not abrogate the Fourth Circuit's controlling decision in *Stuart*.

Even assuming, *arguendo*, that the Ordinance's reach extends beyond a Pregnancy Center's offers to provide services to their substantive conversations with clients, the Ordinance would fall in the middle of the continuum identified by the *Stuart* Court. The Fourth Circuit, both in *Stuart* and this case, along with the Second Circuit in *Evergreen Association, Inc. v. City of New York*, have recognized the importance of analyzing compelled speech requirements *in context*. *Stuart*, 774 F.3d at 247–48; *Greater Balt. Ctr.*, 721 F.3d at 286; *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 249 (2d Cir. 2014). Thus, the "lodestars" in deciding what level of scrutiny applies "must be the nature of the speech taken as a whole and the effect of the

29

compelled statement thereon." *Greater Balt. Ctr.*, 721 F.3d at 286 (quoting *Riley*, 487 U.S. at 796). Pregnancy Centers offer services to their clients within a professional-client relationship. Indeed, Pregnancy Centers, including the Plaintiff, hold themselves out as medical facilities that provide professional, medical services. *See* Glessner Dep. at 57:9–21 ("[Pregnancy Centers] are health care providers. They have a licensed physician providing health care services. . . . They have a medical director supervising medical services. They are a medical practice."). In this context, the Ordinance here requires a Pregnancy Center to "provide its clients and potential clients with a disclaimer substantially to the effect that the center does not provide or make referral for abortion or birth-control services." BALT. CITY HEALTH CODE § 3-502(A). The disclaimer must be "conspicuously posted in the center's waiting room or other area where individuals await service." BALT. CITY HEALTH CODE § 3-502(B). Plaintiff states on numerous occasions that it provides services in its waiting room. Second Clews Aff. ¶ 40 (ECF No. 101, Attach. #4) ("[T]he services and conversations between clients and staff/volunteers in Baltimore City have frequently been provided in the same room as what would be considered the 'waiting room or other area where individuals await service.'"); *see also id.* ¶¶ 46, 56, 59, 66, 81, 86.

Thus, the Ordinance is not a regulation of Pregnancy Centers' "public dialogue" in a "nonprofessional capacity" triggering strict scrutiny. *Stuart*, 774 F.3d at 248. Accordingly, under *Stuart*'s "sliding scale" approach to professional speech, the Ordinance at most triggers intermediate scrutiny. *See Stuart*, 774 F.3d at 248.

### 2.   The Ordinance Directly Advances a Substantial Governmental Interest and is Drawn to Achieve That Interest.

Under intermediate scrutiny, the City must demonstrate that the Ordinance "directly advances a substantial government interest and that the measure is drawn to achieve that interest." *Stuart*, 774 F.3d at 250 (quoting *Sorrell*, 131 S. Ct. at 2667–68). For all the reasons

the Ordinance satisfies strict scrutiny, discussed *infra* at 33–41, it clearly satisfies intermediate scrutiny as well.

### C.  Plaintiff's Arguments Concerning Strict Scrutiny Are Unavailing.

Plaintiff's reasons for arguing that the Ordinance is subject to strict scrutiny are without merit and reflect a misunderstanding of the relevant precedents.  Yet, even if strict scrutiny applies, the Ordinance's disclosure requirements are narrowly tailored to serve a compelling governmental interest by the least restrictive means available.

### 1.   The Ordinance is Viewpoint Neutral.

Contrary to Plaintiff's argument, the Ordinance is viewpoint neutral.  The minimal burdens imposed on speech by the Ordinance are unrelated to the viewpoint of the speaker.  Any person whose primary purpose is to provide pregnancy-related services but who does not provide or make referrals for both abortion and comprehensive birth-control services must post a sign stating that those services are unavailable, regardless of the reason the person does not provide or make referrals for those services.  *See* BALT. CITY HEALTH CODE §§ 3-501, 3-502.  Because the purpose of the Ordinance is to remedy consumer confusion caused by deceptive advertising, the fact that it may disproportionately impact abortion opponents is constitutionally irrelevant.  *See McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) ("[A] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989))).

