**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)**

| | | |
|---|---|---|
| GREATER BALTIMORE CENTER FOR PREGNANCY CONCERNS, INC. | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | **Case No. 10-760-MJG** |
| | * | |
| MAYOR AND CITY COUNCIL OF BALTIMORE, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY IN FURTHER SUPPORT OF
<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Page

I.  The City's Opposition Fails to Dispute the Material Facts Established by the Center and Asserts Many Incorrect, Irrelevant, and Inadmissible "Facts.\ .........................5

    A.  The City Does Not Dispute The Material Facts Established By The Center, Including That The Speech In The Center's Waiting Room Is Fully Protected, Noncommercial Speech ..........................................................................5

    B.  The City's Discussion Of Third Parties Is Legally Irrelevant .................................7

    C.  The City's Assertions of "Facts" Are Largely Irrelevant And Inadmissible .........10

II.  The Ordinance Does Not Regulate Commercial Speech and Thus Strict Scrutiny Applies ...............................................................................................................19

III.  The Ordinance Does Not Regulate Professional Speech And Thus Strict Scrutiny Applies ...............................................................................................................27

    A.  The Professional Speech Doctrine Only Applies When the Government Licenses and Regulates Professionals Who Provide Services For Money ...........28

    B.  The City Waived the Professional Speech Argument ...........................................30

IV.  The Ordinance Is Content and Viewpoint Based and Thus Subject to Strict Scrutiny ..............................................................................................................31

V.  The City Fails to Meet Its Heavy Burden To Justify the Ordinance Under Strict Scrutiny ..............................................................................................................33

    A.  The City has failed to demonstrate that the Ordinance serves a compelling interest...............................................................................................................33

    B.  The City has failed to demonstrate that the Ordinance is narrowly tailored .........39

VI.  The Ordinance Fails Intermediate Scrutiny ....................................................................43

VII.  Judgment May Not Be Granted In The City's Favor On The Center's Free Assembly, Equal Protection, State Conscience Clause And Free Exercise Claims .........46

**TABLE OF AUTHORITIES**

Page

**Cases**

*Bd. of Child Care of the Balt. Annual Conf. of the Methodist Church, Inc. v.
Harker,* 316 Md. 683 (1989) ................................................. 31

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) ......................................... 21, 22, 23, 24

*Brown v. Entm't Merch. Ass'n,* 131 S. Ct. 2729 (2011) ...................................... 36, 37

*Cent. Radio Co. Inc. v. City of Norfolk, Va.,* 2016 WL 360775 (4th Cir. Jan.
29, 2016) .................................................................. 32

*City of Balt. v. Stuyvesant Ins. Co.,* 226 Md. 379 (1961) ............................................. 31

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ............................................... 33

*Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233 (2nd Cir. 2014)............................ 42, 43

*Fargo Women's Health Organization, Inc. v. Larson*, 381 N.W.2d 176 (N.D.
1986) ................................................................. 20, 21, 24

*First Resort, Inc. v. Herrera*, 80 F. Supp. 3d 1043 (N.D. Cal. 2015)........................................... 21

*Frisby v. Schultz*, 487 U.S. 474 (1988) ............................................ 39

*Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and city
Council of Baltimore*, 721 F.3d 264 (4th Cir. 2013)................................. 2

*Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston,*
515 U.S. 557 (1995)........................................................ 27

*Lowe v. SEC*, 472 U.S. 181 (1985) ................................................ 28, 29

*McCullen v. Coakley,* 134 S.Ct. 2518 (2014) ................................................ passim

*Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010)............................ 25, 26

*MJ Harbor Hotel, LLC v. McCormick & Schmick Rest. Corp.,* 599 F. Supp. 2d
612 (D. Md. 2009) ......................................................... 17

*Moore-King v. Cty. of Chesterfield, Va*, 708 F.3d 560 (4th Cir. 2013) ........................... 28, 29, 30

*Nat'l Fed'n of the Blind v. FTC,* 420 F.3d 331 (4th Cir. 2005)................................................. 42

*Nefedro v. Montgomery County*, 996 A.2d 850 (Md. 2010)...................................... 39

*Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Calif.,* 475 U.S. 1 (1986)................................... 27

*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014).................................................... 28, 29

*Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218 (2015)........................................ 31, 32

*Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015).................................................... 44

*Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) ...................................... passim

*Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1996) ....................................................... 44

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.,* 483 U.S. 522 (1987).......................................................................................... 25

*Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011) ...................................................... 31

*Stuart v. Camnitz*, 774 F.3d 238 (4th Cir. 2014)..................................................... passim

*Tepeyac v. Montgomery Cnty.,* 5 F. Supp. 3d 745 (D. Md. 2014)........................................ passim

*Thomas v. Collins*, 323 U.S. 516 (1945)..................................................................... 29

Thompson v. Western States Med. Center, 535 U.S. 357 (2002)................................... 45

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 624 (1994).................................................... 33

*U.S. v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000)........................................ 34, 40

*WV Ass'n of Club Owners & Fraternal Services, Inc. v. Musgrave*, 553 F.3d 292 (4th Cir. 2009)......................................................... 44, 45

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626 (1985)........................................................... 25, 26, 45

**Statutes**

MD. CODE ANN., HEALTH GEN. ART. § 20-214(a)(1) ................................................. 47

**Rules**

Fed. R. Civ. P. 30(b)(6).......................................................................................... 35

Fed. R. Civ. P. 37(c)(1)........................................................................................... 15

Fed. R. Civ. P. 56.................................................................................................. 14

The blank walls of Plaintiff's waiting room do not propose a commercial transaction. This simple and undisputed reality undermines the City's unprecedented First Amendment theory—that the government can force a private speaker to put the government's message on the private speaker's walls. The City seeks to rely on the narrow "commercial speech" exception from the rigorous First Amendment scrutiny ordinarily directed to government-compelled speech, an exception that applies only when the government is actually regulating speech that does no more than propose a commercial transaction (*i.e.*, commercial advertisements). The City seeks to defend an ordinance that mandates a disclaimer on commercial advertisements. But the Ordinance challenged here does not mandate a disclaimer on commercial advertisements, but rather mandates private speakers to post the disclaimer in their lobby regardless of whether they advertise at all.

The City does not cite any case that remotely supports the government's authority to require its preferred statement be posted in a private speaker's lobby—a lobby where the undisputed evidence now shows that no commercial advertisements occur but personal and religious conversations do occur.[1] This failure demonstrates that the City's Free Speech analysis

---

[1] Clews Second Aff., Mem. in Supp. Ex. B, at ¶¶ 56-58 ("56. Sensitive personal and religious conversations have occurred in the waiting room of our Center in Baltimore City, including conversations regarding religion, the Bible, abortion, Jesus Christ, adoption, and available supports for women. 57. The Center has no advertising in its waiting room. 58. No goods or services are offered for sale in the Center's waiting room or anywhere in the Center."). *Cf.* Transcript of Deposition of City's 30(b)(6) Designee ("Duval-Harvey Depo."), attached as Exhibit A, at 55-56 ("Q. Do you know if anyone from the Health Department or the City has visited any limited service pregnancy center in Baltimore City? A. Not to my knowledge. Q. Do you know whether the Greater Baltimore Center at St. Brigid's has religious symbols or writings in their waiting area? A. I don't know. Q. Do you have any basis to know what they have on their waiting room walls? A. No. Q. Okay. Do you have any knowledge of the content of the conversations that they have at the Greater Baltimore Center. A. No.").

is completely unprecedented, extraordinarily broad, and fundamentally dangerous to the principles and all existing jurisprudence underlying the First Amendment.

For these reasons, Judge Chasanow flatly rejected arguments like those advanced by the City in striking down Montgomery County's similar pregnancy center ordinance. *Tepeyac v. Montgomery Cnty.,* 5 F. Supp. 3d 745, 760 (D. Md. 2014) (Chasanow J.) (applying *en banc* decision in *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and city Council of Baltimore*, 721 F.3d 264 (4th Cir. 2013) after the Fourth Circuit remanded this case for discovery).

The City makes an unfounded *ad hominem* argument, namely that pro-life pregnancy centers should be regulated because they are bad—they lie and hurt women. Yet six years after enacting the Ordinance, the City cannot identify a single woman or other human being who has been harmed by what they call a "limited service pregnancy center" (or "LSPC"). The City has never received a complaint about a LSPC, nor investigated or even visited one. The City acknowledges there are no more than two such centers in the City and both are motivated by religious beliefs. The City has posted on its website contact information for the pro-life centers so that women could get free pregnancy tests from these allegedly harmful centers, and the City does not use any of its own substantial resources to notify women about this allegedly grave public harm—a Christian charity that provides free pregnancy tests, diapers, and baby clothes to poor women. The Center understands that the City disagrees with the Center's pro-life message, but the Center cannot accept the City's commandeering of the Center's walls for the City's preferred message. If the City were concerned about deceptive advertising, wouldn't the City actually regulate deceptive commercial advertising as permitted by the Supreme Court? If the City genuinely believed the Center poses a grave risk to public health, wouldn't the City mention the

Center at least once on the City's website and in its annual health reports? By enacting the Ordinance, the City has pressured and harried a small pro-life pregnancy center that seeks to provide women with an alternative to abortion and does not want to act as the City's mouthpiece. However, the Ordinance places an impermissible burden on the Center's freedom of speech and should be struck down.

The Ordinance expressly applies to the Center because of the Center's speech (*i.e.,* it speaks about pregnancy but does not refer for abortions), and the undisputed facts show that the speech actually regulated by the Ordinance (*i.e.*, the speech in the Center's waiting room) is fully protected, noncommercial speech. Thus, strict scrutiny applies and the City completely fails to meet its heavy burden to justify the Ordinance.

The City does not contest the undisputed facts established in the Center's Memorandum of Law in Support of its Motion for Summary Judgment ("Mem. in Support") regarding the Center's ministry and outreach; the non-commercial, religiously motivated speech that occurs in the Center's waiting room; the negative impact of the Disclaimer on the Center's speech and its relationships with the women it serves; and the complete lack of any harm caused by the Center or other Limited-Service Pregnancy Centers in Baltimore City. Instead, the City's Opposition[2] tries to establish irrelevant connections between the Center and other organizations, exaggerating the import of the Center's membership in business, Catholic, and pro-life organizations. The City apparently hopes that if it demonstrates that the Center engages in advertising or pays membership

---

[2] Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in support of Defendants' Cross-Motion for Summary Judgment is referred to as the "Opposition." The City did not actually file a "Cross-Motion for Summary Judgment," filing only a single document labelled Defendants' Memorandum of Law. Thus, it appears that Defendants have not themselves technically moved for summary judgment.

dues to organizations that engage in advertising, the Court will accept the City's tenuous argument that the Ordinance automatically regulates only commercial speech even though it does not require its disclaimer be in any way connected to any alleged commercial speech.

