IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GREATER BALTIMORE CENTER        *
FOR PREGNANCY CONCERNS, INC.

                                        *

            Plaintiff

                                        *

         vs.                  CIVIL ACTION NO. MJG-10-760

                                        *

MAYOR AND CITY COUNCIL OF
BALTIMORE, et al.              *

            Defendants         *

*       *       *       *       *       *       *       *       *

DECISION RE: SUMMARY JUDGMENT

The Court has before it Plaintiff's and Defendants' Cross

Motions for Summary Judgment [ECF 101, 104] and the materials

submitted relating thereto.  The Court conducted a hearing and

received the benefit of the arguments of counsel.

I.    BACKGROUND

A. Factual Background

On December 4, 2009, Defendants, Mayor and City Council of

Baltimore, et al., ("the City"), enacted Ordinance 09-252 (the

"Ordinance"),[1] which requires  a "limited-service pregnancy

center" ("LSPC") to  post a disclaimer in its waiting room

notifying clients that it "does not provide or make referral for

---

[1]     See Balt. City Health Code §§ 3-501 to 3-506 (2010).

abortion or birth-control services."[2]   The Disclaimer must

consist of one or more signs that are written in English and

Spanish, "easily readable" and "conspicuously posted" in the

waiting room or equivalent area.   Balt. City Health Code § 3-502

(2010).   The Ordinance defines an LSPC as "any person

> (1) whose primary purpose is to provide pregnancy-related
> services; and
> (2) who:
>> (I) for a fee or as a free service, provides
>> information about pregnancy-related services; but
>> (II) does not provide or refer for:
>>> (A) abortions; or
>>> (B) nondirective and comprehensive birth-control
>>> services."

Id. at § 3-502.   If an LSPC fails to post the Disclaimer, the

Health Commissioner will issue a notice requiring the LSPC to

correct the violation in ten days.   Id. at § 3-503.   If an LSPC

violates the notice, the Commissioner can issue an environmental

or civil citation of $150 pursuant to the Baltimore City Code.

Id. at § 3-506.

On September 27, 2010, the Baltimore City Health Department

adopted a final Regulation defining "nondirective and

comprehensive birth-control services" to mean "birth-control

services which only a licensed healthcare professional may

prescribe or provide."   [ECF 101-2, Ex. H].   The Regulation also

_____

[2]      Hereinafter "the Disclaimer."

stipulated that "[an LSPC] may indicate on the disclaimer sign what birth-control services it does provide and/or refer for" and "may indicate on the disclaimer sign that the sign is required by Baltimore City ordinance." Id.

The Plaintiff, Greater Baltimore Center for Pregnancy Concerns, Inc. ("the Center"), provides free pregnancy-related services and counseling and falls under the Ordinance's definition of a "limited service pregnancy center."  The Center operates at two locations within Baltimore City, in buildings owned by the Catholic Church.  The Center will not, for religious reasons, provide or refer for abortions or specific methods of birth-control that are contrary to the views of the Catholic Church.  According to the Center, the Disclaimer mandated by the Ordinance is compelled speech that "undermines the supportive message and religious mission of the Center." [ECF 101-1, at 7].

        B. Procedural History

    The Plaintiff[3] filed the instant lawsuit, a 42 U.S.C. § 1983 civil rights action, on March 29, 2010, asserting claims

---

[3]    Originally, the Center was joined by two other plaintiffs, St. Brigid's Roman Catholic Congregation and then-Archbishop Edwin F. O'Brien, who rented the building to the Center.  These

against the City Council of Baltimore, Mayor Stephanie Rawlings-Blake, in her official capacity as Mayor of Baltimore, and Olivia Farrow Esq., in her official capacity as acting Baltimore City Health Commissioner (collectively, "the City"). [ECF 1]. The Center seeks to enjoin enforcement of the Ordinance, contending that the Ordinance is unconstitutional on its face and as-applied to the Center.  Plaintiff's Complaint for Declaratory and Injunctive Relief presents four Counts:

    Count I. First Amendment (Free Speech and Assembly)

    Count II. First Amendment (Free Exercise of Religion)

    Count III. Fourteenth Amendment (Equal Protection)

    Count IV. Maryland State Law (Conscience Clause).[4]

    On June 4, 2010, the Center filed a Motion for Partial Summary Judgment on its Free Speech, Free Assembly, and Equal Protection Claims, supported by an affidavit from the Center's Executive Director Carol Ann Clews. [ECF 9].  The City responded to the summary judgment motion and filed its own

_____

two other plaintiffs were dismissed for lack of standing in this Court's initial Decision and Order, dated January 28, 2011. [ECF 32].  The Fourth Circuit affirmed this Court's standing decision. See Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore, 721 F.3d 264, 291 (4th Cir. 2013).
[4]    Md. Code Ann. Health-General § 20-214.

Motion to Dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) [ECF 11] on June 8, 2010.  The City included evidence from the Ordinance's legislative record,[5] and also filed a Rule 56(f) Affidavit informing the Court that the City believed that additional discovery was required.  [ECF 18].  The Court converted the City's motion to dismiss into a cross-motion for summary judgment under Rule 12(d) because the City had submitted and relied on material outside the Complaint.

On January 28, 2011, this Court issued a Decision and Order on the summary judgment motion and concluded that under strict scrutiny the Ordinance was facially invalid under the Free Speech Clause of the First Amendment because, even if it was enacted to further a compelling government interest, it was not narrowly tailored to accomplish that interest.[6]  This Court also dismissed the claims asserted by Plaintiffs St. Brigid's and the Archbishop for lack of standing.  [ECF 32, at 13].

---

[5]     For a more detailed description of the evidence presented to the Court in 2010, see Greater Baltimore Ctr. for Pregnancy Concerns, Inc., 721 F.3d at 274–75.

[6]     O'Brien v. Mayor & City Council of Baltimore, 768 F. Supp. 2d 804, 808 (D. Md. 2011), aff'd sub nom. Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore, 683 F.3d 539 (4th Cir. 2012), on reh'g en banc, 721 F.3d 264 (4th Cir. 2013), and aff'd in part, vacated in part, remanded sub nom. Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore, 721 F.3d 264 (4th Cir. 2013).

On appeal, a panel of the United States Court of Appeals for the Fourth Circuit affirmed this Court's decision.  <u>See</u> <u>Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor &</u> <u>City Council of Baltimore</u>, 683 F.3d 539 (4th Cir. 2012), <u>on</u> <u>reh'g en banc,</u> 721 F.3d 264 (4th Cir. 2013) [ECF 45].  On August 15, 2012, the Fourth Circuit granted a petition for rehearing <u>en</u> <u>banc</u>.  Subsequently, the Fourth Circuit issued a judgment affirming this Court's decision regarding standing, but vacating the judgment as to the Center's First Amendment claims on procedural grounds and remanding for further proceedings.  <u>See</u> <u>Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor &</u> <u>City Council of Baltimore</u>, 721 F.3d 264 (4th Cir. 2013).

The Fourth Circuit, <u>en</u> <u>banc</u>, held that the Court improperly denied the City discovery, which should have been allowed before the Court converted the City's 12(b)(6) motion into a motion for summary judgment.[7]  <u>Id.</u> at 291.  Since that decision, both parties have conducted extensive discovery.

---

[7]     Specifically, the Fourth Circuit concluded that discovery was needed regarding: the Center's economic motivation (if any), the scope and content of its advertisements, the effect of the Ordinance on the Center's noncommercial speech, the application of the Ordinance to LSPCs with no moral objections to birth control or abortion, and "evidence substantiating the efficacy of the Ordinance in promoting public health, as well as evidence disproving the effectiveness of purported less restrictive alternatives to the Ordinance's disclaimer." <u>Id.</u> at 285–88.

By the instant Motion, the Plaintiff seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on its Free Speech (Count I) and Free Exercise claims (Count II). [ECF 101].  The City sets forth a Cross Motion for Summary Judgment on <u>all</u> claims asserted by the Center, including the Free Assembly (Count I), Equal Protection (Count III), and State Conscience Clause claims (Count IV).  [ECF 104].

As discussed herein, the Court holds that, as applied to the Center, the Ordinance violates the Freedom of Speech Clause of the First Amendment of the Constitution of the United States.