The Supreme Court's recent decision in *McCullen v. Coakley* is fatal to Plaintiff's claim that the Ordinance discriminates on the basis of viewpoint.  134 S. Ct. 2518.  In *McCullen*, the Supreme Court applied intermediate scrutiny to a law that required buffer zones outside abortion

clinics after concluding that strict scrutiny was inappropriate. *Id.* at 2525, 2532. The Court held that the law was both content and viewpoint neutral, even though it applied only to abortion clinics and was enacted to remedy harms specifically caused by abortion opponents. *Id.* at 2531– 34. Indeed, the Court recognized that the Massachusetts Legislature enacted the buffer zone law "in response to a problem that was, in its experience, limited to abortion clinics." *Id.* at 2532. It explained that: "There was a record of crowding, obstruction, and even violence outside such clinics. There were apparently no similar recurring problems associated with other kinds of healthcare facilities . . . ." *Id.* It concluded that: "In light of the limited nature of the problem, it was reasonable for the Massachusetts Legislature to enact a limited solution. When selecting among various options for combating a particular problem, legislatures should be encouraged to choose the one that restricts less speech, not more." *Id.* Plaintiff's reliance on *Reed* for a contrary position is misplaced because *Reed* does not overrule *McCullen*, decided just one term earlier. *See Reed*, 135 S. Ct. 2218.

In arguing that the Ordinance is viewpoint based, Plaintiff finds it significant that the City Council rejected an amendment to the Ordinance that would have required Pregnancy Centers to make disclosures concerning a broader range of pregnancy-related services, including financial assistance and prenatal care. Pl.'s Summ. J. Br. at 23. But *McCullen* makes clear that the City's efforts to remedy a specific and well-documented problem do not raise First Amendment concerns. *See McCullen*, 134 S. Ct. at 2532 ("States adopt laws to address the problems that confront them. The First Amendment does not require States to regulate for problems that do not exist." (quoting *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion))). Plaintiff cites no evidence of deceptive advertising or marketing tactics that would lead to consumer confusion about where financial assistance and prenatal care are offered.

Thus, contrary to Plaintiff's assertions, the Ordinance does not favor one viewpoint about abortion over others.  Nor does the Ordinance imply that abortion is morally a "good option" or the "only available option" for unplanned pregnancy.  *See* Pl.'s Summ. J. Br. at 13, 16.  Rather, it serves to remedy a specific problem that was brought to the attention of the Baltimore City Council: consumer confusion about the services offered by Pregnancy Centers that results from deceptive advertising and marketing tactics.

> **2.** **Although the Ordinance Need Not Satisfy Strict Scrutiny, it Nevertheless Constitutes the Least Restrictive Means of Serving the City's Compelling Interests in Preventing Consumer Confusion and Promoting Public Health.**

Laws that are subject to strict scrutiny must be narrowly tailored to serve a compelling governmental interest by the least restrictive means available.  *See Burson*, 504 U.S. at 198; *Am. Life League, Inc. v. Reno*, 47 F.3d 642, 648 (1995).  The Ordinance meets these requirements.

> *a. The Ordinance Serves the City's Compelling Interests in Protecting Consumers from Deceptive Business Practices and Promoting Public Health.*

The Ordinance serves at least two governmental interests that are sufficiently compelling to warrant the *de minimis* burden of the disclaimer requirement on Pregnancy Centers.  First, the City has a compelling interest in protecting the public from ongoing deceptive business practices.  *See Riley*, 487 U.S. at 792; *Nat'l Fed'n of the Blind v. Fed. Trade Comm'n*, 420 F.3d 331, 339 (4th Cir. 2005); *see also Ill. ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) (holding that public deception is unprotected speech).  As discussed above, Pregnancy Centers often engage in deceptive advertising to attract women seeking abortion or certain birth-control services to their facilities.  *See supra* at 5, 7–8, 40 n.15.  Once they have succeeded in doing so, they use deceptive delay tactics to string women along, stalling them for hours, days, or even weeks from accessing the services they seek.  *See supra* at 8–9.  The Ordinance serves the

City's interest in protecting the public from such deceptive practices by ensuring that women seeking abortion and comprehensive birth-control services are informed promptly upon their arrival at a Pregnancy Center that those services are not available there.  *See* BALT. CITY HEALTH CODE § 3-502.   By eliminating the benefit that Pregnancy Centers gain through deceptive advertising—by delaying women's access to abortion and certain forms of birth-control in an effort to deter women from utilizing those services—the Ordinance also discourages use of deceptive advertising in the first place.