The City suggests that the commercial speech exception applies even though the Ordinance requires a government-mandated disclaimer be posted <u>in a center's waiting room</u>, not on a center's allegedly deceptive advertisements. Yet the City specifically acknowledges that the Center's "noncommercial, religious expressions" actually impacted by the Disclaimer are "completely distinct from Pregnancy Center solicitations and advertisements." Opposition at 24. The City simply ignores the undisputed testimony of the Center and its clients that establishes the speech impacted by the Ordinance is completely protected, noncommercial speech.

The City also seeks, for the first time in this litigation, to argue that the Ordinance is subject to a lower level of scrutiny as a regulation of "professional speech." This argument necessarily fails because the Ordinance is not part of a professional regulatory or licensing scheme. Moreover, the City itself has waived this argument and acknowledged that it has no authority to regulate professionals in this area. The Center is an unlicensed, not-for-profit providing free services in furtherance of its religious and moral beliefs. The fact that the Center has a volunteer doctor who occasionally visits the Center (but has never seen a patient or rendered medical care at the Center) does not change this conclusion—neither the Center nor any of its personnel are licensed by the City. Even if the Court were to consider the Ordinance to be a professional regulation of the Center's medical director (even though the Ordinance omits any reference to medical care and expressly applies to LSPCs who provide information about pregnancy, regardless of whether they have a medical director or render medical care), the City

has specifically acknowledged that Maryland's regulation of medical professionals at the state level preempts any regulation of medical professionals by the City.

Because the City has failed to provide any basis upon which the Court could consider the Ordinance to be a regulation of commercial or professional speech, strict scrutiny applies. The City has failed to meet its heavy burden to establish that the Ordinance is narrowly tailored to serve a compelling interest. The City offers no evidence of an actual harm justifying the imposition of the Disclaimer on every aspect of the Center's speech in its waiting room. It also makes the untenable argument that the most narrow way to address LSPCs' alleged deceptive advertising is by having a disclaimer that is entirely unconnected to such advertisements, applies regardless of whether a LSPC advertises, and must be displayed in LSPCs' waiting rooms at all times.

For the reasons set forth below and in the Center's Mem. in Supp., summary judgment should be granted in the Center's favor.

**I.       The City's Opposition Fails to Dispute the Material Facts Established by the Center and Asserts Many Incorrect, Irrelevant, and Inadmissible "Facts."**

        **A.       The City Does Not Dispute The Material Facts Established By The Center, Including That The Speech In The Center's Waiting Room Is Fully Protected, Noncommercial Speech.**

While the City's statement of undisputed facts includes primarily irrelevant, inadmissible, or unimportant supposed facts, it is important for what it does not do: namely, dispute any of the facts set forth in the Center's Mem. in Supp. regarding the nature of the speech occurring in the Center's waiting room that is actually regulated by the Ordinance and the negative impact the Ordinance has on such speech. *See, e.g.,* Mem. in Supp. at 3-15. Thus, there is no genuine dispute of material fact that:

- The Center's waiting room and the impression that waiting room conveys is an important aspect of the Center's religious and mission-oriented communication to clients, which begins as soon as a client enters the Center (Mem. in Supp. at 3-6);

- Since the enactment of the Ordinance, the services and conversations between clients and staff/volunteers in Baltimore City have frequently been provided in the same room as what would be considered the waiting room (Mem. in Supp. at 6);

- Personal, religious, and moral concerns in support of the Center's Christian, pro-life mission permeate all communications with the Center's clients (Mem. in Supp. at 6-7);

- Sensitive personal and religious conversations have occurred in the waiting room of the Center in Baltimore City, including conversations regarding religion, the Bible, abortion, Jesus Christ, adoption, and available supports for women (Mem. in Supp. at 12);

- The Disclaimer would alter the course of the Center's important and sensitive communications with its visitors occurring in its waiting room and have a negative impact on the Center's Communications and relationship with the women it serves (Mem. in Supp. at 13, 32-33).

During the course of discovery, the City did not ask the Center's Executive Director or board members about the conversations that occur at the Center and the City chose not to depose any Center clients (including one specifically disclosed in discovery as having personal knowledge about conversations with Center staff members and experiences visiting the Center). The City's official 30(b)(6) designee acknowledged that the City had no basis to know what conversations occurred at pregnancy centers, and in particular in the waiting area of the Center. *See* fn. 1, *supra*, at 1. Thus, recognizing that context matters and the viewpoint of both the

speaker and the listener matters, the Center's undisputed facts establish an undisputed context and mutual viewpoint of fully protected, noncommercial speech.

**B.      The City's Discussion Of Third Parties Is Legally Irrelevant.**

The City devotes significant attention to describing how the Center associates with other pro-life and religious groups around the country.  The fact that these like-minded charities support each other in their outreach to poor women might sound nefarious to the City, but it is constitutionally protected and legally irrelevant to this matter.  The City spent enormous resources seeking information from national, pro-life third parties—forcing these nonprofits who are not parties to this lawsuit to engage counsel, produce over a thousand pages of documents, successfully fight off the City's overly aggressive and irrelevant questioning through multiple motions and hearings, and sit for numerous out-of-state depositions.  The City suggested it pursued this discovery for legitimate purposes and not to harass these entities because of their beliefs, but its efforts resulted in no evidence that is material to disposition of this action.

For some reason, the City spends the first five pages of its "Undisputed Facts" section on irrelevant connections between the Center and certain pro-life, professional, and Catholic organizations to which the Center belongs and to describing the revenues and advertising activities of these groups and LSPCs nationwide.  Opposition at 2-6.  Apparently, the City believes these facts demonstrate some commercial aspect to the Center's activities.  Whether the Center engages in some activities that might be considered "commerce" or affiliates with entities that advertise is irrelevant to the commercial speech analysis in this action.  The City acknowledges that what matters is whether the Ordinance regulates commercial or noncommercial speech.  *Id.* at 15.  The City also acknowledges that "[o]f course, not all Pregnancy Center speech is commercial speech."

*Id.* at 22. Thus, the parties agree that the core question for the Court is whether the speech regulated by this Ordinance is commercial speech. It is immaterial to answering this question whether the Center works with out-of-state pro-life affiliates or is a member of the Catholic Business Network. It is immaterial whether the Center engages in commerce outside of the speech regulated by the Ordinance.[3] Even when the Supreme Court upholds a regulation of commercial speech, the Court does not say that it is because the speaker acts in a commercial manner generally but rather because the speech regulated is a commercial advertisement. Of course, the Ordinance does not regulate any advertisements of the Center or anyone else but instead requires the two pro-life centers in Baltimore City to post a government warning in their lobbies whether they advertise or not. No court has ever concluded that an entity's general speech is subject to the lowered First Amendment protections extended to commercial speech based on the fact that the entity advertises, engages in commerce, or is part of a "multi-million dollar industry" (or affiliates with those who do).[4]

---

[3] Of course, nonprofits can engage in activity that is considered commercial for some purposes. What matters is not whether the nonprofit engages in any commerce generally, but whether the speech regulated by the government is commercial speech. This issue is discussed more fully below, but the commercial speech cases cited by the City involve commercial entities that are primarily and fundamentally engaged in commerce as their reason for being. The primary case raising the question of when a nonprofit engages in commercial speech is *Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988), a case which acknowledges that even the commercial speech of a nonprofit group is typically intertwined with its fundamental, protected speech and therefore entitled to full First Amendment protection.

[4] Apparently, because the Center pays between $200 and $250 in annual membership dues to Heartbeat International and CareNet, groups that the City asserts engaged in sophisticated advertising efforts and had annual revenue of $4.3 million and $3.1 million respectively, the City believes the Center's speech must be commercial. Opposition at 2. Applying this theory to other non-profit actors demonstrates its fallacy. The City's special counsel in the matter, the Center for Reproductive Rights, would surely deny that merely because its IRS Form 990 for 2013 reflects total revenue of $28 million and it engages in sophisticated marketing efforts through social media

Finally, the City uses some third-party statements to make irrelevant and unsupported assertions regarding the status of the Center.  Apparently, an official at NIFLA considers the Center a medical clinic.  Opposition at 6.  Of course, NIFLA is not a governmental agency and certainly is not the City of Baltimore.  The City does not and cannot suggest that the City or the State of Maryland consider the Center a medical clinic.  Nor does the City provide any evidence supporting its irrelevant assertion that NIFLA "helped Plaintiff undergo a 'medical conversion.'" Opposition at 6.  In fact the City's assertion is knowingly misleading, having asked NIFLA's representative that exact question at deposition and been told that NIFLA did not help the Center undergo a medical conversion. Transcript of Deposition of  NIFLA Representative, attached as Exhibit B, at 24:11-14 (attached hereto because this page was not included in the City's submission) (Q. Has NIFLA given the Baltimore Pregnancy Center any assistance in medical conversion?  A. No).

Two facts that are undisputed and asserted by the City in Section I of the Opposition are that the Center has a doctor who volunteers to serve as what the Center calls a medical director to assist with reading sonograms and that this volunteer doctor does not speak with clients.  These facts however are irrelevant since, as described more fully below, the City has acknowledged that the Ordinance does not and cannot regulate a medical professional's speech.  The State, as part of its regulation of medical professionals, might enact incidental speech regulations that would

---

and celebrity spokespersons, *see* www.facebook.com/reproductiverights, its speech may be regulated as commercial or, more precisely, that the speech of any non-profit affiliated with the Center for Reproductive Rights is necessarily and entirely commercial based on these revenue figures.  The Center for Reproductive Rights would also surely deny that the government can force it or its affiliates to post in its lobby the government's preferred message if the government can articulate any rational basis for doing so.

arguably be covered by the cases analyzing professional speech. However, receiving assistance from a volunteer doctor does not convert all the speech of a nonprofit entity and its personnel into the speech of a licensed professional. The City's Opposition is also notable for what it does not say or support on this issue. The City provides no evidence (because there is none) that the Center is licensed by the State or by Baltimore City, nor that the speakers who engage in the religious and personal conversations with clients are licensed professionals by the State or the City. It is this unlicensed speech (of the Center and its personnel) that is regulated and negatively impacted by the Ordinance.