II.  <u>SUMMARY JUDGMENT STANDARD</u>

A motion for summary judgment shall be granted if the pleadings and supporting documents "show [] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

The well-established principles pertinent to summary judgment motions can be distilled to a simple statement: the Court may look at the evidence presented through the non-movant's rose-colored glasses, but must view it realistically. After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether

the movant would, at trial, be entitled to judgment as a matter of law.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991). Thus, in order to defeat a motion for summary judgment, "the party opposing the motion must present evidence of specific facts from which the finder of fact could reasonably find for him or her."  Mackey v. Shalala, 43 F. Supp. 2d 559, 564 (D. Md. 1999) (emphasis added).

When evaluating a motion for summary judgment, the Court must bear in mind that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

Cross motions for summary judgment "do not automatically empower the court to dispense with the determination whether questions of material fact exist."  Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt, 700 F.2d 341, 349 (7th Cir. 1983).  "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  Mingus Constructors, Inc. v. United

<u>States</u>, 812 F.2d 1387, 1391 (Fed. Cir. 1987).  The court may grant summary judgment in favor of one party, deny both motions, or grant in part and deny in part each of the parties' motions. <u>See Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 (4th Cir. 2003).


III. <u>DISCUSSION</u>

A. <u>Undisputed Facts</u>[8]

1. <u>The Ordinance and Legislative Record</u>

The Baltimore City Council and Mayor enacted Ordinance 09-252 to remedy potential consumer confusion about the scope of services offered by LSPCs.  The Ordinance requires an organization providing pregnancy-related services, but not providing or referring abortions or birth control, an "LSPC", to conspicuously post a disclaimer in its waiting room stating that it "does not provide or make referral for abortion or birth-control services."  Balt. City Health Code § 3-502.  The Ordinance applies regardless of whether an LSPC provides services for free and whether an LSPC advertises or not.

The City passed the Ordinance in response to information concerning LSPCs and delays in accessing reproductive health services that can threaten public health.

---

[8]   Both sides insist that there are no disputes of material fact in this case.

Along with other testimony, the City Council considered two reports before passing the Ordinance: (1) a 2006 report prepared for U.S. Representative Henry A. Waxman ("the Waxman Report") [ECF 18-2], which details results from an investigation into 23 LSCPs nationwide and (2) a 2008 report by NARAL Pro-Choice Maryland Fund ("the Maryland Report") [ECF 18-3], which summarizes an investigation of LSPCs in Maryland, including Plaintiff.[9]  The Waxman Report states that the investigated LSPCs provided "false and misleading information" over the phone about "a link between abortion and breast cancer," "the effect of abortion on future fertility," and "the mental health effects of abortion." [ECF 18-2, at i].

The Maryland Report echoes these findings and also states that many Maryland LSPCs use medical services, such as STI testing and sonograms, as a tactic to delay women in getting an abortion.  [ECF 18-3, at 7] ("By persuading women to visit the center, [LSPCs] effectively push their anti-abortion agenda while delaying access to abortion services. By delaying access to abortion services these centers make

---

[9]    "Our investigation included personal visits to CPCs in Montgomery, Prince George's, Harford, and Baltimore counties, as well as Baltimore City. We visited eleven centers in total." [ECF 18-3, at 5].

abortion more costly, dangerous, and difficult or impossible
to obtain.").


### 2. LSPCs in Baltimore

There are two LSPCs in Baltimore City.  One is Plaintiff,
Greater Baltimore Center for Pregnancy Concerns, Inc., a
religious non-profit organization that operates in a rent-free
space provided by St. Ann's Catholic Church.  Second Affidavit
of Carol Clews ("Clews Aff."), at ¶ 13. [ECF 101-2, Ex. B].  The
other is Baltimore Pregnancy Center, a small, volunteer-run
organization that offers women "practical alternatives to
abortion, providing testing, counseling, maternity clothes, baby
clothes, formula" and more for free.  [ECF 101-2, Ex. L, at 18].
Both centers are pro-life organizations that do not offer, or
refer for, abortion or birth control.   Id.

The City has not visited these Baltimore LSPCs either
before or after the Ordinance was passed.  Deposition of
Jacquelyn Dual-Harvey ("Dual-Harvey Depo."), at 51, 55 [ECF 101-
2, Ex. E,].


### 3. Plaintiff's Mission and Activities

The Center began counseling women in Baltimore in 1980.  It
now operates in four locations, one in Baltimore City

(Plaintiff) and three in Baltimore County.[10]  According to its
Mission Statement, the Center "is a locally organized and funded
volunteer ministry demonstrating the love of Jesus Christ by
providing alternatives to abortion," and "shar[ing] the love of
Jesus Christ, including the plan of redemption from our sins."
Clews Aff., at ¶¶ 20-21 [ECF 101-2, Ex. B].  "The Center assists
over 1,200 women per year at its four locations and also
provides assistance to roughly 8,000 women per year via the
Center's telephone helpline."  Id. at ¶ 9.  The Center has eight
paid employees and many unpaid volunteers.  All Center staff,
volunteers, and board members must agree to the Center's
Statement of Principles, its Mission Statement, and its
Statement of Faith.  Id. at ¶ 18.

> [T]he motivation for all the Center does is the belief
> in Jesus Christ and belief that the Bible and
> Christianity are strongly opposed to abortion and
> strongly value life.  The motivation of the board,
> staff, volunteers, and donors to the Center is the
> Christian, pro-life mission of the Center.

[ECF 101-1, at 10] (internal citations omitted).

The Center provides the following services to its clients:
"material assistance (such as diapers, bottles and formula,
cribs, strollers, baby and maternity clothing, baby and
parenting books, etc.), educational programs through its Earn

---

[10]   All further references to "the Center" refer only to the
Plaintiff's Baltimore City location.

While You Learn Program (such as parenting skills and Bible study), pregnancy testing, confidential peer counseling, abstinence information, sonograms, pre-natal development information, and a 24-hour helpline." Clews Aff., at ¶ 36 [ECF 101-2, Ex. B]. The Center does not offer, or refer for, contraceptives or abortions. However, "if someone calls to make an appointment and they ask about our abortion services, or if [the Center] perform[s] abortions, the first thing [staff members] say to them is we do not perform or refer for abortions." Deposition of Carol Clews ("Clews Depo."), at 18 [ECF 104-3]. If a woman walks in seeking an abortion, she is told immediately, or very soon after arriving, that the Center does not provide or refer for abortion services. Id. It is the policy of the Center to conduct an approximately 45 minute counseling session with a woman seeking a pregnancy test before giving her the test. Id. at 25.

The Center has a medical director who "oversees the medical aspect of the clinic," and reviews ultrasound images taken by the sonographer. Id. at 29. The medical director is "very rarely" at the location and does not meet directly with clients. Id.

The Center is an affiliate member of the National Institute of Family Life Advocates ("NIFLA"), which provides legal and medical resources for pregnancy centers, since 2009. Typically,

the Center will not give a sonogram to a woman who is less than seven weeks pregnant because it is then that a beating heart becomes discernible.  Id. at 28.  Once a woman is seven weeks along in her pregnancy, she can schedule a free sonogram, but she will usually have to return a day or two later to get the sonogram because the Center only has one sonographer who must travel between the four locations.  Id. at 30.

The Center and its staff and volunteers have no economic interest in their actions or speech with clients, nor does the Center propose any commercial transactions with clients.  The Center's motivation is "deeply spiritual and religious."  Clews Aff., at ¶ 95 [ECF 101-2, Ex. B].  All services at the Center are provided free of charge. The Center makes referrals to adoption agencies and for services such as health care and housing.  The Center is not paid for, and does not receive money for, any referrals.  Id. at ¶ 101; Clews Depo., at 26 [ECF 104-3].  The Center does not receive money from the Baltimore City government.  Clews Aff., at ¶ 7 [ECF 101-2, Ex. B].  Instead, it is funded primarily through private donations and fundraising. Clews Depo., at 21 [ECF 104-3].