Second, the City has a compelling public health interest in ensuring that individuals who seek reproductive health services have access to truthful information about the services available at Pregnancy Centers.  *See Am. Life League*, 47 F.3d at 651–52 (holding that government has a substantial interest in protecting public health, which extends to preserving access to all reproductive health care services).   Abortion is a lawful and safe medical procedure when performed by a properly trained medical professional, but the risks of abortion, as well as the costs, increase as the woman advances through her pregnancy.  *See* Blum Decl. ¶ 8.  As a result, the longer a woman must wait to have an abortion, the riskier and costlier the procedure becomes.  Similarly, delays in access to the birth-control method of an individual's choice can leave the individual and his or her partner vulnerable to unintended pregnancy and sexually transmitted disease.  *See id.*   By discouraging Pregnancy Centers from engaging in deceptive practices and by ensuring that individuals seeking abortion and comprehensive birth-control services are informed promptly upon their arrival at such centers that those services are not available there, the Ordinance serves the City's compelling interest in promoting public health.

Dr. Blum confirmed that the Ordinance serves important public health goals by providing women with key information they need in deciding where to seek reproductive health care.  *Id.*

34

¶ 5.  Family planning is critical for improving the health and well-being of both women and their children, as women who can plan the number and timing of their births have fewer unwanted pregnancies, lower rates of abortion, and are more likely to complete their education and secure stable jobs.  *Id.* at ¶ 6.  Women seeking family planning services are already disadvantaged because medical providers possess more information and power than consumers, and certain populations, including "adolescents, individuals with low literacy skills, and others who are economically disadvantaged or marginalized in society" are particularly vulnerable to deception by Pregnancy Centers when they do not disclose the scope of services they provide.  *Id.* ¶¶ 7, 9.  Because family planning services are often time-sensitive, delays in accessing information about contraception and abortion lead to increased health risks and poor health outcomes like unintended pregnancy and sexually transmitted infection.  *Id.* ¶ 8.

Dr. Blum testified that he has personally observed the concrete harms patients suffer after visiting Pregnancy Centers.  For vulnerable populations in particular, there is a danger that patients will be misled into visiting Pregnancy Centers believing they are getting certain services that are not delivered, and may not even know they have other options—effectively, a "[b]ait and switch."  Blum Dep. at 92:4–20.  Dr. Blum testified that he has seen adolescent patients who delayed visiting medical clinics by two or three weeks after receiving misinformation about the mental and physical harms of abortion, which increased and cost and risks of the abortion procedure for these patients.  *Id.* at 124:10–127:19.  He vividly recalled one patient who came to him in tears asking "Why did they lie to me?"  *Id.* at 129:12–16.

Ultimately, Plaintiff's arguments that Pregnancy Centers do not harm women and the Ordinance does not improve public health ignore extensive evidence throughout the record to the

contrary.[12]  This evidence demonstrates that the City has a compelling government interest in public health, which is served by the Ordinance.

> b.  *The Ordinance is the Least Restrictive Means of Serving the City's Compelling Interests.*

To assess whether a law subject to strict scrutiny is narrowly tailored, the Fourth Circuit applies a "least restrictive means available" test.  *See generally Am. Life League*, 47 F.3d at 648. Here, the Ordinance is the least restrictive means available to serve the City's compelling interests in protecting the public from deceptive business practices and promoting public health.

The Ordinance does no more than impose a modest disclaimer requirement on Pregnancy Centers.  *See* BALT. CITY HEALTH CODE § 3-502.  It does not prevent such centers from speaking, nor does it limit their speech.  *See id.*  As the Supreme Court has repeatedly stated, disclosure requirements are less restrictive than other kinds of regulations of speech.  *See John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366–67 (2010); *Zauderer*, 471 U.S. at 651.

Further, the signage requirement of the Ordinance is less restrictive than other methods of communicating the disclaimer.  For example, the City could require Pregnancy Center personnel

---

[12] Plaintiff's reliance on Dr. Duval-Harvey's testimony in support of this argument is particularly puzzling.  *See* Pl.'s Summ. J. Br. at 38–39.  As the Interim Commissioner of Health of Baltimore City since 2014, she was not involved with developing or passing the Ordinance—which was written and enacted by the Baltimore City Council—and she did not become Commissioner of Health until long after this litigation began.  Any purported gaps in Dr. Duval-Harvey's knowledge of the purpose of the Ordinance cannot and do not undermine the City's established compelling interest in promoting public health.  Plaintiff also argues that the City's voluntary agreement to postpone enforcement of the Ordinance during the pendency of the litigation undermines the City's compelling interest.  *Id.* at 39.  The parties entered into this agreement for the purposes of judicial economy, to avoid the need for litigating a motion for preliminary injunction.  If the Court were to hold this agreement against the City, it would discourage parties from entering into similar agreements in the future.

to communicate the disclaimer orally to consumers who call or visit a center.  Likewise, it could require that every page of a Pregnancy Center's website, as well as text in all paid advertisements, brochures, and other written materials, contain the disclaimer.  But such measures would impose considerably greater burden and cost on Pregnancy Centers.