### C. The City's Assertions of "Facts" Are Largely Irrelevant And Inadmissible.

The City asserts that it has evidence of "deceptive advertising" by pregnancy centers, largely relying on documents already in the City's legislative record. These "facts" are immaterial because, as discussed elsewhere, the Ordinance does not prohibit or regulate deceptive advertisements (or any advertisements). As an evidentiary matter, the City relies on two "reports" from pro-abortion political advocates (the so-called "Waxman Report" prepared for U.S. Rep. Henry A. Waxman and NARAL Pro-Choice Maryland's "Maryland Report") for the notion that LSPCs engage in deceptive advertising practices and solicitation to attract women. ECF Doc. Nos. 18-2 and 18-3. But neither report constitutes admissible evidence of actual deceptive advertising practices by pregnancy centers. Indeed, relying on unnamed sources and information obtained from disguised "investigators" who called or visited LSPCs, both summary reports actually focus on allegedly misleading or false information provided by LSPCs about the safety and risks associated with abortion—which is fully protected speech the City acknowledges is not the basis for the Ordinance. In other words, both reports reflect a fundamental disagreement with

the content and viewpoint of the Center's speech. Both reports accuse LSPCs of deceptive advertising merely based on allegations that the LSPCs' advertisements do not specifically state that the LSPCs do not provide or refer for abortion. Neither supplies any evidence, however, of any deceptive advertising by a Baltimore City LSPC nor of any Baltimore City woman ever being harmed as a result of visiting a LSPC. Importantly, the City's own official 30(b)(6) designee has acknowledged that the City has no evidence of any harm or delay in medical care resulting from any LSPC. Duval-Harvey Depo. 108:18-109:5 (Ex. A).

The City also relies on the written Council testimony of two individuals—McReynolds, a NARAL Pro-Choice Maryland Board member who admittedly had never visited a pregnancy center in Baltimore and who last visited a pregnancy center decades ago, and Kelber-Kaye, an "educator of college-aged women" who relayed only "stories" she had heard, provided no first-hand knowledge of the activities of Baltimore LSPCs, and made biased and inaccurate comments like LSPCs "exist simply to make sure women are not able to access a full range of reproductive options and services"—to allege that the Council had heard evidence that pregnancy centers use deceptive tactics. ECF Doc. Nos. 18-4 and 18-5. Neither individual offers any actual evidence of present deceptive advertising by LSPCs in Baltimore or anywhere or of any woman being harmed by a Baltimore LSPC and neither was offered by the City as a witness having personal knowledge of any of the interests served by the Ordinance. *See* Exhibit I to Mem. in Supp. (City's Answers to Interrogatories 1, 3, and 5).

The Opposition also claims that the "legislative record contained an on-line advertisement for option line." The document referenced is not an actual advertisement, but a page from a report on the work of national pregnancy center networks that was submitted by the national pregnancy

center networks to the City Council.  Ex. 26 to Opposition.  The page shows what appears to be a picture of a previous website operated by CareNet and Heartbeat International—two national associations that are not based in Baltimore—not an advertisement by any Baltimore City pregnancy center.

The City now points to what it characterizes as additional evidence of "deceptive advertising" through discovery in the form of an advertisement that refers to "Free Abortion Alternatives" run by a national pro-life group called the Vitae Foundation.  Ms. Clews explained what she understood to be the broad purposes for such advertisements at her deposition:

> We are trying to cast as broad a net as possible and have an opportunity to talk to as many women as possible regardless of what their reasons for coming to see us are. When somebody calls to make an appointment, which they may have done. It didn't appear very much with the campaign. But, if someone calls to make an appointment and they ask about our abortion services, or if we perform abortions, the first thing we say to them is we do not perform or refer for abortions.
>
> So, do we welcome the opportunity to talk to women regardless of what their circumstances are, whether they need material assistance, whether they're contemplating an abortion, whether they think they're pregnant and need a pregnancy test, absolutely. This ad, I believe was designed—and it was not designed by me by the way anyway and also had to be very brief because it was a confined area—was designed to reach as many women as possible regardless of their circumstance.

Transcript of Deposition of Carol Clews, attached as Exhibit C, at 63:10-64:8.  Of the 1,071 women noted to have called the Center during the period this advertisement ran, only one woman mistakenly thought that the Center performed abortions.  Ex. 27 to Opposition.  There is no evidence that this one mistaken woman lived in Baltimore City or intended to visit a center in Baltimore City (the Center has locations outside of Baltimore City).  There is no evidence that such advertisements caused any women to visit the Center, to delay receiving medical care as a result of such visit, or to suffer harm as a result of a delay.

It is also noteworthy that these "advertisements" in the record are actually not deceptive. A center's advertising that it performs "abortions alternatives" should not imply to a reasonable reader that the center is a location to receive an abortion (but rather an alternative to an abortion), and, indeed, the vast majority of those who called the Center during the period the advertisement ran were not confused regarding the scope of the Center's services. Ex. 27 to Opposition. The City's argument that an ad is inherently deceptive if it does not describe services the advertiser does not perform would make nearly every advertisement ever published deceptive.

What is undisputed is that the Center immediately informs, in its chosen way, all of its clients that it does not perform or refer for abortions. Clients receive upon entry a welcoming and supportive message that is called the Center's "Commitment of Care." See Ex. B(iii) to Mem. in Supp. In the context of the Center's commitment to honesty, confidentiality, nondiscrimination, and providing accurate information in a loving way, the Commitment of Care includes a statement that the Center does not offer or refer for abortions but is committed to offering accurate information about abortion procedures and risks. *See* Clews Aff. ¶¶ 32-34 (Ex. B. to Mem. in Supp.). As referenced in Ms. Clews' deposition above, and her affidavit at ¶ 60, if a caller or visitor is not clear about the kinds of services available at the Center, the information is immediately clarified. Further, a welcome form signed by all new clients at the Center confirms in bold lettering the Center's statement that it "does not offer, recommend, or refer for abortions or abortifacients (birth control), but we are committed to offering accurate information about abortion procedures and risks." *See* "Welcome" Form attached as Exhibit D (which was also Ex. 5 to Duval-Harvey Depo. and Ex. 28 to Clews Depo). In the entire legislative record and the City's own investigative or discovery procedures in the six years since the City has imposed this

Ordinance, there is no evidence at all that a single woman or tester called a LSPC in Baltimore City looking for an abortion and was not told immediately that the center did not provide or refer for abortions.

Critically, the City also lacks evidence that these undisputed actions by the Center—to inform women truthfully and quickly and in the context of care and compassion about the services offered by the Center—are insufficient to address any asserted governmental interest in informing women who visit the Center. Although the City itself does not inform women about services provided or not provided at LSPCs, the City's official 30(b)(6) designee acknowledges that a woman who reads the Center's statement in bold in the welcoming sign-in form has the same knowledge as a woman who reads the disclaimer required by the Ordinance. Duval-Harvey Depo. 107:3-11 (Ex. A). Thus, even if the City did establish some harm from confusion to Baltimore City women (which it has not—the City admits it has no evidence of any woman in Baltimore City harmed or delayed by a LSPC), it has not provided any evidence that the Center's own actions are not fully adequate to address any such "harm."

The City also purports to rely on expert testimony that is inadmissible and properly excluded. First, the Opposition advances expert opinions from Dr. Robert W. Blum that are beyond the scope of his Rule 26(a)(2)(B) Expert Disclosure, attached as Exhibit E, and are otherwise irrelevant. The City attaches a recently signed "declaration" by Blum that is inadmissible under Fed. R. Civ. P. 56. Blum's testimony "that he has seen adolescent patients who delayed visiting medical clinics by two or three weeks after receiving misinformation about the mental and physical harms of abortion" or that an unnamed patient "came to him in tears asking 'Why did they lie to me?'" when he worked in Minnesota in the late 1990s or early 2000s

does not express any expert opinion. Opposition at 34-35; Transcript of Deposition of Dr. Robert W. Blum, attached as Exhibit F, at 129:1-16. Rather, the City is attempting to use Blum to offer inadmissible hearsay evidence of what unnamed third-parties told him, which may not be relied upon by the City for summary judgment. The affidavit is not made based on personal knowledge and he was not disclosed as a witness with personal knowledge, and thus any factual assertions in his affidavit should be struck. Such information is also irrelevant to the Center's challenge, as Blum specifically admitted (consistent with the testimony of the City's 30(b)(6) designee) that he was unaware of any situation where any woman in Baltimore has suffered harms because she went to a crisis pregnancy center. Blum Depo. 121:16-20 (Ex. F).

Further, Blum's opinions regarding the efficacy of disclosure language must be stricken because he is not qualified in that area and he was not disclosed as an expert in the topics of the effectiveness of sign disclosures, the efficacy of disclosure language, or consumer confusion. Despite this, the City now purports to rely on Blum for the propositions that: "adolescents, people with low levels of education or poor reading comprehension, and non-native English speakers are unlikely to read and understand a long list of disclosures in print or online"; "a conspicuous sign at the point of service using the simplest language possible … functions more effectively as a disclosure"; and the " simpler and clearer the language, the more likely a disclosure will diminish uncertainty and confusion." Opposition at 39-40. The City's failure to designate Blum as an expert in these areas precludes the use of this testimony. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or to identify a witness as required by Rule 26(a) or (3), the party is not allowed to use that information or witness to supply evidence on a motion … unless the failure was substantially justified or is harmless."). But even if the Court were willing to consider Blum's

testimony on this topic, Blum's deposition demonstrates that he was not disclosed as an expert on these topics because he admittedly "do[es] not have expertise in communication" and that the efficacy of the City's Disclaimer has "not been researched."  Blum Depo. 141:2-3; 142:21-143:1 (Ex. F); *see also id.* at 96:7-8 ("I'm not a health communication person"); *id.* at 139:18-19 ("I do not have any expertise in communication mechanisms.").  Finally, insofar as this testimony is offered to suggest that the City properly considered and rejected other alternatives to the Ordinance, there is no factual evidence at all that the City considered Blum's opinions in this regard prior to enacting the Ordinance.  Additionally, the City asserted legislative privilege as to any pre-enactment considerations by the City except for materials in the legislative record. Having asserted this privilege and instructed its 30(b)(6) witness not to answer questions regarding such matters, including what alternatives if any were considered, the City cannot now through a post-hac "expert" suggest that the City Council actually considered any alternatives when there is no factual basis for the suggestion and the Center has been prohibited from asking questions about it.  *See* Duval-Harvey Depo. 207:2-19 (Ex. A) ("Mr. Kinkopf [attorney for the Center]: . . . you are instructing Dr. Duval-Harvey not to answer any questions in connection with alternatives that City Council may or may not have considered in connection with the ordinance? Is that accurate? Ms. Katz [attorney for the City]: Yes.")

Second, the City may not rely on the purported expert testimony of Anirban Basu.  While Basu's testimony regarding the commercial nature of the Center's activities is entirely irrelevant (that the Center engages in commercial transactions does not transform all of its speech into commercial speech), it is also inadmissible legal opinion masquerading as expert opinion and should be stricken.  Basu's testimony is offered for the proposition that a "nonprofit, mission-

driven organization is capable of engaging in commercial transactions regardless of whether the organization is primarily motivated by religious or moral beliefs," and that an "organization's status as a not-for-profit for tax exemption purposes is not indicative of whether it engages in commercial activities." Opposition at 18-19. Whether a non-profit entity's activities are commercial is a legal question for the Court (albeit an entirely irrelevant question that the court need not answer) and certainly any question of what constitutes "commercial speech" is a legal question for the Court. But, of course, "[e]vidence supplied by experts as to legal conclusions is not admissible" as a matter of law. *MJ Harbor Hotel, LLC v. McCormick & Schmick Rest. Corp.,* 599 F. Supp. 2d 612, 623 (D. Md. 2009).