### 4. The Center's Advertisements

Additionally, the Center has engaged in paid advertising. In December 2010, the Center participated in an advertising

campaign with another national pro-life organization, the Vitae

Caring Foundation, which placed advertisements in city buses

around Baltimore.  The ads featured a picture of a young woman

with large text stating:  "FREE Abortion Alternatives." [ECF

104-24].  The ad also included in slightly smaller text:

- "FREE Confidential Options Counseling"
- "FREE Pregnancy Tests"
- "FREE Services."

Id.  The ad then listed the phone numbers and locations of the

Center and four other LSCPCs in surrounding areas.  During the

month of December when the bus ads were running, a volunteer

from the Center reported that she spoke on the telephone with

several "abortion minded callers" who were "under the impression

from the bus advertisements that we assisted in paying for

abortions. . . .   Another did not seem to understand, 'abortion

alternatives' and wanted to schedule an abortion."  Email from

Alice Steck to Carol Clews, Jan. 5, 2011 [ECF 104-28, at 2].

From April to July 2013, the Center ran ads in the

Pennysaver, a publication that features local advertisements.

[ECF 104-22].  The full page ad listed the Center's contact

information and stated: "The Center's FREE services include:

- 24-hour helpline [number]
- Pregnancy testing
- Confidential peer counseling with trained volunteers
- Pre-natal development information
- Information about procedures and risks of abortion

- Hannah's Cupboard (maternity and infant supplies)
- Earn While You Learn Program (Education)
- Abstinence Program & Speakers Bureau
- Bible Study
- Referrals to community resources, including housing, healthcare & adoption
- Post Abortion Counseling & Education
- Sonograms (limited), prenatal vitamins."

[ECF 104-22, at 3].

The Center also paid for a "short-run radio advertising campaign on a local radio station." Clews Depo., at 11 [ECF 104-3]. The Center has installed no signage other than on the façade at the Center itself. Id. at 16.

The Center receives an indirect benefit from the advertising of third-parties. The Center pays annual dues to be an affiliate of two large "umbrella" organizations, Care Net and Heartbeat International, which serve pregnancy centers nationwide. Id. at 10. The Center can take advantage of training materials and conferences provided by the national organizations. Id. Also, as an affiliate, the Center is listed in the referral databases for Care Net's Pregnancy Decision Line[11] and Heartbeat's Option Line,[12] which are call centers and

---

[11]    Pregnancy Decision Line is "the only national call center and Internet website designed to reach people considering abortion with immediate pregnancy decision coaching, information, and referrals." [ECF 104, at 10].

16

websites that connect people with local pregnancy centers in

their areas.  [ECF 104, at 10].  Option Line's website stated

that its affiliates listed in the database provide: "Abortion

and Morning After Pill information, including procedures and

risks," "Medical services, including STD tests, early

ultrasounds and pregnancy confirmation," and "Confidential

pregnancy options."  [ECF 104-27].  Both Care Net and Heartbeat

advertise their services and referral databases, which

potentially direct individuals to the Center in Baltimore.[13]


5. Effect of the Disclaimer on the Center

The Center in Baltimore occupies a small office space.

Director Carol Clews stated that much of the organization's

ministry, including praying, talking with clients, and peer

---

[12]   The Option Line database "connects those experiencing an
unplanned pregnancy with their local pregnancy center 24 hours a
day, 7 days a week." [ECF 104-10, at 2].
[13]   The Baltimore City Health Department has also referred
women to the Center through its "Reproductive Health &
Pregnancy" webpage that linked to the "B'more for Healthy
Babies" website, which lists locations that offer free pregnancy
tests and prenatal care.

After January 1, 2012, the Health Department webpage
contained a notice stating that "the Center for Pregnancy
Concerns and the Baltimore Pregnancy Center do not perform or
make referrals for abortions, morning after pills, or other
birth control," but the notice was not there prior to 2012. [ECF
101-2, Exs. J, P].  Since 2014, that webpage with the notice has
been removed, but the B'more for Healthy Babies website still
exists and lists the Center as a resource. See Affidavit of
Charlotte Hoffman, at ¶ 4. [ECF 101-2, Ex. O].

counseling takes place in the small waiting area itself.  Clews
Aff., at ¶ 40 [ECF 101-2, Ex.B].  A majority of the
conversations in the waiting room are related to clients'
"pregnancies and related personal, religious, and moral
concerns."  Id. at ¶ 41.  Clews stated that "[t]he mission-
oriented communication between Center and client that begins
when the client enters the facility, continues during the entire
time the client is at the Center."  Id. at ¶ 35.

To that end, the Center tries to make the waiting room as
welcoming and inviting as possible.  The waiting room contains
"copies of the Bible, children's books and toys, a poster on
pre-natal development, and a small statue of Jesus Christ."  Id.
at ¶ 30.  The Center also displays a document titled "Commitment
of Care" that lists values and promises to clients.  Clews.
Depo., at 5 [ECF 104-3] ("Each Center has a copy of this in full
view of clients, generally in the reception area.").  Number
seven on the list states, "We do not offer, recommend, or refer
for abortions or abortifacients (birth control), but we are
committed to offering accurate information about abortion
procedures and risks."  Clews. Aff., Ex. iii. [ECF 101-2, Ex.B].
There are no advertisements in the waiting room, and no goods or
services are offered for sale anywhere in the Center.  Id. at ¶¶
57-58.

According to the Center, "[t]he Disclaimer would alter the course of the Center's communications with its visitors" because it would "ensure that every conversation at the Center begins with the subject of abortion and a government warning."  Id. at ¶¶ 65, 70; see also Clews Depo., at 6 [ECF 104-3] ("Any client who came in to be counseled would not be able to avoid seeing that sign.").  The Disclaimer as mandated

> forces pregnancy centers to begin their conversations with a stark government disclaimer, divorced from the support offered by the Center, and suggesting that abortion is available elsewhere and might be considered a good option by pregnant women — a message that the Center expressly finds morally offensive and would not otherwise provide.

Clews Aff., at ¶ 80 [ECF 101-2, Ex. B].  This impact could affect all visitors, regardless of why they were coming or how they heard about the Center.  Indeed, the City wants "everyone who comes to the Center to be aware of the disclaimer in connection with the conversations they have at the Center." Dual-Harvey Depo., at 183 [ECF 101-2, Ex. E].

### B. Free Speech Claim

#### 1. Legal Standard

To determine whether the Ordinance violates the Free Speech Clause of the First Amendment the Court must decide what level of scrutiny applies, which necessitates determining what type of

speech is regulated by the Ordinance.  The parties disagree on what level of scrutiny the Court should apply to the Ordinance.

The City contends that either "rational basis" or "intermediate" scrutiny is appropriate because the speech that is regulated is commercial or professional speech.  The Center maintains that "strict scrutiny" applies because the Ordinance is not content or viewpoint-neutral and regulates noncommercial speech.

The City chose to regulate allegedly deceptive commercial speech — not by enjoining deceptive advertising directly — but by compelling speech in a different context, the waiting rooms of the Center where no advertising takes place.  Because this case involves speech in many different forms and contexts, both written and oral, inside and outside the Center, the analysis is complex.  Nevertheless, the Court finds that the underlying principles animating the First Amendment case law are instructive and lead this Court to conclude that the Ordinance is a content-based regulation that regulates noncommercial speech, or, at the least, that the Center's commercial and professional speech is intertwined with its noncommercial speech, and is thus subject to strict scrutiny.

The First Amendment, as applied to the states by the Fourteenth Amendment, prohibits regulations "abridging the freedom of speech."  U.S. Const. amend I.  This protection

necessarily includes "the right to refrain from speaking at all." Wooley v. Maynard, 430 U.S. 705, 714 (1977). Therefore, compelled speech, such as the Disclaimer at issue here, ordinarily is subject to strict scrutiny as a content-based regulation because "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech." Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc., 487 U.S. 781, 795 (1988).

This sentiment holds true even when the compelled speech is a true statement of fact, because "an individual's 'right to tailor [his] speech' or to not speak at all 'applies . . . equally to statements of fact the speaker would rather avoid.'" Stuart v. Camnitz, 774 F.3d 238, 246 (4th Cir. 2014) (quoting Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. Of Bos., 515 U.S. 557, 573 (1995)). "[T]he government, even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners; free and robust debate cannot thrive if directed by the government." Riley, 487 U.S. at 791. Therefore, "[w]hile it is true that the words the [City] puts into the [Center]'s mouth are factual, that does not divorce the speech from its moral or ideological implications." Stuart, 774 F.3d at 246.