The Ordinance is thus much less restrictive than the disclosure provision invalidated by the Second Circuit in *Evergreen*.  *See Evergreen*, 740 F.3d at 238.[13]  The New York City law at issue in *Evergreen* required that Pregnancy Centers not only post a sign in their waiting rooms indicating whether or not they "provide or provide referrals for abortion," "emergency contraception," or "prenatal care," but also required centers to provide this disclosure on signs at their entrances, on any advertisements, and to communicate this information during all in-person or telephone conversations with prospective clients seeking such services.  *Evergreen*, 740 F.3d at 238; Administrative Code § 20-816(f).  Accordingly, the law required Pregnancy Centers to address abortion, emergency contraception, or prenatal care at the beginning of any and all contact with potential clients.  *Evergreen*, 740 F.3d at 249.  In contrast, the Baltimore Ordinance only requires that a sign substantially similar to a statement in Plaintiff's Commitment of Care (which it already displays in its waiting room), be posted in Plaintiff's waiting room or other areas where clients await service.  *Compare* BALT. CITY HEALTH CODE § 3-502 (requiring a disclaimer "given through 1 or more signs" "substantially to the effect that the center does not provide or make referral for abortion or birth-control services"), *with* Commitment of Care at

---

[13] The Second Circuit upheld a different provision of the New York City ordinance requiring Pregnancy Centers to disclose "whether or not they 'have a licensed medical provider on staff who provides or directly supervises the provision of all of the services at such pregnancy service center.'" *Evergreen*, 740 F.3d at 238 (quoting Administrative Code § 20-816).  The Second Circuit held that striking down this provision "would deprive the City of its ability to protect the health of its citizens and combat consumer deception in even the most minimal way." *Id.* at 247.

GBCPC 000110 ("We do not offer, recommend or refer for abortions or abortifacients (birth control), but we are committed to offering accurate information about abortion procedures and risks."). Thus, the Baltimore Ordinance is less restrictive than the New York City Ordinance, and requires Pregnancy Centers to expend far fewer resources on compliance.

The content of the required disclaimer is also less restrictive than any alternatives. Signs required by the Ordinance must state only that the Pregnancy Center does not itself provide abortion or comprehensive birth-control services and does not refer consumers to providers of those services. *See* BALT. CITY HEALTH CODE § 3-502; Regulation, §§ (B)-(C). In *Riley*, the Supreme Court explained that a statute requiring a fundraiser "to disclose unambiguously his or her professional status" would be narrowly tailored. *Riley*, 487 U.S. at 799 n.11 ("[S]uch a narrowly tailored requirement would withstand First Amendment scrutiny."). Subsequently, this Court upheld a statute requiring a professional fundraiser making unsolicited calls on behalf of a charity to disclose the name of the charity and the purpose of the call. *See Nat'l Fed'n of the Blind*, 420 F.3d at 343. Distinct from the relevant circumstance in *Evergreen*, Plaintiff's contention that the use of the words "abortion" and "birth-control" alone make the Ordinance's compelled speech requirements offensive is hardly credible, as Plaintiff uses the same language in its Commitment of Care and advertisements. *See* Commitment of Care at GBCPC 000110 ("We do not offer, recommend or refer for abortions . . . ."); Advertisement at GBCPC 000116 ("FREE Abortion Alternatives.").

The disclaimer required by the Ordinance is analogous to those endorsed by the Supreme Court in *Riley* and the Fourth Circuit in *National Federation of the Blind* in that it is a statement that does not require the provision of more information than is absolutely necessary to achieve the relevant governmental interests and imposes only a modest burden on the speaker. *Cf. Nat'l*

*Fed'n of the Blind*, 420 F.3d at 344–45 ("[T]he [required] disclosure []—designed only to identify quickly the nature and purpose of the call—is much more modest than an obligation to reveal how much one is being paid for the call.  Not only does the latter requirement compel more speech, but it also adversely affects how receptive a listener will be to the remainder of what is said." (citation omitted)).