Basu, an attorney, offers legal conclusions on what constitutes commerce[5] and commercial transactions that are not only unhelpful to the Court in deciding what is and is not commercial speech, but that are also unreasonable in their conclusions. For example, Basu considers giving a donation to the NAACP, giving a donation to a Catholic Church at mass, and giving a donation to a political campaign all to be commercial acts. Transcript of Deposition of Anirban Basu, attached as Exhibit G, at 48-50. Of course, whether a donation to a LSPC is a commercial act or whether a LSPC otherwise engages in commerce is not relevant to this action since the Ordinance does not regulate donations to LSPCs or other potential commercial acts. The question for the Court is whether the speech regulated by the Ordinance is "commercial speech" and Basu acknowledges that he has no opinion or expertise on the question of "commercial speech."

---

[5] At his deposition, Basu succinctly described the purpose of his testimony as follows: "My mission has been to define commerce." Basu Depo. 28:16-17 (Ex. G). Basu acknowledged that what constitutes commercial speech under the First Amendment is beyond the scope of his expert review. *Id.* at 76:4-20 (Ex. G).

Interestingly, even when a donation is given to a nonprofit like a pregnancy center (*i.e.* Basu's asserted commercial transaction between donor and the nonprofit), Basu opines that the client who receives free services from the center is not part of a commercial transaction with the center. Basu Depo. 68:11-21 (Ex. G) (opining that the client receiving the services is "not part of the transaction"). That is, Basu's own theory is that there is no commercial activity between the Center and its clients who receive free goods or services. Thus, in response to the question of whether a commercial transaction has occurred when GBCPC provides free services to clients, Basu opines:

> No, that's not when the transaction occurs. So, as an example, let's isolate the giving of formula to a new mother. Is that a commercial transaction in and of itself? It is not. Why? Because, in that case, the mother is receiving a good, but does not exchange value.

*Id.* at 66:16-67:9 (Ex. G). In other words, Basu's own theory undermines the City's claim that the Center engages in commercial speech when it advertises its services with its clients. According to Basu, such conversations are not part of a commercial transaction because no money was exchanged.

Notably, Basu offers these opinions about the commercial nature of LSPC activities even though he admits he was provided no factual materials about what pregnancy centers do and that he has no knowledge of the nature of the communications and discussions LSPCs have with women. *Id.* at 28:9-17; 104:14-105 (Ex. G). Basu's opinions are irrelevant, unreasonable, and actually undermine the City's position.

**II.     The Ordinance Does Not Regulate Commercial Speech and Thus Strict Scrutiny Applies.**

The City and the Center agree that, as the City states: "The standard to which the Ordinance is subject depends, in large part, on whether it regulates commercial speech or noncommercial speech."  Opposition at 15.  The City points to advertising by pregnancy centers and cites numerous cases that evaluate regulation of advertising under a commercial speech analysis.  Of course, <u>the central problem in the City's argument is that the Ordinance does not regulate the Center's advertisements</u>.  The Ordinance requires a limited-service pregnancy center (defined in the Ordinance based on what the LSPC says, not based on whether or how it advertises) <u>to post a disclaimer in its waiting room</u>.  The City argues as if the Ordinance requires a disclaimer on deceptive advertisements by LSPCs, but that is simply not what the Ordinance at issue here says.  The City attempts to defend an Ordinance that it did not enact.

The crux of the City's commercial speech argument is a bait-and-switch.  The City points to allegedly deceptive, commercial advertisements and cites precedents relating to commercial advertisements; but the Ordinance does not actually regulate commercial advertisements at all.  The City says that because the Center has advertised the free services it provides, the City can regulate any aspect of the Center's speech, so long as the City believes the regulation has some rational relationship to the alleged harms caused by the Center's advertising.  The City ignores the plain language and effect of the Ordinance, which actually regulates the fully-protected speech occurring in the Center's waiting room—where the negative impact on the Center's speech and its clients has been established by the undisputed evidence—evidence simply ignored by the City.

As Judge Chasanow aptly explained in the *Tepeyac* case, advertisements of a pregnancy center may not be used by the government "to extrapolate that it can regulate all of Plaintiff's

speech as commercial speech, including that within its waiting room." *Tepeyac,* 5 F. Supp. 3d at 760.

The speech regulated by the waiting room disclaimer is the speech in the waiting room. In the Center's Mem. in Supp., *e.g.* at 24-32, the Center established the non-commercial nature of the speech in the Center's waiting room and the impact of the Disclaimer on the Center's protected speech, through undisputed affidavits and documentary evidence. The City does not dispute these facts in its Opposition. Indeed, the City itself asserts a strong distinction between the Center's speech in its waiting room (which is what is regulated by the Ordinance and which is undisputedly protected) and the speech in the Center's advertisements (which is not impacted at all by the Ordinance and which the City argues is commercial speech). Opposition at 24.[6]

*Fargo Women's Health Organization, Inc. v. Larson,* 381 N.W.2d 176, 177 (N.D. 1986) confirms the errors of the City's commercial speech argument. While the City claims that this Supreme Court of North Dakota case is "exactly on point," the City fails again to recognize that *Larson* involved the application of a false advertising statute directly to purportedly false advertisements. The *Larson* cased involved the direct prohibition of false and misleading advertisements, not an attempt to put a government-mandated disclaimer on the walls of a nonprofit. The law there restricted the defendant's newspaper and yellow-pages advertisements themselves. Rather than supporting the City's position, that court's decision to approve "a

---

[6] Thus, the City argues that the Center's alleged commercial speech occurs when "Pregnancy Centers promote their goods and services in the commercial marketplace" or make "proposals to provide commercially valuable goods and services" through "advertisements and other forms of solicitation." Opposition at 19-21. The City expressly acknowledges, however, that this speech is "completely distinct" from the Center's "noncommercial, religious expressions," *id.* at 24, which indisputably occurs in the Center's waiting room and is actually regulated by the Ordinance.

narrowly prescribed order temporarily restraining allegedly false and deceptive communication," *id*. at 182, demonstrates the City's unconstitutional overreach in mandating a disclaimer that impacts all of the speech occurring in the Center's waiting room. Again, if the City actually regulated false advertising, the *Larson* case would be more on point. Indeed, as described in the Center's Mem. in Supp. at 31-32, the *Larson* court actually struck down part of the injunction against the pro-life center that required the center to state in any advertisements using the term abortion that the center does not perform abortions. *Larson*, 381 N.W.2d at 179.

Because of this obvious difference between regulating speech in ads and regulating speech in waiting rooms, Judge Chasanow distinguished *Larson* and applied strict scrutiny in striking down a similar Montgomery County statute that the County tried to justify as a commercial speech regulation, stating: "Here, unlike the advertisements in *Larson*, the speech being regulated takes place within an LSPRC's waiting room, not amongst the general discourse between and among pregnancy-service providers and pregnant women, but within Centro Tepeyac's four walls, much closer to their ideological message." *Tepeyac*, 5 F. Supp. 3d at 760.[7]

The City wrongly relies upon *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983), attempting to analogize the contraceptive pamphlets at issue in *Bolger* to the Center's

_____

[7] The California District Court's recent decision in *First Resort, Inc. v. Herrera*, 80 F. Supp. 3d 1043 (N.D. Cal. 2015) upholding a San Francisco ordinance that prohibits false and misleading public <u>advertising</u> by limited service pregnancy centers merely demonstrates further the tenuous nature of the City's claim that it is attempting to regulate false advertising by requiring a sign in the Center's waiting room, rather than attempting to address the false advertising itself. *First Resort* offers no support for the claim that the City may regulate the Center's waiting room because the Center also has advertisements. In *First Resort*, the speech regulation restricted <u>only</u> ads. The speech regulation did not require a government posting in a center's waiting room and it was triggered only by deceptive advertising (it did not apply regardless of whether a center advertised).

advertisements. But the contraceptive pamphlets found commercial in *Bolger* were "conceded to be advertisements," "reference[d] a specific product," and were sent with "an economic motivation." *Id.* at 66-67. The law under review in *Bolger* directly regulated the advertisements that constituted the commercial speech, "prohibit[ing] the mailing of unsolicited advertisements for contraceptives." *Id.* at 61. The Court recognized the pamphlets to be an attempt by a commercial contraceptive company to avoid regulation by linking the contraceptives to current issues in public debate, namely venereal disease and family planning. *Id.* at 68.

Here, quite unlike *Bolger's* direct regulation of advertising, the Ordinance imposes its Disclaimer on the speech occurring in the Center's waiting room, apart from and unrelated to any advertising. As set forth in the Mem. in Supp. at 12, the Center has no advertising in its waiting room and offers no goods or services for sale in its waiting room or anywhere else. On the other hand, the Center does engage in sensitive personal and religious conversations in its waiting room, integrating its Christian pro-life views into each of its communications and interactions with visitors in the waiting room. *Id.* Far from falling within the "core notion of commercial speech," *i.e.*, "speech that does no more than propose a commercial transaction" as alleged by the City, Opposition at 20, the speech occurring in the Center's waiting room undisputedly includes core First Amendment non-commercial speech. Indeed, the City specifically recognizes the non-commercial nature of the speech actually regulated by the Ordinance, acknowledging that "[o]f course, not all Pregnancy Center speech is commercial speech. For example, a conversation between a Pregnancy Center staff member and a consumer about abortion's risks and alternatives . . . is plainly noncommercial." Opposition at 22; *see also id.* at 16 *(*"Not all pregnancy center speech is commercial.").

But even if the Court were to somehow find that the Ordinance regulated the Center's advertisements, those advertisements would not constitute commercial speech pursuant to the standard set forth in *Bolger*. As the *Bolger* Court recognized, the "mere fact" that the pamphlets at issue were advertisements "does not compel the conclusion that they are commercial speech;" that "reference to a specific product does not by itself render the pamphlets commercial speech;" and the fact that the defendant "has an economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into commercial speech." *Bolger*, 463 U.S. at 66-67. Only when each of those factors is present did the Court find strong support for the conclusion that the pamphlets at issue were commercial. *Id*.

Here, the undisputed facts demonstrate that at least two of the *Bolger* factors are absent from the Center's advertisements. Thus, the Center's ads do not reference a "specific product" like Campbell's soup or Trojan condoms, but instead notify potential clients of the various free services and types of information provided by the Center, including parenting classes, post-abortion counseling, Bible study, referrals to community resources, information about risks of abortion, speakers on abstinence and other topics, and information about pre-natal development. *See* Center's PennySaver Flyer, attached as Exhibit H.