However, there are two exceptions to strict scrutiny in compelled speech cases that the City argues are applicable here:

the commercial speech exception and the professional speech
exception.  Each will be addressed in turn.


a. Commercial Speech

The first exception applies to regulations of commercial
speech.  "Disclosure requirements aimed at misleading commercial
speech need only survive rational basis scrutiny, by being
'reasonably related to the State's interest in preventing
deception of consumers.'"  Greater Baltimore Ctr. for Pregnancy
Concerns, Inc., 721 F.3d at 283 (quoting Zauderer v. Office of
Disciplinary Counsel of the Supreme Court, 471 U.S. 626, 651
(1985)).

Traditionally, commercial speech, as defined by the Supreme
Court, is an "expression related solely to the economic
interests of the speaker and its audience," Central Hudson Gas &
Elec. Corp. v. Pub. Serv. Comm'n of New York, 447 U.S. 557, 561
(1980), or "speech that does no more than propose a commercial
transaction." United States v. United Foods, Inc., 533 U.S.
405, 409 (2001).  But, as the Fourth Circuit advised, speech can
be commercial even when it does not propose a commercial
transaction under the holding in Bolger v. Youngs Drug Prods.
Corp., 463 U.S. 60 (1983).

From Bolger, courts of appeals have gleaned "three
factors to consider in deciding whether speech is

commercial: (1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech."

Greater Baltimore Ctr. for Pregnancy Concerns, Inc., 721 F.3d at 285 (quoting U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 933 (3d Cir. 1990)).  The presence of all three Bolger factors makes it more likely that the speech is commercial, but it is not necessary for all three to be present for a court to properly characterize the speech as commercial.  See id.

On remand, the Fourth Circuit instructed this Court to conduct a factual inquiry into the issue of commercial speech, including whether the Center possesses economic interests, and to consider the context of the speech, including the viewpoint of the consumer.  Id. at 285-86.

The Center denies that any of its advertisements constitute commercial speech because it has no economic motivation for its provision of services and its advertisements do not reference specific products.  Furthermore, the Center receives no money for referrals.  But, as the City correctly points out, the Bolger test "does not hinge solely on whether the Center has an economic motive."  Id. at 285.  The City points to the Center's advertisements that promote its services, such as the provision of prenatal vitamins and sonograms, as evidence of the first two

23

Bolger factors.  To support its proposition, the City cites to
Fargo Women's Health Org., Inc. v. Larson, a case in which the
North Dakota Supreme Court held that a pregnancy center engaged
in commercial speech because its "advertisements are placed in a
commercial context and are directed at the providing or services
rather than toward an exchange of ideas."  381 N.W.2d 176, 181
(N.D. 1986).

    Additionally, the City, through its expert witness,
economist Anirban Basu, theorizes that the Center could be
engaging in commercial transactions even though it provides
services to clients for free because its donors pay the Center
money "in exchange" for services to third parties.  Declaration
of Anirban Basu, at ¶ 7 [ECF 104-36].  Mr. Basu stated that

> [t]ypically, donors make payments to these centers
> because 1) they want the centers to make certain
> services available to members of the public; 2) they
> think it important that the group being served have
> access to those services; and/or 3) they appreciate the
> manner in which services are delivered.

Id. at ¶ 9.  If this were true, then the Center's motives
for advertising its free services and attracting clients
could theoretically be commercial in additional to
religious.  However, the evidence presented to the Court
does not bear this out.  Instead, the only evidence relating
to donor motivations came from a donor to the Center who
stated that her reason for donating to the Center is because

she supports its pro-life, Christ-centered mission, not "so
that something can be purchased" or so that certain goods or
services can be provided. Deposition of Elizabeth Dickenson,
at 30 [ECF 101-2, Ex. C].

   Although, there are clear distinctions between the facts of
this case and that in Bolger,[14] there is an argument to be made
that the Center's advertisements could be considered commercial
speech, even if the Center has no economic interest, because it
is not necessary to meet all of the Bolger factors.
Nevertheless, even if the Court assumes for purposes of this
motion that the Center does engage in commercial speech,  the
question of what level of scrutiny applies is not answered.

---

[14]   For example, in Bolger, the plaintiff engaged in the sale
of contraceptives and undertook "a campaign of unsolicited mass
mailings" of flyers, including advertisements for
contraceptives, as well as  "informational pamphlets discussing
the desirability and availability of prophylactics in general or
Youngs' products in particular." Bolger, 463 U.S. at 62.   It
was Youngs' economic motive to sell its product, combined with
the advertisement and reference to the specific contraceptive
product, that led the Court to characterize the informational
flyer as commercial speech. Id. at 67.   It was the link of a
product, sold by Youngs, to a current public debate, that
downgraded the pamphlet from noncommercial speech to less-
protected commercial speech. Id. at 68.
   Unlike Youngs, the Center is not a manufacturer or seller
of any of the products or services it provides for free to
clients.   Instead, it is the current public ideological debate
about abortion and birth control that spurs the Center's
services and advertisements, not the other way around.

Rather, the essential inquiry is whether the Ordinance actually regulates that commercial speech or does it instead regulate the noncommercial, religiously-motivated speech taking place in the waiting room, or perhaps both.

In this case, the Court is not considering a single instance of the Center's speech standing alone, such as a set of advertisements or a single dialogue.  Rather the Court must consider that the City is compelling the Center to act in a way that directly impacts the Center's most essential communications about sensitive and morally-laden topics.  The City seeks to thrust the topics of abortion and birth control into the face of women at the beginning of their in person interaction with the center.  The City maintains that the Ordinance "does not regulate any aspects of Pregnancy Centers' noncommercial speech" because it does not "regulate the manner in which Pregnancy Centers discuss abortion or birth-control services with consumers" and "does not prevent Pregnancy Centers from telling consumers that they believe abortion and certain methods of birth-control are immoral or unhealthy."  [ECF 104, at 29].  The Center disagrees with the City's assessment:  "[t]he speech regulated by the waiting room disclaimer is the speech in the waiting room."  [ECF 107, at 24].  The Center argues that the relevant context of the Center's speech is the waiting room itself since the Disclaimer is not required to be included in

the advertisements, and indeed must be posted in the Center
regardless of what an advertisement says or, indeed, if there
are any advertisements at all.  Id. at 28.

The Ordinance regulates the Center's noncommercial speech
by mandating the timing and content of the introduction of the
subjects of abortion and birth control in its conversations with
clients.  On its face, the Ordinance does nothing to alter what
the Center says in its advertisements, nor does it matter if an
LSPC advertises at all; instead the Ordinance only affects both
the speaker (the Center) and the listener (the client) if and
when the client enters the waiting room.  The Center presented
evidence of the impact that the Disclaimer will have on its
speech and activities in the waiting room.  Executive Director
Clews stated that "[t]he Disclaimer would undermine the Center's
attempt to convey care, comfort, support, and a family-friendly,
appropriately spiritual setting through its first communications
with visitors" and would "alter the course of the Center's
communications with its visitors."  Clews Aff., at ¶¶ 67, 65
[ECF 101-2, Ex. B].  A client of the Center declared that if she
had seen the disclaimer in the Center's waiting room

> [The Disclaimer] would have been upsetting to me and
> would have impacted how I viewed the Center,
> especially if I had seen it when I first visited the
> Center, at a time when I was dealing with fear and
> worry over how I would care for my children.  . . .
>     I would be uncomfortable bringing my children to
> the Center with the Ordinance displayed because it

> would expose my older child, who can read, to the
> concept of abortion.

Affidavit of Carolyn Ambrose, at ¶¶ 10-11 [ECF 101-2, Ex. F].