Further, the City has demonstrated considerable "evidence disproving the effectiveness of purported less restrictive alternatives to the Ordinance's disclaimer."  *Greater Balt. Ctr.*, 721 F.3d at 288.  Plaintiff attempts to identify less restrictive alternatives, arguing that the City could disclose the information itself—through advertising, signage, or social media—more vigorously enforce its antifraud laws, or enact new antifraud laws with greater scope.[14]  Pl.'s Summ. J. Br. at 41–43.  Yet Supreme Court and Fourth Circuit precedent confirm that an alternative can only be "less restrictive" for the purposes of strict scrutiny if it is also equally effective at promoting the government's compelling interest.  *See, e.g.*, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("The question is whether [the alternative] can be effective."); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 318 (4th Cir. 2013).  The City has met its burden to show that no such less restrictive alternatives exist.

Indeed, discovery has confirmed that the Ordinance is more effective than alternatives in preventing deception, particularly for vulnerable populations.  Dr. Blum emphasized that adolescents, people with low levels of education or poor reading comprehension, and non-native

---

[14] It is unclear how this alternative is more narrowly tailored than the Ordinance, as an expansion of antifraud laws would be considerably more broad than the targeted disclaimer requirement of the Ordinance.

English speakers are unlikely to read and understand a long list of disclosures in print or online.[15] Blum Decl. ¶ 9; Blum Dep. at 146:18–147:10.  A conspicuous sign at the point of service using the simplest language possible, however, functions more effectively as a disclosure.  Blum Dep. at 113:2–10; 139:4–10.  The simpler and clearer the language, the more likely a disclosure will diminish uncertainty and confusion.  *Id.* at 180:5–11.  Dr. Duval-Harvey too explained why a posted sign, as opposed to other disclosure methods, effectively addresses the City's concerns. The Ordinance's requirement for simple, easily understandable text, presented in large font in both Spanish and English, follows the City's established practices for effective public education materials.  *See* Deposition of Jacquelyn Duval-Harvey ("Duval-Harvey Dep.") (relevant excerpts annexed hereto as Exhibit 38), 82:4–83:7.  A sign at the point of service is particularly effective because it allows people to decide in the moment whether to stay or leave, and removes the social commitment and engagement involved with interpersonal interactions.  *See id.* at 89:5–90:20.

The City need not show that it considered every possible alternative before concluding that the Ordinance was the least restrictive means of serving its compelling interests.  Rather, the City need only show that the means are narrowly tailored to serve a compelling government interest: Here the City has shown that, given the risk to the public from ongoing deceptive

---

[15] The City's concern for protecting vulnerable populations is particularly acute given that discovery revealed how Plaintiff has deliberately targeted young, minority women with its vaguely worded bus advertisements.  *See* E-mail from Thomas Cronquist to Bruce Gemmill (Nov. 5, 2010, 11:11 AM) (annexed hereto as Exhibit 39), N000924 (noting that bus ads would run near Coppin State University, Baltimore City Community College, and a local mall and so would be "a good test of our effectiveness in reaching students"); E-mail from Grace Morrison, Dev. Coordinator for Balt., Vitae Found., to Carol Clews, Exec. Dir. of Greater Balt. Ctr. for Pregnancy Concerns (Nov. 5, 2010, 11:46 AM) (annexed hereto as Exhibit 40), GBCPC 000127 (asking if bus ads should feature "an African-American women, a Hispanic woman, or both?").

practices and the need to promote public health, particularly for vulnerable populations, the Ordinance is the least restrictive means available. Accordingly, it satisfies the requirements of strict scrutiny. *See Burson*, 504 U.S. at 198; *Am. Life League*, 47 F.3d at 648.

### III.    The City is Entitled to Summary Judgment on Each of Plaintiff's Remaining Claims.

The City has demonstrated that it is entitled to summary judgment on Plaintiff's free exercise, free assembly, equal protection, and State law claims. Summary judgment is warranted because Plaintiff has failed to meet its heavy burden of showing that the Ordinance infringes upon its right of free exercise of religion or of assembly, let alone that the Ordinance creates a substantial burden on such rights. As discussed below, Plaintiff's free exercise and free assembly claims fail as a matter of law. Moreover, Plaintiff's equal protection claim fails as a matter of law because the Ordinance does not impose any classification that burdens Plaintiff's fundamental right to free speech. Even assuming that the Ordinance did create such a classification, Plaintiff is not entitled to a higher degree of scrutiny on its equal protection claim than its free speech claim, c*f. Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 544–45 (9th Cir. 2004), and Plaintiff's free speech claim is infirm under any level of scrutiny, *see supra* at 24–27, 30–31, 33–41. Finally, Defendants are entitled to summary judgment on Plaintiff's state law claim because the Ordinance in no way requires any person to "perform or participate in, or refer to any source for, any medical procedure that results in artificial insemination, sterilization, or termination of pregnancy." MD. CODE ANN., HEALTH GEN. § 20-214(a)(1).