The undisputed facts also demonstrate that the Center has no economic motivation in its advertisements. While the City has not adduced any evidence that the Center has any economic motivation in its advertising, the Center has supplied undisputed testimony that: the sole motivation for the Center's operations, speech, actions, and provision of services to women is "love of Jesus Christ and a commitment to protect life from the moment of conception"; the "Center is not motivated by economics in its actions or communications with the women it

serves"; the "Center does not have an economic interest in its advertisements"; and the "sole motivation for the Center's advertisements is to further its religious and moral opposition to abortion by reaching out to women to provide support and opening a dialogue with pregnant woman so that they might choose not to have an abortion." Ex. B to Mem. in Supp. at ¶¶ 14, 75, 91-92; *see also id.* at ¶ 76 ("The Center engages in speech relating to abortion and birth-control based on strongly held religious and moral beliefs rather than commercial interests or profit motives."); ¶ 85 ("The Center's motivation is its religious and moral opposition to abortion and its objective is to support women so that they will choose to carry their babies to full term."). In response to these undisputed facts, the City musters only the (inadmissible) testimony of its expert, Basu, who acknowledges that the clients the Center serves, and to whom the Center's advertisements are directed, do not engage in commercial transactions with the Center. *See* Section I(C), *supra*, at 16-18. The absence of two of three *Bolger* factors demonstrate that even the Center's actual advertisements (which are not even regulated by the Ordinance) are not commercial speech.

This conclusion is further demonstrated by the context of the Center's speech, which is described in detail in the Center's Mem. in Supp. at 29-30, and to which the City offers no facts in rebuttal. The relevant context for the Court to consider is not the context of advertisements—since the Ordinance does not regulate advertisements or even require them. The Center is required to post the Disclaimer (because of what the Center says and does not say) even if it never advertises again and regardless of what its "advertisements" say. The context of the Center's past ads and the context of ads by third parties is irrelevant. The context of ads in *Larson* and *First Resort*, etc. were relevant because the laws being challenged there directly regulated ads; here it is the context

of the waiting room that is relevant because the Ordinance regulates the speech in the waiting room by requiring the Disclaimer to be posted there.

The City's reliance on *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.,* 483 U.S. 522, 535 (1987) is similarly misplaced. In that case, the Court held that Congress could regulate the word Olympic where used "for the purpose of trade [or] to induce <u>the sale of any goods or services</u> as commercial speech." *Id.* (internal citation omitted, emphasis added). The Court found that "prohibiting the use of one word for particular purposes," *i.e.* Olympic in connection with the defendant's publicizing of a planned gay athletic competition (including through the sale of T-shirts, buttons, and bumper stickers), did not prevent the defendant from making a political statement about the status of gay persons in society. The Court emphasized that the limitation on the use of the word "Olympic" was "incidental to the primary congressional purpose of encouraging and rewarding" the U.S. Olympic Committee's efforts to give the word "Olympic" special <u>commercial</u> value. *Id.* at 536. Because of the unique commercial value (recognized by Congress as the use for trade and to induce the sale of goods or services) of the word "Olympic," there was no free speech violation in the restriction of its promotional usage. The Court did not say, as the City suggests, that if an entity generally "promotes goods and services" then the government can regulate all of its speech under rational basis review.

Further, that the Supreme Court has authorized mandatory disclosures on attorney advertising in the cases of *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985) and *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010) provides no support for the City's claims that the Ordinance is a commercial speech regulation. At issue in those cases was the direct regulation of "advertising pure and simple." *Zauderer*,

471 U.S. at 637. Recognizing the "'common-sense' distinction between speech proposing a commercial transaction . . . and other varieties of speech," *Zauderer* approved a professional conduct rule requiring attorneys "who advertise their willingness to represent clients on a contingent-fee basis to state that the client may have to bear certain expenses even if he loses," because the regulation took "the form of a requirement that appellant include in his *advertising* purely factual and uncontroversial information." *Id.* at 650-51 (emphasis added). Similarly, *Milavetz* upheld a disclosure in advertisements for bankruptcy services by debt relief agencies, including certain law firms, where the parties "parties agree[d] . . . that the challenged provisions regulate only commercial speech." 559 U.S. at 249. Neither case holds that attorneys may be required to place a disclaimer in their waiting room, completely divorced from their advertisements.

The City's claim that the Ordinance is nevertheless acceptable because it "does not prevent Pregnancy Centers from telling consumers that they believe abortion and certain methods of birth-control are immoral or unhealthy," Opposition at 22, has been specifically rejected by the Fourth Circuit. Rather, in *Stuart v. Camnitz* the Fourth Circuit dispelled the City's notion that compelled disclaimers are acceptable so long as the burdened party can supplement the government's speech, holding:

> The state protests that the Requirement does not dictate a specific script and that the doctor is free to supplement the information with his own opinion about abortion. Reply Br. 1416. That is true; the state does not demand that the doctor use particular words. But that does not mean that the Requirement is "not designed to favor or disadvantage speech of any particular content." *Turner*, 512 U.S. at 652, 114 S.Ct. 2445. In fact, the clear and conceded purpose of the Requirement is to support the state's pro-life position. That the doctor may supplement the compelled speech with his own perspective does not cure the coercion—the government's message still must be delivered (though not necessarily received).

774 F.3d 238, 246 (4th Cir. 2014).  Requiring the Center to engage in additional speech to explain the government's message and its own position on abortion and birth control represents additional burden on the Center's freedom of speech, not a cure to the harm caused by the compelled Disclaimer.  Thus, the Supreme Court did not say it was sufficient for the plaintiff parade organizers in *Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston,* 515 U.S. 557 (1995) to simply put additional units in the parade to counter those units the parade organizer disagreed with; it was not sufficient for the utility company in *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Calif.,* 475 U.S. 1 (1986) to include additional information in its newsletters; and it was not sufficient for the charitable solicitor in *Riley, supra,* to explain more about how the charity would spend the funds it raised.  In every one of those cases, the compelled speech was struck down despite the plaintiff's opportunity to deliver additional speech to its audience. The Supreme Court consistently holds that the First Amendment protects a private speaker from being forced to deliver a message it chooses not to deliver.

## III. The Ordinance Does Not Regulate Professional Speech And Thus Strict Scrutiny Applies.

Nor can the City rescue its Ordinance by claiming that it is actually just regulating the conduct of a licensed professional. Br. 28-30. That argument—raised now for the first time, more than five years after the Ordinance was enacted—has already been waived. And it was waived for a very good reason: the professional speech doctrine has no applicability where there is no licensed profession in which services are provided for money and the City has no authority to regulate health professionals.[8]

---

[8] Importantly, in its section on professional speech, the City necessarily asserts that the Ordinance regulates the speech that occurs in the Center between the Center and its clients, not the Center's

**A. The Professional Speech Doctrine Only Applies When the Government Licenses and Regulates Professionals Who Provide Services For Money.**

As the Fourth Circuit has explained, "[u]nder the professional speech doctrine, the government can license and regulate those who would provide services to their clients for compensation." *Moore-King v. Cty. of Chesterfield, Va*, 708 F.3d 560, 569 (4th Cir. 2013). Regulation of a licensed profession may include regulation of the licensed professional's speech when that speech is "incidental to the conduct of the profession." *Lowe v. SEC*, 472 U.S. 181, 232 (1985) (White, J., concurring). This allows governments some power to regulate speech that occurs within relationships formed by professionals "by means of their state-issued licenses." *Pickup v. Brown*, 740 F.3d 1208, 1228 (9th Cir. 2014).

Here, the professional speech doctrine does not apply because the City does not license and regulate any "profession" of providing information about pregnancy options. No such "profession" exists under the law. No license is required to talk about pregnancy options. There can be no regulation of "professional speech" where there is no *profession*. The City does not even purport to assert that it has enacted a professional regulating scheme of which the Ordinance is simply an incidental part.

This case is thus quite different from the City's cases, all of which involve licensed professions. *See Stuart*, 774 F.3d at 247 (discussing "licensing and regulation by the state" of the

---

advertisements (as the City asserts in its commercial speech section). <u>This concession is fatal to the City's commercial speech arguments</u> because it confirms that the Ordinance regulates the undisputedly noncommercial personal and religious conversations with clients and not the allegedly commercial advertisements of LSPCs.

medical profession)[9]; *Pickup*, 740 F.3d at 1234 (law "regulates licensed mental health providers").

Carol Clews is thus nothing like the fortune-teller in *Moore-King*, who was subject to professional

speech regulations because she needed "to acquire a fortune teller business permit, pay the fortune

teller license tax, and secure a conditional use permit." *Moore-King*, 708 F.3d at 570. ("Indeed,

although the steps may differ, the basic paradigm of regulatory requirements before one can

publicly practice a profession also applies to law, medicine, taxi-driving, counseling, and many

other occupations.").  The speech between the Center and its clients also cannot be regulated as

"professional speech" because "the record is devoid of any indication that [the Center] 'purports to

exercise judgment on behalf of' its program participants, a critical component of professional

speech." *Tepeyac*, 5 F.Supp. 3d at 761-62 (quoting *Lowe* 472 U.S. at 232 (White J., concurring)).

Furthermore, the very point of the professional speech doctrine is "to protect the public

from those who seek for one purpose or another to ***obtain its money***" by practicing a profession.

*Thomas v. Collins*, 323 U.S. 516, 544-45 (1945) (Jackson, J., concurring) (emphasis added). It is

thus designed to regulate those who provide services "for compensation." *Moore-King*, 708 F.3d

at 569. That is why the Fourth Circuit has explained that the "relevant inquiry" to determine

whether the professional speech doctrine applies is whether the speaker "is providing personalized

advice in a private setting ***to a paying client***." *Id.* (emphasis supplied).

Here, of course, there is no evidence that the Center (or any other speaker covered by the

Ordinance) engages in speech with women to extract "compensation" from them as "a paying

---

[9] The Ordinance is also starkly different from the law at issue in *Stuart*, which actually did
regulate the conduct of a licensed profession. That law "regulate[d] both speech and conduct" and
"require[d] doctors to 'say' as well as 'do.'" *Stuart*, 774 F.3d at 245, 248. By contrast, the City's
Ordinance does not regulate conduct at all and instead focuses solely on speech.

client." *Id.; see* Mem. in Supp. at 9 (noting that it is undisputed that there are only two LSPCs in the City, each of which provides all services for free and in support of moral and/or religious objections to abortion).  Presumably that is why the government has never sought to make talking about pregnancy options into a licensed and regulated profession in the first place.