The City claims that the Disclaimer does not alter the Center's speech because the Center displays a "Commitment of Care" document that notifies clients that the Center "do[es] not offer, recommend, or refer for abortions or abortifacients (birth control), but we are committed to offering accurate information about abortion procedures and risks."  This argument ignores the First Amendment mandate "that we presume that speakers, not the government, know best both <u>what</u> they want to say and <u>how</u> to say it."  <u>Riley</u>, 487 U.S. at 791 (emphasis added).  Neither does the fact that the Regulation allows the Center to explain that the Disclaimer is government mandated change the legal analysis.  As the Fourth Circuit noted in <u>Stuart</u> when considering a similar argument about another compelled disclosure, "That the doctor may supplement the compelled speech with his own perspective does not cure the coercion — the government's message still must be delivered."  <u>Stuart</u>, 774 F.3d at 246.  The same rule applies here. The Center maintains that its preferred disclosure, given in the context of the Commitment of Care, expresses what it wants to say about the topics of birth control and abortion in the style and way it wishes to say it — in line with its mission.

Judge Chasanow's reasoning on the topic of commercial speech in Tepeyac v. Montgomery County, a case that also involved a required disclosure[15] to be posted on the waiting rooms walls of LSPCs in Montgomery County, is persuasive and can be adopted to directly apply to the case at hand.  As Judge Chasanow said:

> Here, unlike the advertisements in [Fargo Women's Health Org., Inc. v.] Larson, the speech being regulated takes place within an LSPRC's waiting room, not amongst the general discourse between and among pregnancy-service providers and pregnant women, but within [the Center's] four walls, much closer to their ideological message. There is nothing in the record indicating that [the Center] is advertising its provision of services in its waiting room. . . . Nor does the record contain evidence that [the Center's] physical facility advertises its services to passers-by whereby a pregnant woman would want to know the qualifications of those providing these services. Plaintiff advertises its services [on the internet through third-party affiliates, and through a limited number of other mediums, such as the bus ad and Pennysaver ad], which could be considered commercial speech. From that, Defendants incorrectly attempt to extrapolate that it can regulate all of Plaintiff's speech as commercial speech, including that within its waiting room. But as the Fourth Circuit stated: "context matters." Greater Balt. Ctr., 721 F.3d at 286. Defendants' arguments and the record do not demonstrate that a website advertising services out to the world is equivalent to a center's waiting room where there is no indication that advertisements take place and it is

---

[15]    The ordinance at issue in Tepeyac required LSPCs to post a sign in their waiting rooms that reads: (1) "the Center does not have a licensed medical professional on its staff"; and (2) "the Montgomery County Health Officer encourages women who are or may be pregnant to consult with a licensed health care provider." Tepeyac, 5 F. Supp.3d at 748.

> undisputed that [the Center] does not charge for its
> services. Even under the broader, contextual analysis
> of commercial speech, the evidence in the record does
> not demonstrate that the Resolution regulates
> Plaintiff's commercial speech.

Tepeyac v. Montgomery Cty., 5 F. Supp.3d 745, 760 (D. Md. 2014),

reconsideration denied (Mar. 26, 2014) (footnote omitted).

The Baltimore Ordinance and Disclaimer are completely distinguishable from the facts in Larson where the court imposed a preliminary injunction against the pregnancy center, enjoining the use of false and deceptive advertising. Larson, 382 N.W.2d at 177. Here, because the Ordinance actually regulates and impacts the noncommercial speech taking place in the waiting room, the alleged commercial speech taking place outside the waiting room, which the Ordinance was passed to address, does not dictate the standard of scrutiny to apply. Thus, this Court will not use a lower form of scrutiny based on the commercial speech doctrine.

### b. Professional Speech

The City contends that the Ordinance could be viewed as a regulation of professional speech, which is not subject to strict scrutiny. As Justice Jackson explained in Thomas v. Collins, the government may incidentally regulate speech in its legitimate quest "to protect the public from those who seek for one purpose or another to obtain its money. . . . [and may

shield] the public against the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency." Thomas v. Collins, 323 U.S. 516, 545 (1945) (Jackson, J., concurring).  However, as Justice Jackson further clarified in his concurrence, "[v]ery many are the interests which the state may protect against the practice of an occupation, very few are those it may assume to protect against the practice of propagandizing by speech or press." Id.

In Stuart v. Camnitz, the Fourth Circuit applied a "sliding scale" model of scrutiny to a regulation of professional speech. 774 F.3d 238, 248 (4th Cir. 2014), cert. denied sub nom. Walker-McGill v. Stuart, 135 S. Ct. 2838 (2015)("When the First Amendment rights of a professional are at stake, the stringency of review thus slides 'along a continuum' from 'public dialogue' on one end to 'regulation of professional conduct' on the other.")(internal citations omitted).  In Stuart, which involved a law compelling physicians to provide certain disclosures and information to women about to get an abortion while the doctor was performing a sonogram, the Fourth Circuit determined that the law was both a compelled, content-based regulation of speech and a regulation of professional speech, and thus, intermediate scrutiny was appropriate. Id. at 245.  Here, likewise, the City agrees that, if the Center engages in professional speech that

is being regulated by the Ordinance, intermediate scrutiny should apply. [ECF 104, at 37].

"[W]hether, when, and to what extent the government can compel speech by a professional cannot be established with hard and fast rules." Stuart v. Loomis, 992 F. Supp. 2d 585, 597 (M.D.N.C.), aff'd sub nom. Stuart v. Camnitz, 774 F.3d 238 (4th Cir. 2014), cert. denied sub nom. Walker-McGill v. Stuart, 135 S. Ct. 2838 (2015).  In Lowe v. SEC, Justice White describes the difference[16] between a regulation of a profession and regulation of speech:

> Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as  legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such.

Lowe v. SEC, 472 U.S. 181, 232 (1985) (White, J., concurring). To this end, the Fourth Circuit directs courts to consider "whether the speaker is providing personalized advice in a private setting to a paying client or instead engages in public

---

[16]   Justice Jackson also drew a "rough distinction" between permissible professional regulation and impermissible First Amendment infringement: "the state may prohibit the pursuit of medicine as an occupation without its license, but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought." Thomas v. Collins, 323 U.S. at 544 (Jackson, J., concurring) (emphasis added).

discussion and commentary." Moore-King v. Cty. of Chesterfield, Va., 708 F.3d 560, 569 (4th Cir. 2013).  Facts to consider include "the regulatory context, the nature of the professional relationship, the degree of intrusion into it, the reasons for the intrusion and evidentiary support for the intrusion, and the connection between the compelled speech and the government's interests." Stuart v. Loomis, 992 F. Supp. 2d at 600-01 (citing Riley, 487 U.S. at 796).

To support its argument that the Ordinance is a regulation of professional speech, the City contends that the "Pregnancy Centers, including the Plaintiff, hold themselves out as medical facilities that provide professional, medical services." [ECF 104, at 37].  The following evidence is relevant to the City's professional speech contention:

- The Center provides limited ultrasound services to clients.  If the sonographer sees a problem with a sonogram "she immediately advises the client that there is a problem and advises her to get to a medical doctor." Clews Depo., at 29 [ECF 104-3].

- A medical director "oversees the medical aspects of the Center." Id.  The medical director is on-site rarely and does not meet directly with clients.  The director reviews ultrasound images and is available to answer questions from the sonographer.  The director has taken one or two Center clients on as personal clients.  Id.

- A representative of NIFLA, an affiliate of the Center, stated in his deposition that "They [the Center] are health care providers.  They have a licensed physician providing health care services, limited ultrasound. . . . They are a medical

33

practice." Deposition of Thomas Glessner, at 4 [ECF 104-26].

- Volunteers meet with clients on an individual and group basis to perform the following services, sometimes in the waiting room: confidential peer-counseling, Earn While You Learn classes, Bible studies, and pre-natal education. Clews Aff., at ¶ 36 [ECF 101-2, Ex. B].

In response the Center argues that the professional speech doctrine should not apply because the Center is not engaged in a "profession," it is not regulated or licensed by the City or state, it does not charge for its services, and it does not attempt to exercise judgment on behalf of its clients. It has a moral and religious pro-life mission instead of a medical or professional one.