### A.    *Plaintiff's Free Exercise Claim Fails as a Matter of Law.*

The Ordinance does not impose any burden on Plaintiff's right of free exercise of religion. Notably, it does not require Plaintiff Pregnancy Center to provide abortion or comprehensive birth-control services to anyone, or to make referrals for such services. *See*

BALT. CITY HEALTH CODE § 3-502.  The Ordinance merely requires Plaintiff to disclose via a posted sign that it does not provide or make referrals for such services.  *See id.*

It is well-settled that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'"  *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982)).  In *Smith*, the plaintiffs claimed that Oregon's criminal prohibition on use of the hallucinogenic drug peyote violated the Free Exercise Clause of the First Amendment because they ingested the drug for sacramental purposes during religious ceremonies at their church.  *See id.* at 874.  In that case, unlike here, the plaintiffs were forced to choose between foregoing a religious practice and violating the law.  *See id.*  Nevertheless, the Supreme Court rejected the plaintiffs' free exercise claim, holding that the right of free exercise did not relieve the plaintiffs of the obligation to comply with a valid and neutral law of general applicability on the ground that the law prohibited conduct essential to a religious practice of the plaintiffs.  *Id.* at 882.

*A fortiorari*, the right of free exercise does not relieve Plaintiff of its obligation to comply with the Ordinance.  Disclosure that Plaintiff does not provide or make referral for certain services does not conflict with any tenet of its religious beliefs.  *See id.* at 879.  Indeed, Plaintiff is already disclosing this information to clients voluntarily through its Commitment of Care, which is posted in its waiting room.  Commitment of Care at GBCPC 000110; Second Clews Aff. ¶¶ 32–33.  Accordingly, the City is entitled to summary judgment on Plaintiff's free exercise claim.

**B.   *Plaintiff's Free Assembly Claim Fails as a Matter of Law.***

The Ordinance imposes no limitation on a Pregnancy Center's ability to assemble or to meet with others; it merely requires a Pregnancy Center to post a sign containing a disclosure in its waiting area.   *See* BALT. CITY HEALTH CODE § 3-502.   In an analogous case, *San Jose Christian College*, the court held that a religiously affiliated college failed to assert a colorable claim that a city's denial of its rezoning application violated its right of freedom of assembly because the city's action did not "impose[] a serious burden upon, affect[] in any significant way, or substantially restrain[]" the college's efforts to gather its members together for education and worship.   *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1033 (9th Cir. 2004). Similarly, Plaintiff cannot sustain a claim that the Ordinance violates its right of freedom of assembly because the Ordinance does not impose a serious burden upon, affect in any significant way, or substantially restrain a Pregnancy Center's ability to assemble or to meet with others. Accordingly, the City is entitled to summary judgment on Plaintiff's free assembly claim.

## CONCLUSION

For the reasons set forth above, the City respectfully requests that the Court deny Plaintiff's motion for summary judgment in its entirety and grant the City's motion for summary judgment in its entirety.

Dated: December 18, 2015

Respectfully submitted,

*/S/ Suzanne Sangree*
Suzanne Sangree
Senior Public Safety Counsel
Federal Bar No. 26130
CITY OF BALTIMORE LAW DEPARTMENT
100 N. Holliday Street
Baltimore, Maryland 21202
Telephone: (443) 388-2190
Fax: (410) 539-0536
E-mail: Suzanne.Sangree2@baltimorecity.gov

Stephanie Toti*
Special Assistant City Solicitor
New York Bar No. 4270807
Autumn Katz*
New York Bar No. 4394151
Tiseme Zegeye*
New York Bar No. 5075395
Molly Duane*
New York Bar No. 5318530
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Floor
New York, NY 10038
Telephone: (917) 637-3684
Fax: (917) 637-3666
E-mail: stoti@reprorights.org
        akatz@reprorights.org
        tzegeye@reprorights.org
        mduane@reprorights.org

*Admitted Pro Hac Vice*

**Attorneys for Defendants**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on December 18, 2015, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court through the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: December 18, 2015

*/S/ Stephanie Toti*_____
Stephanie Toti