The professional speech doctrine does not give the City the power to regulate the Center's clearly non-professional speech which it offers not to earn money but for religious reasons. Rather, when the government regulates speech in a "nonprofessional capacity" that action "trigger[s] strict scrutiny." Opposition at 30 (quoting *Stuart*, 774 F.3d at 248).

As Judge Chasanow recently explained in rejecting a similar argument after remand in the *Tepeyac* case, the City here

> seeks to blur—and perhaps eliminate—the distinction between discussion of professional subject matter and the practice of a profession. Such an outcome would represent a breathtaking expansion of the narrow professional speech doctrine and would ensnare countless charitable organizations based solely on their provision of information to program participants in a private setting. Accordingly … strict scrutiny will be applied.

*Tepeyac*, 5 F. Supp. 3d at 762.

### B. The City Waived the Professional Speech Argument.

There is another reason the City has not advanced its professional speech argument until now: the City waived that argument at the outset of the case.  In particular, the City explained in a letter to this Court on August 10, 2010:

> Finally, I wish to clarify seemingly contradictory statements that I made during the heat of oral argument concerning the Ordinance's application to licensed medical professionals. While the issue of preemption is not before the Court because no licensed medical professional has challenged it, the Ordinance is preempted by state law from regulating licensed professionals because they are already pervasively regulated as to disclosure and informed consent.  *See Bd. of Child Care of the Balt.*

> *Annual Conf. of the Methodist Church, Inc. v. Harker,* 316 Md. 683, 697
> (1989); Defendant's Motion to Dismiss p. 19; *see also City of Balt. v.
> Stuyvesant Ins. Co.,* 226 Md. 379, 389-92 (1961) (finding the entirety of
> a local regulatory ordinance valid even where it is partially preempted
> from applying to State-licensed persons).

ECF Doc. No. 22, Letter from Counsel for the City to Hon. Marvin Garbis, August 10, 2010. The

City thus can make no professional speech argument because it has already taken the position that

it lacks the power to regulate licensed professionals *at all*.[10]

## IV.    The Ordinance Is Content and Viewpoint Based and Thus Subject to Strict Scrutiny.

As explained in the Mem. in Supp. at 18-23, the Ordinance regulates non-commercial

speech based on its content and viewpoint.  Pursuant to the controlling precedent of *Reed v. Town

of Gilbert, Ariz.*, 135 S. Ct. 2218 (2015), the Ordinance is therefore subject to strict scrutiny.

While disputing whether the Ordinance constitutes viewpoint discrimination, the City does not

(and cannot) dispute that the Ordinance is content-based and all but acknowledges that if the Court

concludes that the Ordinance does not regulate commercial or professional speech, it must be

subject to strict scrutiny.  Opposition at 15 n.5.[11]

---

[10] For this reason, the City's attempted focus on medical services, Opposition at 30, confers no power on the City to regulate speech. In any case, as the City concedes elsewhere in the brief, the medical director is "very rarely" at the Center and "does not ever meet directly with center clients."  Opposition at 6 (*citing* Clews Depo. 107:6-11, Ex. C). It makes no sense for the City to claim a power to regulate the speech of a professional where (a) it has already acknowledged it can have no such power under state law, and (b) the City's regulation is designed to influence *every* Center discussion with a pregnant woman, while the licensed professional participates in *none*.

[11] The City's contention that *Reed*'s presumption of unconstitutionality for facially content-based laws does not apply to commercial and professional speech is simply incorrect. Opposition at 15 fn.5. Rather, as the Supreme Court held in *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011), "[a law that makes] content- and speaker-based restrictions" on its face is subject to strict scrutiny review, and "commercial speech is no exception."  *Id*. at 2663-65.  Pursuant to *Reed* and *Sorrell*,

Thus, the City's claim that *McCullen v. Coakley,* 134 S.Ct. 2518 (2014) is fatal to the Center's viewpoint discrimination claim is irrelevant, since strict scrutiny applies to the Ordinance's plain regulation of non-commercial and non-professional speech on the basis of its content. *Reed*, 135 S. Ct. at 2227. But the City's reading of *McCullen* on the issue of viewpoint discrimination is also incorrect and *McCullen* further underlines the Ordinance's lack of facial content and viewpoint neutrality, which independently require strict scrutiny review of the Ordinance.

In *McCullen*, the Court held that a buffer zone created only around abortion clinics was content and viewpoint neutral because the law did not draw distinctions between speech and speakers on its face, *i.e.*, "whether petitioners violate the Act depends not on what they say but simply where they say it." *Id* at 2531.[12] The Court specifically recognized, however, that the law "would be content based if it required enforcement authorities to examine the content of the

---

regardless of whether the Ordinance regulates commercial speech, it is likewise subject to strict scrutiny review for the singular reason that it singles out specific speakers disfavored for the content of their speech, namely "limited-service pregnancy centers" who do not "provide or refer for abortions or nondirective and comprehensive birth-control services." Ordinance; *see also* Mem. in Supp. at 20-24. For further context, in *Cent. Radio Co. Inc. v. City of Norfolk, Va.,* 2016 WL 360775, at *5 (4th Cir. Jan. 29, 2016) the Fourth Circuit recently held that a sign code that "exempted 'works of art' that 'in no way identif[ied] or specifically relate[d] to a product or service,' but [] applied to art that referenced a product or service" was "[o]n its face...content-based because it applied or did not apply as a result of content." The Fourth Circuit did not mention commercial speech or consider the possible commercial nature of art referencing products or services.

[12] Although the Court found the buffer zone law content and viewpoint neutral, it nonetheless failed constitutional review because the government failed to present evidence demonstrating that the purported harm could not be addressed "with less intrusive tools readily available to" the government. *McCullen,* 134 S.Ct.2539. Thus, as discussed below, *McCullen* also supports summary judgment in the Center's favor because the City has not satisfied its burden of demonstrating the Disclaimer is the least restrictive means of achieving the City's supposed interest.

message that is conveyed to determine whether a violation has occurred." *Id.* Here, the Ordinance indisputably applies based on whether the Center speaks and "provides information about pregnancy-related services" but does not "provide or refer for abortions" and certain types of contraceptives. *See* Ordinance (Ex. G to Mem. in Supp.). The Ordinance is thus facially content and viewpoint discriminatory, targeting those speakers who wish to discuss pregnancy related services without providing or referring for abortions (*i.e.,* those whose viewpoint is opposed to abortion). Mem. in Supp. at 18-24. *McCullen*'s statement that a state legislature need not address problems that do not confront them applies only to facially neutral laws (*i.e.*, laws based on location or other non-speech characteristics) and does not authorize the City to make facial content and viewpoint distinctions in speech regulations unless such regulations can pass strict scrutiny.

## V.     The City Fails to Meet Its Heavy Burden To Justify the Ordinance Under Strict Scrutiny.

The Ordinance cannot satisfy strict scrutiny because the City has failed to provide sufficient evidence to satisfy its burden of demonstrating that the Ordinance serves a compelling interest or is narrowly tailored. *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997) (noting that the government's burden to "demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law").

### A.     The City has failed to demonstrate that the Ordinance serves a compelling interest.

To survive strict scrutiny the City has the burden of demonstrating "that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. F.C.C.* ("*Turner I*"), 512 U.S. 624, 664 (1994).

The government "must present more than anecdote and supposition" to support a speech regulation, but instead must prove the existence of the alleged concern underlying the law based on substantial evidence. U.S. *v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000). The City takes just the opposite approach.

In response to the Center's Mem. in Supp. at 38-40, which explained the lack of any evidence that Baltimore LSPCs harm public health, the City responds with unsupported supposition and generalities from the City and its expert Blum that women are harmed by LSPCs' alleged misleading advertising. In the City's words: by "discouraging Pregnancy Centers from engaging in deceptive practices and by ensuring that individuals seeking abortion and comprehensive birth-control services are informed promptly upon their arrival at such centers that those services are not available there, the Ordinance serves the City's compelling interest in promoting public health." Opposition at 34. But the City offers no evidence of any women who delayed receiving medical care as a result of LSPC advertising or visiting an LSPC, much less a woman whose health was harmed as a result.

Indeed, as noted above, Blum has specifically admitted that he had no evidence that women in Baltimore were delayed in accessing comprehensive information about contraceptives because they went to a crisis pregnancy center. Blum Depo., 121:9-20 (Ex. F). He also admitted he had no evidence that women in Baltimore were harmed by going to a pregnancy center or by the "risks and costs of an abortion [that] increase with the gestational age of the pregnancy," because they first went to a pregnancy center. *Id.* at 122:1-10. Blum admitted he was "not aware of a single situation in which an actual human being has been harmed … because she has been to a crisis pregnancy center." *Id.* at 122:11-123:1. Blum also acknowledged that he had no idea

whether going to a crisis pregnancy center made women more likely to get medical care than woman who do not visit a center. *Id.*

Further, in the Center's Mem. in Supp., it explained that the City had also admitted in discovery that it was not aware of any "evidence of any person in Baltimore City actually delaying medical care because of any act or omission or information provided by a limited service pregnancy center" (Duval-Harvey Depo., 109:10-14, Ex. A); that the City had not investigated LSPCs (*Duval-Harvey Depo.,* 110:15-19, Ex. A); and that the City Health Department had not tested the Disclaimer or its efficacy (Duval-Harvey Depo. 85-87, Ex. A). Mem. in Supp. at 38-41. In its Opposition, the City does not dispute these facts. Rather, it complains that the Center referred to the deposition testimony of the City's Fed. R. Civ. P. 30(b)(6) representative, Dr. Jacqueline Duval-Harvey, the City's then Interim Commissioner of Health, as the source of the Center's facts. Opposition at 36 n.12. Of course, by her very nature and designation as the City's 30(b)(6) representative, Duval-Harvey was testifying on behalf of the City, not in her individual capacity, about all "information known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6). Duval-Harvey and her counsel clarified during her deposition that she was testifying on behalf of the City. *E.g.* Duval-Harvey Depo. 52 – 53 (Ex. A) (counsel for the City confirms that the witness "can answer on behalf of the city."); *see also* Amended Notice of Rule 30(B)(6) Deposition of Mayor and City Council of Baltimore, attached as Exhibit I (which was also Ex. 2 to Duval-Harvey Depo); Duval-Harvey Depo. at 23-25 (Ex. A). Duval-Harvey's testimony and admissions as the City's Rule 30(b)(6) designee were properly cited and attributed to the City in the Center's Mem. in Supp.; they can and do invalidate the City's purported compelling interest.