The Court concludes that to apply the professional speech exception here would be an impermissible doctrinal stretch when viewed in the context and regulatory environment of the speech taking place. When courts have held that the professional speech exception applies, the facts almost always involve the context of a professional's relationship with a <u>paying</u> client. Often these professionals are lawyers, accountants, doctors, or other health professionals. <u>See, e.g.</u>, <u>Stuart v. Camnitz</u>, 774 F.3d 238, 242 (4th Cir. 2014) (physicians); <u>Accountant's Soc. of Virginia v. Bowman</u>, 860 F.2d 602, 603 (4th Cir. 1988) (accountants). In cases that do not involve these professions, the regulated party was required to be licensed or was subject

to a state regulatory scheme.  See, e.g., Moore-King, 708 F.3d
at 569 (involving a fortune teller who gave personalized
services to a paying client and who was subject to a "generally
applicable licensing and regulatory regime for fortune
tellers").

An Eastern District of California case, currently on
appeal, involves a First Amendment challenge to a California
statute requiring pregnancy centers to post a sign informing
patients that public programs are available to provide access to
prenatal care, contraception, and birth control.[17]  See A Woman's
Friend Pregnancy Res. Clinic v. Harris, 153 F. Supp. 3d 1168
(E.D. Cal. 2015), appeal docketed, 15-17517 (9th Cir. Dec. 23,
2015).  In that case, the district court held that the statute
regulated professional speech and should be reviewed under
intermediate scrutiny at the most.  Id. at 1195.  However, the
district court's conclusion rested on facts that are materially
different than those presented here.  The district court

---

[17]    The sign must say:
        "California has public programs that provide immediate free
        or low-cost access to comprehensive family planning
        services (including all FDA-approved methods of
        contraception), prenatal care, and abortion for eligible
        women. To determine whether you qualify, contact the county
        social services office at [insert the telephone number]."
153 F. Supp. 3d at 1180.

distinguished its case from other pregnancy center cases,

saying:

> Unlike the pregnancy centers in <u>Evergreen</u> and
> <u>Tepeyac</u>, plaintiffs' declarations here establish that
> each clinic holds a medical license in the State of
> California, has Licensed Medical personnel on staff,
> and provides medical services.  These facts weigh in
> favor of treating the relationship between plaintiffs
> and their clients or patients as a professional
> relationship.

<u>Id.</u> at 1201 (internal citations omitted).  In addition, the

plaintiff pregnancy center in that case performed holistic

personal assessments of each client, offered medical consults

based on individual ultrasounds, created medical charts,

employed registered nurses to assess and take medical histories

of each client, and offered "a variety of health services

'depending upon the needs and requests of the client.'"  <u>Id.</u> at

1202.

The Center in the instant case resembles the center in

<u>Tepeyac</u> more than that in <u>A Woman's Friend Pregnancy Resource</u>

<u>Clinic</u>.  The Center is not a licensed facility, it is not

regulated by state health regulations, the staff are not

registered nurses performing medical histories and assessments,

and the volunteer medical director does not regularly take

referrals, does not meet with clients, and only serves as an

occasional resource for the sonographer.  The bulk of the

Center's services are religious, educational, and consist of

giving free services to clients in order to further its pro-life
mission.  And while the Center volunteers meet personally and
confidentially with clients as part of their mission, the record
does not reveal, nor does the City make the argument, that the
Center staff exercises medical or other judgment or makes
decisions on behalf of its  clients.

To summarize, again using  the words of Judge Chasanow in
Tepeyac:

> [T]he County reaches too far. The mere fact that Centro
> Tepeyac provides its program participants with the
> promise of confidentiality does not transform its
> message into professional speech. The County has
> offered no evidence that Centro Tepeyac does anything
> other than provide pregnancy-related information to
> these women. Indeed, the record is devoid of any
> indication that Centro Tepeyac "purports to exercise
> judgment on behalf of" its program participants, a
> critical component of professional speech. At bottom,
> the County seeks to blur — and perhaps eliminate — the
> distinction between discussion of professional subject
> matter and the practice of a profession. Such an
> outcome would represent a breathtaking expansion of the
> narrow professional speech doctrine and would ensnare
> countless charitable organizations based solely on
> their provision of information to program participants
> in a private setting. Accordingly, in evaluating
> whether the Resolution violates Centro Tepeyac's First
> Amendment rights, strict scrutiny will be applied.

Tepeyac, 5 F. Supp. 3d at 761–62 (internal citations omitted).

As in Tepeyac, because neither the commercial speech or the
professional speech exception applies, the Court will apply
strict scrutiny to the Ordinance.

c. Intertwined Speech

Even if some of the Center's speech could be considered commercial or professional, that type of speech is intertwined with the Center's undoubtedly protected political, ideological, and religious speech, and thus strict scrutiny nevertheless shall apply.  See Riley, 487 U.S. at 796 ("[W]e do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech.").  When "component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase."  Id. (overturning a law requiring professional fundraisers to disclose to potential donors the percentage of charitable contributions collected that were actually turned over to charity).

The Supreme Court clarified the meaning of "inextricably intertwined" in Board of Trustees of State University of New York v. Fox, saying that parts of speech are not "inextricable" when "[n]othing in the resolution prevents the speaker from conveying, or the audience from hearing, these noncommercial messages, and nothing in the nature of things requires them to be combined with commercial messages."  492 U.S. 469, 474 (1989)(concluding that noncommercial discussions of home economics were not "inextricably intertwined" with commercial

sales speech at Tupperware parties).  The Fox Court elaborated saying, "[i]ncluding these home economics elements no more converted AFS' presentations into educational speech, than opening sales presentations with a prayer or a Pledge of Allegiance would convert them into religious or political speech."  Id. at 474–75.

Analyzing the Center's regulated speech as a whole, it is clear that the moral and political conversations that take place in the waiting room are inextricably intertwined with its provisions of services, which may include professional or commercial speech.  The record reveals that the dialogue between the Center and its clients starts as soon as the client steps into the waiting room and that services are rendered in conjunction with counseling and pro-life conversations.  See Clews. Aff., at ¶ 35 [ECF 101-2, Ex.B]  The Center's staff is trained not to provide a woman with services, such as pregnancy tests, without first speaking on a personal level with her.  See Clews Depo. at 25 [ECF 104-3].  Furthermore, some of the Center's speech, such as Bible studies, have no medical or commercial element at all, yet the Disclaimer impacts those conversations equally.  As Director Clews stated, "[t]he Disclaimer would alter the course of the Center's communications with its visitors" because it would "ensure that every conversation at the Center begins with the subject of abortion

and a government warning." Clews Aff., at ¶¶ 65, 70 [ECF 101-2, Ex. B].  The Disclaimer would "hover over the sensitive personal, moral, and religious communications that are held in the Center's waiting room."  Id. at ¶¶ 67-68.

The religious and political conversations about abortion and contraception that are at the heart of the Center's mission are not equivalent to "opening sales presentations with a prayer," as in Fox.  Instead, the Disclaimer would introduce the topic of abortion and birth control, making it impossible for the Center to frame the conversation on those issues as it wishes.  Therefore, strict scrutiny should apply, even if some of the Center's speech were considered commercial or professional.


## 2. Strict Scrutiny Analysis

The Court shall herein conduct an analysis of the Ordinance using strict scrutiny.  The Center brings facial and as-applied challenges to the Ordinance under the First Amendment.  Although strict scrutiny will apply to both, the burden of proof differs according to which type of challenge is being made.  In a facial challenge, the plaintiff must bring a prima facie case of invalidity, whereas in as-applied challenge under strict scrutiny, the government bears the burden of proof.  See Educ.

Media Co. at Virginia Tech v. Swecker, 602 F.3d 583, 588 (4th

Cir. 2010).

> [A] court considering a facial challenge is to assess
> the constitutionality of the challenged law "without
> regard to its impact on the plaintiff asserting the
> facial challenge." Swecker, 602 F.3d at 588.   In
> contrast, an as-applied challenge is "based on a
> developed factual record and the application of a
> statute to a specific person[.]" Richmond Med. Ctr.
> for Women v. Herring, 570 F.3d 165, 172 (4th Cir.
> 2009) (en banc).