Duval-Harvey also acknowledged that the Center's own "Welcome" sign-in form (Ex. D) provides a woman the "same knowledge about the services that are not provided by the pregnancy center as a woman who reads and understands the disclaimer that's required under the Ordinance." Duval-Harvey Depo., 107:7-11 (Ex. A). The Center's Commitment of Care also explains that the Center does not provide or refer for abortions or certain types of birth control. Ex. B (iii) to Mem. in Support. Further, the undisputed testimony of the Center's Executive Director established the Center's commitment to honesty and providing accurate information, particularly if a caller or visitor is not clear about the kinds of services available at the Center, in which case the information is immediately clarified. See, *supra*, Section I(C) at 13-14. The City provides no evidence or explanation as to why the Center's voluntary statements, in the Center's chosen words and context,[13] are insufficient to correct any confusion as to the scope of services offered at the Center. The City also provides no evidence that any woman has ever visited a LSPC in Baltimore seeking an abortion and not been immediately told that the center did not provide or refer for abortions. Thus, the City lacks evidence not only of any harm caused by a LSPC, but also that the Ordinance's Disclaimer would alleviate any alleged harm.

The City's evidence is far weaker than the evidence the Supreme Court rejected as "not compelling" in *Brown v. Entm't Merch. Ass'n,* 131 S. Ct. 2729 (2011). In *Brown*, the Court considered whether a California law that imposed restrictions on violent video games comported

_____

[13] The City claims that the fact that the Center already informs women that it does not provide or refer for abortion or certain kinds of birth control somehow prevents the Center from objecting to or being harmed by the City's government-mandated disclaimer. This is simply untrue. In the Mem. in Supp. at 13-14 and 32-33, the Center explained in detail and through undisputed facts the negative impact that would be caused by the Disclaimer, the basis for the Center's objection to being compelled to post the government's message on its walls, and why the Center voluntarily informs women that it does not provide or refer for abortion in its own way and in its own voice.

with the First Amendment.  *Id.* at 2732. That law prohibited the sale or rental of "violent video games" to minors and required the packaging of the video games to be labeled for ages "18" and older.  *Id.*  The Court treated the law as a content-based restriction on protected speech and applied strict scrutiny.  *Id.* at 2738. As to the purported compelling interest, the Court explained: "[t]he State must specifically identify an 'actual problem' in need of solving . . . and the curtailment of free speech must be actually necessary to the solution."  *Id.* "That is a demanding standard."  *Id.*

Although California conceded that it could not point to a direct causal link between violent video games and harm to minors, California "claimed that it need not produce such proof because the legislature can make a *predictive* judgment that such a link exists, based on competing psychological studies."  *Brown* 131 S. Ct. at 2738 (emphasis added).  In rejecting this argument, the Court reasoned that because the government "bears the risk of uncertainty, . . . **ambiguous proof will not suffice**."  *Id.* at 2739 (emphasis added). To support a compelling interest, California relied primarily on psychological research that "purport[ed] to show a connection between exposure to violent video games and harmful effects on children."  *Id.* The Court, however, found that these studies "d[id] not prove that violent video games *cause* minors to act aggressively. . . ."  *Id.*  Rather, they only indicated some correlation, and the Court found that this "evidence is not compelling."  *Id.* Consequently, the Court held that California failed to show that the law served a compelling government interest.  Here, too, the City may not make a "predictive judgment" that women will be harmed by alleged misinformation of LSPCs.  Demonstrating a compelling interest requires proof that LSPCs are actually negatively impacting women's health and the City is undisputedly without any such evidence.

Indeed, in *Tepeyac*, Judge Chasanow found that the "record produced by Defendants," which included very similar and in many cases identical "evidence" to that advanced by the City, "was simply insufficient to sustain this regulation of Plaintiff's First Amendment rights." *Tepeyac*, 5 F. Supp. 3d at 768. Thus, Judge Chasanow concluded:

> Assuming *arguendo* that the County has a compelling interest in positive health outcomes for pregnant women, the critical flaw for the County is the lack of any evidence that the practices of LSPRCs are causing pregnant women to be misinformed which is negatively affecting their health. It does not necessarily follow that misinformation will lead to negative health outcomes. The County attempts to elide this distinction by providing no evidence for the effect, only the alleged cause. The Waxman and NARAL reports focus on the misinformation problem. So too do all of the comments made to the County Council in support of the Resolution. These commenters—who were universally volunteers from a pro-choice organization sent to investigate LSPRCs' practices—discussed the alleged misinformation they were provided and that that the LSPRCs were not forthcoming with the fact that they are not a medical center and that they do not provide referrals for abortions. But even assuming all that is true—that LSPRC are presenting themselves as medical providers and thus pregnant women are accepting their misinformation as sound medical advice, the County must still demonstrate the next supposition on the logical chain: that these practices are having the effect of harming the health of pregnant women. The County has failed this task…. Similarly, the two pieces of evidence from the Baltimore case are unavailing. Ms. McReynolds expressed frustration at being tricked as to the credentials of the LSPRC she visited, but does not indicate that the time she wasted there led to any negative health outcomes. Dr. Kelber–Kaye's testimony recounted her many students who went to an LSPRC thinking they were going to receive the full panoply of services and counseling and instead wound up "feeling harassed, coerced, and misinformed." But even then, there is no evidence that those women failed to get the medical services and counseling they desired or that the time spent at the LSPRC was to the detriment of their health.

*Id.* Here, too, the City has not met its burden of showing any real harm actually addressed by the Ordinance and, thus, the Ordinance cannot survive strict scrutiny. This Court should adopt Judge Chasanow's correct analysis and grant summary judgment in the Center's favor.

**B.    The City has failed to demonstrate that the Ordinance is narrowly tailored.**

"A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy."  *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).  If the source of the Center's alleged "evil" is false or misleading advertising, the City cannot seriously claim that a Disclaimer negatively impacting the religious and mission-driven advocacy in the Center's waiting room is narrowly tailored to target the "exact source" of that evil.

The Center's Mem. in Supp. at 41-42 explains at least two other less restrictive and more narrowly tailored alternatives to the Ordinance: the City can use or amend existing anti-fraud laws to address alleged false advertising or can itself publish the information required by the Disclaimer.

In its Opposition, the City claims that addressing LSPCs' allegedly harmful advertising through regulation of false advertising and fraud is not a less restrictive alternative based on its unsupported assertion that "an expansion of antifraud laws would be considerably more broad than the targeted disclaimer requirement of the Ordinance."  Opposition at 39.  The City is correct that, by its nature, a neutral anti-fraud law would rightfully apply to a broader range of speakers than the City's attempted content and viewpoint discrimination towards only LSPCs.  The question, though, is whether applying fraud laws to false advertising would burden more or less protected speech.  The answer to that question is plainly that applying such antifraud laws would burden less protected speech than the permanent Disclaimer, which impacts all of the Center's protected speech occurring in its waiting room.  *Nefedro v. Montgomery County*, 996 A.2d 850, 863 (Md. 2010) ("There is at least one less restrictive, effective means for combating fraud: laws making

fraud illegal without respect to protected speech."); *see also Riley*, 487 U.S. at 800 (noting that "the State may vigorously enforce its antifraud laws").

The City also makes the claim that the Ordinance is more effective than the City using its own voice to educate woman on the availability of abortion and contraception, which it indisputably has not done, *see* Mem. in Supp. at 39-44, instead relying on the unsupported testimony of Blum. The City misstates its burden to demonstrate narrow tailoring. *Playboy Entm't Grp.* does not stand for the proposition that a less restrictive alternative is narrowly tailored only if it is equally or more effective than the government's chosen alternative. Rather, as *Playboy Entm't Grp.* provides, "[w]hen a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Playboy Entm't Grp., Inc.,* 529 U.S. at 816. But in support of its burden to prove narrow tailoring, the City offers no admissible evidence demonstrating that the plainly less restrictive alternatives of regulating false advertising or of the City itself publishing the information compelled in the Disclosure are ineffective.

Regardless, the City may not rely on Blum for its claims that the Disclaimer in the Center's waiting room would be more effective or easily understood than the City publicizing the information required by the Disclaimer. Blum undisputedly was not disclosed as and, in fact is not, an expert in the area of communications and admittedly has never researched or tested the efficacy of the Disclaimer. *See* Section I(C), *supra*, at 14-16. Indeed, Blum specifically admitted that he did not have any "reason to believe that a sign on the wall is more effective at telling people where they can get comprehensive pregnancy information than the Internet, social media, schools" or other places. Blum Depo. at 101:9-16 (Ex. F). Blum acknowledged that he did not

know whether the Center's Welcome sign-in form (Ex. D) "is more or less effective than the [Disclaimer] that the City requires on the wall." *Id.* at 136:5-16 (Ex. F). Blum also admitted that he did not know whether the City's Disclaimer would be more or less effective than the Center's Commitment of Care in explaining the services the Center does not provide. *Id.* at 138:18-139:4 (Ex. F).

Duval-Harvey's testimony relied on by the City also provides no support for its argument that the Disclaimer is more effective than alternatives. Duval-Harvey specifically admitted that the Health Department did not test the Disclaimer or any alternative disclaimers before the passage of the Ordinance to determine the efficacy of the Disclaimer, even though the Health Department "typically" does test such disclaimers in the community and seeks feedback regarding effectiveness. Duval-Harvey Depo. 85-87 (Ex. A).

The City also offers no admissible evidence that these less restrictive alternatives have actually been attempted by the City and failed. The City has ignored the Supreme Court's clear direction that where "vital First Amendment interests [are] at stake, it is not enough for [the government] simply to say that other approaches have not worked," the government must provide evidentiary proof that such alternatives have been tried and failed. *McCullen*, 134 S. Ct. at 2340. Indeed, in finding Massachusetts' abortion clinic buffer zone law unconstitutional under intermediate scrutiny, the *McCullen* Court repeatedly pointed to the government's failure to ground its tailoring arguments in actual evidence, including any evidence that the government "seriously undertook to address the problem with less intrusive tools readily available to it." *Id.* The Court also noted that the government had identified concerns with individuals gathered at just one clinic in the state and: "For a problem shown to arise only once a week in one city at one

clinic, creating 35–foot buffer zones at every clinic across the Commonwealth is hardly a narrowly tailored solution." *Id.*

Here, the City has not established any harm or delay caused by a Baltimore LSPC, and may not rely on reports of alleged bad acts by other centers in other locations. As *McCullen* explains, requiring each Baltimore LSPC to post a mandated disclaimer can hardly be a narrowly tailored solution to a problem allegedly occurring elsewhere (if occurring at all). Further, the City admittedly never pursued the less effective alternatives identified by the Center and the City cannot rely on its own, untested supposition that such alternatives would be insufficient.[14]

The City's claim that the Disclaimer can survive strict scrutiny because it is, in the City's view, more narrowly tailored than the nearly identical disclaimer found unconstitutional by the Second Circuit in *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233 (2nd Cir. 2014) is also baseless.[15] The City would distinguish *Evergreen's* disclaimer, which also required a pregnancy center to state that it does not provide or refer for abortion, on the basis that the ordinance in

---

[14] Additionally, in the course of discovery, the City asserted legislative privilege as to any pre-enactment considerations by the City except for materials in the legislative record. Having asserted this privilege and instructed its 30(b)(6) witness not to answer questions regarding such matters, including what alternatives if any were considered, the City cannot now (through an expert or otherwise) suggest that the City Council actually considered these less restrictive alternatives when there is no factual basis for the suggestion and the Center has been prohibited from asking questions about it. *See* Duval-Harvey Depo. 207:2-19 (Ex. A) ("Mr. Kinkopf [attorney for the Center]: . . . you are instructing Dr. Duval-Harvey not to answer any questions in connection with alternatives that City Council may or may not have considered in connection with the ordinance? Is that accurate? Ms. Katz [attorney for the City]: Yes.")