Educ. Media Co. at Virginia Tech v. Insley, 731 F.3d 291, 298,

n.5 (4th Cir. 2013).   Thus, this Court must analyze the Center's

facial challenge and as-applied challenge separately.


a. As Applied Strict Scrutiny Analysis

In analyzing the Ordinance as it applies to the Center, the

Court considers whether the City has met its burden to

demonstrate that the Ordinance survives strict scrutiny. See

United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 817

(2000) (Government bears the burden of proving constitutionality

of regulations of protected speech).   To overcome the

presumptive invalidity of the Ordinance, the City must show that

the Ordinance is "narrowly tailored to promote a compelling

Government interest," id. at 813, and it must use the least

restrictive means available. See Ashcroft v. Am. Civil Liberties

Union, 542 U.S. 656, 666 (2004); Am. Life League, Inc. v. Reno,

47 F.3d 642, 648 (4th Cir. 1995).

The City identifies two interests to support the Ordinance:
(1) to protect the public from deceptive business practices, and
(2) to promote public health by "ensuring that individuals who
seek reproductive health services have access to truthful
information about the services available at Pregnancy Centers."
[ECF 104, at 41].

These interests must actually be promoted by the Ordinance.
See Tepeyac, 5 F.Supp.3d at 764 ("[T]he restriction on speech
must actually further that [compelling] interest."),
Furthermore,  the City must satisfy what the Supreme Court calls
a "demanding standard" in that it must "specifically identify an
'actual problem' in need of solving, and the curtailment of free
speech must be actually necessary to the solution."  Brown v.
Entm't Merchants Ass'n, 564 U.S. 786, 799 (2011) (quoting United
States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 818, 822–23
(2000).  The Supreme Court admitted that it is "rare" for a
content-based regulation to ever be permissible.  Id.

For purposes of this motion, the Court assumes, without
deciding, that promoting public health by protecting the public
from deception are compelling interests in the context of this
case.  Cf. Am. Life League, Inc. v. Reno, 47 F.3d 642, 656 (4th
Cir. 1995) (finding that "protect[ing] public health by
promoting unobstructed access to reproductive health facilities"
is a compelling interest).

42

The City's expert in medicine and public health, Dr. Robert Blum, discusses how the City's dual interests are related:

> Women seeking family planning services or pregnancy-related care are at a disadvantage relative to service providers . . . [because] providers possess more information than consumers. . . . As a result, full disclosure of what services a provider is offering, as well as what biases underlie the provision of those services, is needed to ensure that consumers are not deceived or taken advantage of; consumers are able to make fully informed, autonomous decisions about family planning or pregnancy-related care; and consumers have timely access to the services they seek.
>
> Furthermore, family planning services and pregnancy-related care are frequently time-sensitive. Women who are delayed in accessing comprehensive information about contraception or the contraceptive method of their choice may be vulnerable to unintended pregnancy and sexually transmitted infection. . . . [Additionally], both the risks and costs of abortion increase with the gestational age of the pregnancy. Accordingly, women who are delayed in accessing abortion services are subject to increased health risks and other obstacles to obtaining care.

See Declaration of Robert W. Blum at ¶¶ 7-8 [ECF 104-30].

The City contends that the Ordinance furthers its interest in preventing public deception "[b]y eliminating the benefit that Pregnancy Centers gain through deceptive advertising — by delaying women's access to abortion and certain forms of birth-control in an effort to deter women from utilizing those services — the Ordinance also discourages use of deceptive advertising in the first place." [ECF 104, at 41].

Certainly, the health care delays described by Dr. Blum present a potential problem — even a serious one.  However, there is insufficient evidence to demonstrate that deception actually takes place and that health harms are in fact being caused by delays resulting from deceptive advertising. Instead the City relies on evidence of "misinformation" being disseminated within LSPCs, which is a different problem and interest than the Ordinance purportedly serves.

Both the Maryland Report and the Waxman Report, which were considered by the City Council and are described supra, focus on alleged deceptive speech that occurs inside an LSPC or when an individual is on the phone with an LSPC volunteer.  The reports do not focus on interactions or effects of deceptive advertising, and barely mention advertising at all, except to conclusory state that LSPCs use advertising and that this advertising can be misleading. According to the Waxman Report, LSPCs "often mask their pro-life mission in order to attract 'abortion vulnerable clients.'  This can take the form of advertising under 'abortion services' in the yellow pages or obscuring the fact that the center does not provide referrals to abortions in the text of an advertisement." [ECF 18-2, at 1] (footnotes removed).  The Maryland Report's only mention of advertising states that LSPCs can use advertising to attract

44

clients and suggests that university newspapers

"investigate" if "an advertisement offers 'pregnancy options

counseling' and does not clearly state a position on

abortion and birth control . . . . If the advertisers refuse

to provide a referral for abortion services, they are likely

a CPC using misleading advertising." [ECF 18-3, at 9].

These references to the use of advertising and that it is

misleading do not show if, and how, women react to these

messages and if they are harmed as a result of them.  This is an

important missing link because the City claims the Ordinance

targets deceptive advertising.  Additionally, none of the

Maryland Report investigators who called or visited the LSPCs

and received alleged misinformation were harmed, in that none of

them were prevented or delayed in getting desired reproductive

health care.

Indeed, Jacquelyn Dual-Harvey, the Interim Commissioner of

Health for Baltimore City, stated that the City does not know of

any instance when a person who has visited an LSPC in Baltimore

City was harmed or delayed medical care because of an act or

omission or information provided by the LSPC. [ECF 101-2, Ex. E

at 109-10].  Despite Ms. Dual-Harvey's testimony, the City

argues that LSCPs do harm women, and points only to Dr. Blum's

testimony that "he has seen adolescent patients who delayed

visiting medical clinics by two or three weeks after receiving

misinformation about the mental and physical harms of abortion."
[ECF 104, at 42].   But Dr. Blum provides no evidence to show
that these adolescents who were "misinformed" were deceived by
advertising into going to an LSPC in the first place.   The
Ordinance itself is not meant to remedy alleged misinformation
being provided by the Centers — it is meant to cure or prevent
any ill effects resulting from deceptive advertising.

Other evidence before the City at the time of the
Ordinance's passing included testimony by Jodi Kelber-Kaye, PhD,
who reported:

> As an educator of college-aged women, I have heard
> countless stories from students who go [to] these
> centers, assuming they will get a full range of
> services and counseling and wind up feeling harassed,
> coerced, and misinformed. . . .
>
> These clinics, usually established near high
> schools and colleges, will usually refuse to give out
> Information by phone and insist potential clients come
> into the Office. Women who go to these clinics, under
> the assumption that they will be getting advice on all
> their options, report being harassed, intimidated and
> given false information by center staff.

[ECF 18-5].   This testimony recounts stories from others and
does not come from personal knowledge, making it inadmissible
hearsay.[18]   Moreover, it does not provide any evidence of the

---

[18]   "An affidavit or declaration used to support or oppose a
motion must be made on personal knowledge, set out facts that
would be admissible in evidence, and show that the affiant or

problem of false advertising.  The only thing Ms. Kelber-Kaye
stated about advertising is that "there should be truth in
advertising and, like all other consumer products, limited-
service pregnancy centers need to kept honest about what
services they actually provide."  This is a conclusion or
aspiration — not factual evidence of a problem that is
necessarily solved by compelled speech.

Additionally, the City Council also relied on the
testimony of one woman who recounted feeling "tricked" when
she was in high school by an LSPC in central Maryland that
was listed in the phone book under "Abortion Counseling."
Testimony of Tori McReynolds, Bill Hearing, 10/27/09 [ECF
18-4].  She stated that "[h]ad my mother and I seen a sign
at that reception desk informing us that we could not get
referrals for abortion or birth control, we would have
simply moved on."  Id.  This encounter, which took place
decades ago and somewhere outside Baltimore City, is not
pertinent to show that there is an actual problem with
deceptive advertising leading to harmful delays in
healthcare in Baltimore City that would justify restricting
protected speech.

---

declarant is competent to testify on the matters stated." Fed.
R. Civ. P. 56(c) (emphasis added).

The City presents evidence that was not considered by the
City Council and which occurred after the Ordinance was passed
in 2009.  The record shows that the Center participated in the
Pennysaver and bus advertisement campaigns.  [ECF 104-24, at
21].  There is evidence showing that after the bus campaign some
women called the Center asking for or believing the Center
referred for abortions. [ECF 104-28].  These women were
immediately informed that the Center does not provide abortion
services.  Clews Depo., at 19 [ECF 104-3].  There is no evidence
that any women actually came to the Center seeking abortions or
contraception because they were misled by advertising.  In fact,
according to Center Director Clews, most women call before
coming to the Center (giving the staff an opportunity to correct
any confusion regarding scope of services before a woman's time
is wasted), and that when women do walk-in, which is "not a
lot," and are seeking an abortion, they are immediately told
that the Center does not provide or refer for abortions.  Id. at
18.