[15] The City's reliance on *Riley* and *Nat'l Fed'n of the Blind v. FTC,* 420 F.3d 331, 344-45 (4th Cir. 2005) is misplaced. Rules requiring professional fundraisers making unsolicited phone calls to disclose their professional status can hardly be analogized to burdening all of the speech, including indisputably fully protected speech, occurring in the waiting room of a not-for-profit providing free services in support of its religious and moral mission. Indeed, Judge Chasanow expressly rejected the same attempted analogy in *Tepeyac*, 5 F.Supp. 3d at 755.

*Evergreen* required the disclaimer to be posted, but also to be made orally and in advertisements. The *Evergreen* court found that the disclaimer was not sufficiently tailored under either strict or intermediate scrutiny. The court based its decision on the fact that a "requirement that pregnancy services centers address abortion, emergency contraception, or prenatal care at the beginning of their contact with potential clients alters the centers' political speech by mandating the manner in which the discussion of these issues begins." *Id. at* 249. The same concern exists for the Disclaimer required by the Ordinance, despite the lack of an oral component, because the Disclaimer will nonetheless be viewed at the beginning of and impact each conversation occurring at the Center. *See* Section I(A), *supra*, at 5-6. Further, even though the *Evergreen* court parsed the New York ordinance at issue there and upheld certain parts of it, the court struck down the posted disclaimer portion of the law that is identical to the requirement of the City's Ordinance. Recognizing the "context" of the disclaimer as a "public debate over the morality and efficacy of contraception and abortion," the Second Circuit found the disclaimer overly burdened the plaintiff pregnancy center's speech and rejected the disclaimer at issue "regardless of whether less restrictive means exist." *Id.*

## VI.     **The Ordinance Fails Intermediate Scrutiny.**

Even if the Court were willing to accept the City's claim that the Ordinance constitutes a commercial or professional speech regulation, the Ordinance nonetheless fails intermediate scrutiny. Under intermediate scrutiny, the "state bears the burden of demonstrating 'at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest.'" *Stuart*, 774 F.3d at 250 (invalidating pro-life compelled disclosure by professionals under intermediate scrutiny). The City's burden:

> is not satisfied by mere speculation or conjecture; rather, a governmental body
> seeking to sustain a restriction on commercial speech must demonstrate that the
> harms it recites are real and that its restriction will in fact alleviate them to a
> material degree. We cautioned that this requirement was critical; otherwise, a State
> could with ease restrict commercial speech in the service of other objectives that
> could not themselves justify a burden on commercial expression.

*Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1996) (invalidating restriction on beer labels where government should have proceeded more directly against alleged harm) (internal citation and quotations omitted). Further, "intermediate scrutiny does indeed require the government to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden." *Reynolds v. Middleton*, 779 F.3d 222, 228-229 (4th Cir. 2015) (rejecting county-wide ban on roadside solicitation under intermediate scrutiny where county's evidence "established, at most, a problem with roadway solicitation at busy intersections in the west end of the county").

Here, however, the Ordinance not only burdens substantially more speech than necessary, it burdens *all* the Center's speech occurring in its waiting area. Moreover, requiring the Disclaimer in the Center's waiting room can certainly not be said to "directly" advance the government's stated interest of addressing Center's alleged deceptive advertising and is not drawn to achieve that interest, considering it in no way regulates the Center's advertising.

Further, as set forth in *McCullen* above, even in the context of intermediate scrutiny, the government must establish that other less restrictive alternatives were tried and failed. *McCullen*, 134 S. Ct. at 2359. "In this regard, any commercial speech restrictions must be 'a necessary as opposed to merely convenient means of achieving [the government's] interests.'" *WV Ass'n of Club Owners & Fraternal Services, Inc. v. Musgrave*, 553 F.3d 292, 305 (4th Cir. 2009) (quoting

*Thompson v. Western States Med. Center,* 535 U.S. 357, 373 (2002) (striking down a speech regulation where "there is no hint that the Government even considered these or any other alternatives.")).  Speech restrictions "must be a last-not first-resort."  *WV Ass'n of Club Owners*, 553 F.3d at 305 (internal citations and quotation marks omitted).  Thus, in response to the City's claim that the Center's proposed alternatives are less effective in combatting fraud, the Supreme Court has repeatedly stated:  "If this is not the most efficient means of preventing fraud, we reaffirm simply and emphatically that the First Amendment does not permit the State to sacrifice speech for efficiency."  *Riley*, 487 U.S. at 795.  There is no evidence that the City considered such alternatives.

Finally, as described above in Section V(A), *supra*, the City has offered no evidence that "harms it recites are real," considering it has no evidence of any women ever being harmed by a Baltimore LSPC, nor has the City demonstrated that the Center's existing Commitment of Care and welcome/sign-in form fail to achieve the Disclaimer's purported objective of informing women visiting the Center of the types of services not offered by the Center.[16]  Thus, the City has failed to demonstrate that the Disclaimer will advance the government's purported interest.

---

[16] For the same reasons, the Ordinance would fail under even the most permissive standard of review, as it does not "reasonably relate to the State's interest in preventing" deceptive commercial advertising. *Zauderer*, 471 U.S. at 628.  Indeed, the Ordinance does not regulate advertising at all.  But even if it did, the lack of evidence of any women ever being harmed or deceived by a LSPC or that the Center's own speech does not adequately address the City's purported interest precludes a finding that the Ordinance "reasonably relates" to the pursuit of any legitimate governmental interest.

**VII.     Judgment May Not Be Granted In The City's Favor On The Center's Free Assembly, Equal Protection, State Conscience Clause And Free Exercise Claims.**

The Center did not move for summary judgment on its Free Assembly, Equal Protection, and State Conscience law claims. In its Opposition, the City fails to supply sufficient basis for judgment in its favor on any of these claims. With respect to the City's Free Assembly claim, the City claims that the Ordinance does not impose a serious burden upon or significantly impact the Center's ability to assemble or meet with others. Yet, the City's very purpose in mandating the Disclaimer is to interrupt and inject its own views into the Center's conversations with women in the hopes they will leave the Center. *See* Mem. in. Supp. at 15; Opposition at 1, 34. The Center has specifically described with factual support the negative impact the Ordinance will have on the Center and its conversations with clients. *See* Mem. in Supp. at 13, 32-33. The City offers no facts in dispute and supplies no other basis supporting the entry of judgment in its favor on this claim, which must be denied.

With respect to the Center's equal protection claim, the City argues only that this claim is subject to the same review as the Center's speech claim and fails for the reasons the Center's speech claim allegedly fails. Of course, quite the opposite is true: the undisputed facts and legal arguments set forth here and in the Center's Mem. in Supp. demonstrate that the Center is entitled to summary judgment on its speech claim. Thus, the City's Opposition with respect to the Center's equal protection claim fails.

The City's Opposition devotes just a single conclusory sentence to asserting that the Ordinance does not violate the state conscience clause because it does not require any person to "perform or participate in, or refer to any source for, any medical procedure that results in artificial

insemination, sterilization, or termination of pregnancy." Opposition at 41 (citing MD. CODE ANN., HEALTH GEN. ART. § 20-214(a)(1)). The City ignores that the conscience clause statute provides further that the refusal to provide abortions referrals "may not be a basis for civil liability to another person or disciplinary or other recriminatory action." *Id.* § 20-214(a)(2). Under the Ordinance, liability may arise only for a person or entity that refuses to provide or refer for abortion; if a LSPC provides or refers for abortion it is not subject to the Ordinance's penalties. Thus, as a matter of law, refusing to provide or refer for abortions is a basis for liability under the Ordinance. The City's 30(b)(6) designee admitted this in her deposition. Duval-Harvey Depo. 202:1-6; 204:11-205:3 (Ex. A). Thus, the City's Opposition fails with respect to the Center's conscience clause claim.

Finally, the Center moved for summary judgment with respect to its free exercise claim, explaining that the Ordinance is not "neutral and generally applicable" and substantially burdens the Center's religious exercise, subjecting the Ordinance to strict scrutiny. Mem. in Supp. at 47-48. In response, the City claims that the Ordinance does not burden the Center's religious exercise and is neutral and generally applicable. Both of the City's arguments fail. The undisputed facts demonstrate the Disclaimer's negative impact on the Center's exercise of its religious beliefs through its outreach to women. Additionally, the law is not neutral or generally applicable because it applies only to two religiously-motivated entities and is based entirely on their refusal to provide or refer for abortions and abortifacients based on their religious beliefs. The City's Opposition should be denied because judgment should be entered in the Center's favor on its Free Exercise claim.

Respectfully submitted,

_____s/   David W. Kinkopf_____
David W. Kinkopf
Steven G. Metzger
GALLAGHER EVELIUS & JONES LLP
218 North Charles Street, Suite 400
Baltimore, Maryland 21201
(410) 727-7702

Mark Rienzi
Columbus School of Law
The Catholic Univ. of America
3600 John McCormack Road, NE
Washington, DC 20064
(202) 319-4970

Peter J. Basile, Federal Bar # 10405
pbasile@fsb-law.com
FERGUSON, SCHETELICH & BALLEW, P.A.
1401 Bank of America Center
100 South Charles Street
Baltimore, MD 21201-2725
(410) 837-2200

*Counsel for Plaintiff Greater Baltimore Center for*
*Pregnancy Concerns, Inc.*

Dated:  February 19, 2016

# **EXHIBIT LIST**

| Exhibit | Description |
|---------|-------------|
| A | Transcript of Deposition of Jacquelyn Duval-Harvey |
| B | Transcript of Deposition of National Institute of Family & Life Advocates |
| C | Transcript of Deposition of Carol Clews |
| D | Welcome Form (Exhibit 5 to Depo. of Duval-Harvey) |
| E | Expert Disclosure of Robert W. Blum, M.D. |
| F | Transcript of Deposition of Robert W. Blum, M.D. |
| G | Transcript of Deposition of Anirban Basu, M.A. |
| H | PennySaver Flyer |
| I | Amended Notice of Rule 30(B)(6) Deposition of Mayor and City Council of Baltimore (Exhibit 2 to Depo. of Duval-Harvey) |