The sparse evidence, such as it is, offered by the City is
inadequate to justify the heavy burden imposed on Plaintiff's
speech.  The Court notes that when considering First Amendment
challenges to very similar disclosures, two other courts, in
Tepeyac and Evergreen, have held that the compelled disclosures
failed strict scrutiny.  This court in Tepeyac found a similar

48

lack of evidence when considering an almost identical

legislative record.  Judge Chasanow stated:

> the critical flaw for the County is the lack of any
> evidence that the practices of LSPRCs are causing
> pregnant women to be misinformed which is negatively
> affecting their health. It does not necessarily follow
> that misinformation will lead to negative health
> outcomes. The County attempts to elide this distinction
> by providing no evidence for the effect, only the
> alleged cause. The Waxman and NARAL [Maryland] reports
> focus on the misinformation problem. So too do all of
> the comments made to the County Council in support of
> the Resolution. These commenters — who were universally
> volunteers from a pro-choice organization sent to
> investigate LSPRCs' practices — discussed the alleged
> misinformation they were provided and that that [sic]
> the LSPRCs were not forthcoming with the fact that they
> are not a medical center and that they do not provide
> referrals for abortions. But even assuming all that is
> true — that LSPRC are presenting themselves as medical
> providers and thus pregnant women are accepting their
> misinformation as sound medical advice, the County must
> still demonstrate the next supposition on the logical
> chain: that these practices are having the effect of
> harming the health of pregnant women.

5 F. Supp.3d at 768.  Likewise, here, even if there had been

bountiful evidence of misleading advertising, there is no

evidence that women were coming to the Center under false

pretenses and suffering harmful health consequences because of

it.  Thus, the City has not satisfied the "demanding standard"

of showing that the Ordinance actually promotes a compelling

interest in solving a specific problem.

Moreover, the Ordinance is not narrowly tailored.

> A statute is narrowly tailored only "if it targets and
> eliminates no more than the exact source of the 'evil'
> it seeks to remedy." Frisby v. Schultz, 487 U.S. 474,

485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). "Broad
prophylactic rules in the area of free expression are
suspect. Precision of regulation must be the touchstone
in an area so closely touching our most precious
freedoms." <u>NAACP v. Button</u>, 371 U.S. 415, 438, 83 S.Ct.
328, 9 L.Ed.2d 405 (1963).

<u>Greater Baltimore Ctr. for Pregnancy Concerns, Inc.</u>, 721 F.3d at

304-05 (Niemeyer, J., dissenting).

Again, the missing element is the existence of deceptive

advertising — the very problem that the City contends it is

targeting with the Ordinance.  Because the Ordinance applies to

LSPCs regardless of whether they advertise nonfraudulently or do

not advertise at all, it is overinclusive and fails to advance

the purported compelling interest.  The Ordinance does not

mention false advertising, does not target only false

advertising, and has no stated link to advertising.  An

organization falling under the definition of an LSPC that does

no advertising would nonetheless be swept up in the City's

regulatory fervor, leaving just another free speech casualty.

Thus, the Ordinance is a "blunt" instrument that fails to

"curtail speech only to the degree necessary to meet the

particular problem at hand, and [fails to] avoid infringing on

speech that does not pose the danger that has prompted

regulation."  <u>Fed. Election Comm'n v. Massachusetts Citizens for

Life, Inc.</u>, 479 U.S. 238, 265 (1986).

Even in <u>Evergreen</u>, where the Second Circuit Court of Appeals upheld a compelled status disclosure, the court determined unconstitutional another part of the law that mandated LSPCs disclose that they do not provide or refer for abortions — even if it were viewed as narrowly tailored.

> Here, the context is a public debate over the morality and efficacy of contraception and abortion, for which many of the facilities regulated by Local Law 17 provide alternatives. "[E]xpression on public issues has always rested on the highest rung on the hierarchy of First Amendment values." . . . A requirement that pregnancy services centers address abortion, emergency contraception, or prenatal care at the beginning of their contact with potential clients alters the centers' political speech by mandating the manner in which the discussion of these issues begins.

<u>Evergreen Ass'n, Inc. v. City of New York</u>, 740 F.3d 233, 249 (2d Cir. 2014), <u>cert. denied sub nom.</u> <u>Evergreen Ass'n, Inc. v. City of New York, N.Y.</u>, 135 S. Ct. 435 (2014), and <u>cert. denied sub nom.</u> <u>Pregnancy Care Ctr. of New York v. City of New York, N.Y.</u>, 135 S. Ct. 435 (2014) (quoting <u>NAACP v. Claiborne Hardware Co.</u>, 458 U.S. 886, 913 (1982) (internal quotation marks omitted)).

For these reasons, the Court determines that the Ordinance is unconstitutional as applied to the Center.

b. <u>Facial Challenge Analysis</u>

In a facial challenge, the plaintiff bears the burden of making a prima facie case of invalidity.

> In the First Amendment context, there are two ways for a plaintiff to mount a facial challenge to a statute. First, the plaintiff may demonstrate "that no set of circumstances exists under which [the law] would be valid, or that the [law] lacks any plainly legitimate sweep." Second, the plaintiff may show that the law is "overbroad [because] a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

Greater Baltimore Ctr. for Pregnancy Concerns, Inc., 721 F.3d at

282 (quoting United States v. Stevens, 559 U.S. 460 (2010)

(citations and internal quotation marks omitted)).  The Fourth

Circuit also instructed this Court to consider evidence

"concerning the distinctive characteristics of Baltimore's

various limited-service pregnancy centers."  Id.

In this case, the Plaintiff has not presented evidence

adequate to establish that there are "no set of circumstances"

wherein the Ordinance would be valid against any LSPC in

Baltimore; nor is there adequate evidence to determine if a

"substantial number" of the Ordinance's applications are

unconstitutional in relation to its "legitimate sweep."

In addition to the Center, Baltimore Pregnancy Center

("BPC") is an LSPC affected by the Ordinance.  The record

includes BPC's list of objections to the City's subpoena for

documents, a document with BPC's address, phone number, and

hours of operation, a document listing the free services BPC

provides stating "all services are free and confidential," and a

document requesting donations that summarizes BPC's mission as a

"pro-life pregnancy resource center." [ECF 101-2, Ex. L].
However, there is no evidence showing the potential impact of
the Ordinance on BPC's speech, whether and how BPC advertises,
whether it provides any professional services, its religious
motivations, if any, or the nature of the speech that may take
place in its waiting room. See id.

   The Court does not foreclose the possibility that BPC would
be able successfully to assert an as-applied challenge to the
Ordinance.  However, the Court concludes that, on the record of
the instant case, the Center has not presented evidence adequate
to establish that the Ordinance is facially unconstitutional.


        C. Counts II, III, and IV

   As discussed herein, the Center is entitled to summary
judgment on Count I, the First Amendment freedom of speech
claim.  Thus, the Center's remaining claims are rendered moot.

IV.   CONCLUSION

For the foregoing reasons:

  1. Plaintiff Greater Baltimore Center for Pregnancy
     Concerns, Inc.'s Motion for Summary Judgment [ECF 101]
     is GRANTED.

  2. Defendants Mayor and City Council of Baltimore, et
     al.'s Cross Motion for Summary Judgment [ECF 104] is
     DENIED.

  3. By October 23, 2016 the parties shall provide an
     agreed, as to form,[19] Judgment Order or separate
     proposed Judgment Orders consistent with this
     decision.

SO ORDERED, this Tuesday, October 4, 2016.

                              _____/s/___   __ _____
                                   Marvin J. Garbis
                              United States District Judge

---

[19]    Agreement with the Judgment Order constitutes agreement
only with the fact that the said Order accurately states the
effect of the instant decision.  It does not constitute
agreement with the instant decision or any action by the Court.
All appellate rights are retained.